IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
1:12-CV-1179

_____

| | |
|---|---|
| STEVEN HEWETT,<br><br>          Plaintiff,<br><br>v.<br><br>CITY OF KING<br><br><br>          Defendant,<br><br>and<br><br><br>THE AMERICAN LEGION AND AMERICAN LEGION POST 290 OF KING, NORTH CAROLINA,<br><br><br>     Defendant-Intervenors. | DEFENDANT CITY OF KING'S BRIEF IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT<br><br>(FED. R. CIV. P. 56) |

Defendant City of King ("City" or "King") respectfully submits this Brief in support of its Motion for Summary Judgment filed concurrently herewith. An Appendix containing supporting documents is also filed concurrently herewith. The following Table of Contents is furnished as an aid to the Court.

## TABLE OF CONTENTS

I. Nature of this Case…………………………………………………………...……………… 2

II. Statement of the Facts…………………………………………………………..………… 3

III. Questions Presented…………………………………………………………..……….6

IV. Argument…………………………………………………………………...……….7

1

    A. Plaintiff Lacks Standing…………………………………………………………....…7

        i.  Plaintiff Has Not Suffered an Injury-in-Fact Due to the Flag Policy…………....7

        ii.  "Offended Observer" Status Is an Insufficient Injury-in-Fact Because
           Plaintiff Lacks Frequent Contact with the Veterans Memorial…………..…….9

    B. Plaintiff's Claims for Equitable Relief Against King's Veterans
       Gatherings Are Moot Because King Discontinued Those Events…………..……11

    C. King Has Complied with the Establishment Clause by Creating a Limited
       Public Forum for Private Parties to Express Their Commemorative
       Messages on a Flag in the Veterans Memorial…………………………...…………12

    D. Even the Portions of the Memorial that Are City Speech Comply
       With the Establishment Clause Because King Intended the Memorial
       to Honor Veterans, the Memorial Conveys that Message, and the
       Memorial Does Not Entangle King with Religion………………….…………20

        i.  The Memorial Has A Secular Purpose…………………………………………..20

        ii.  King's Memorial Has the Effect of Honoring Veterans, Not of
           Endorsing Religion……………………………………………………………23

           a.  The Memorial's physical context honors veterans without
              endorsing religion…………………………………………..………..27

           b.  The Memorial's historical context honors veterans without
               endorsing religion…………………………………………………30

        iii. The Memorial Does Not Foster Excessive Entanglement With Religion…….32

        iv. This Court Should Refrain From Ruling on King's Invocations Until
           Case Law Is Settled………………………………………………...………33

V. Conclusion…………………………………………………………………...………34

## I.  NATURE OF THIS MATTER

      Tucked away from the busy streets and hustle of town, the City of King ("King")
maintains a Veterans Memorial designed to be a solemn place to remember those who
have given sacrificially in service of our country. The Memorial includes a limited public

2

forum flagpole where residents may choose to fly a flag in recognition of veterans and a statue of a soldier kneeling at a soldier's grave marked by a cross.

Plaintiff lacks standing to challenge the constitutionality of the limited public forum because he has not sustained an injury-in-fact by the policy. Even if he had standing, however, King is well within its constitutional rights to create a limited public forum for private speech, and a person may not censor the speech of private persons based on the Establishment Clause. Plaintiff also objects that the kneeling soldier statue is unconstitutional because of its ten-inch high cross grave marker. But the statue has a secular purpose, does not advance or inhibit religion, and does not entangle King with religion. Finally, Plaintiff objects to King's former practice of allowing private individuals to pray at veterans' holidays. Since King discontinued its affiliation with those events, Plaintiff's claims are moot.[1] Because Plaintiff's claims are not justiciable and because the Veterans Memorial complies with the First Amendment, the Court should grant summary judgment in King's favor.

## II. STATEMENT OF FACTS

King's Central Park is approximately seventeen acres. It contains paved walking trails, a stocked fish pond, picnic gazebos, restored eighteenth century cabins, and an amphitheatre. King added a Veterans Memorial to Central Park in 2004.[2] The Memorial is dedicated to all veterans from the five branches of the armed services since World War I (Compl. Ex. B at 1), and was funded in part with donations. The Memorial includes a

---

[1] Even if the claims were not moot, a case currently pending before the Supreme Court will affect those claims. *See Galloway v. Town of Greece*, 681 F.3d 20 (2d Cir. 2012), *cert. granted,* 133 S. Ct. 2388 (2013) (No. 12-696) (argued Nov. 6, 2013).

[2] At the request of local residents, in 2003, King formed a Veterans Committee to honor area veterans who served this country and the King community. App. 1, Veteran's Day Committee Report. King residents learned of a Veterans Memorial in nearby Tobaccoville, North Carolina and solicited King Mayor Jack Warren to build a veterans memorial, (App. 2, Warren Dep. 138-139), which King Council supported, (App. 3, *Id.* at 139-140). The committee designed, planned, and developed the Veterans Memorial.

pool, fountain, bricks (pavers) dedicated to individual veterans, and a wall inscribed with the names of local veterans who were killed in action. On top of the fountain walls are ten flags commemorating the five branches of the military, the North Carolina State flag, the POW Flag, the City of King flag, the American Legion flag, and in the center and elevated among them the United States flag. There is also an eleventh flag pole where residents may fly a flag of their choosing honoring the faith tradition of a loved-one who served in the military. Initially included among these flags was what some refer to as the "Christian" flag. (Compl. ¶16). No one objected to the flags chosen by the committee at the time they were selected or for five years after the Memorial opened.

In March 2010, the King Appearance Commission recommended that King add a kneeling soldier statue to the Memorial. (Compl. ¶45). Local resident Butch Callaway donated his time in erecting the statue. King paid approximately $400.00 for the materials. The two dimensional statue is approximately four by eight feet, located in a grassy area to the left of the memorial, and not visible as one approaches the Memorial's front. The statue depicts a soldier kneeling at a gravesite marked with a Latin cross, which measures ten inches high.

Months after King added the statue, it received a complaint about the presence of the "Christian" flag at the Memorial. In five years, no other complaint had been raised, but, nevertheless, the City Council voted to remove the flag. Many residents were displeased with the flag removal. Some protested in the park. (Compl. ¶27). Others "displayed the Christian flag throughout the City" on private property and vehicles. (*Id.* ¶25). At one point, 5,000 people attended a rally opposing the removal of the flag. (*Id.* ¶30). Even Plaintiff, despite his complaints about the flag, flew a "Christian" flag in his yard at that time. (App. 4, Plf. Dep. 100-101).

King responded by allowing citizens to display a flag of their own choosing (or no

4

flag) on the Memorial's eleventh flagpole. King did so by adopting a Limited Public Forum Policy on November 1, 2010, which permitted citizens, on a rotating basis, to recognize and honor the belief traditions of men and women who served in the U.S. military.[3] (Compl., ¶ 32, Ex. B at 2). Under the policy, City residents may apply to fly a flag or no flag in memory of an honorably discharged or killed/missing-in-action veteran. (*Id*. at 3 ¶7). If the applicant chooses to fly a flag, it must display an emblem of belief recognized by the U.S. Department of Veterans Affairs ("DVA") for placement on government headstones or markers. (*Id*. at 4 ¶10). Each approved applicant must provide his or her own flag at his or her own expense. (*Id*.).

Due to demand, King uses a random and neutral lottery to select the fifty-two conforming requests to be fulfilled during the year. (*Id*. at 4 ¶8). Each flag flies for a period of one week beginning on Monday at approximately 9:00 a.m. and remains until removed at approximately 8:59 a.m. the following Monday. (*Id*. at 4 ¶9). Whenever a flag (or no flag) is displayed, a sign is placed on the flagpole identifying the name, rank, area served, service dates, and status applicable of the honored veteran. (*Id*. at 2 ¶4 & 4 ¶10). The marker also states that the flag is temporarily displayed to honor the role that faith traditions play for service members. (Compl. Ex. B at 2 ¶4). In addition, the following disclaimer is provided: "This flag is being flown at the request of a private citizen and is the private expression of such individual and is not an official view or expression of the City." (Compl. Ex. B. at 4 ¶10h).

---

[3]  King relied upon the military's longstanding tradition of recognizing the individual faith traditions of its service members through identifying faith on dog tags, providing military chaplains, and identifying faith on grave markers. (Compl. Ex. B at 1). Because King recognized that a veteran's devotion to duty and call to sacrifice is often driven by a conscientious fidelity and purpose that exceeds devotion to self, family, and country, King elected to allow veterans and the family of veterans access to the Memorial for the express and limited purpose of publicly recognizing the faith traditions that inspired and sustained the service and sacrifice made by the veterans. (*Id*.).

Case 1:12-cv-01179-JAB-JLW   Document 69   Filed 11/27/13   Page 5 of 36

The first lottery was held in December 2010, and the limited public forum opened January 3, 2011. Plaintiff has spoken in the forum on multiple occasions. In 2011, King received 110 requests, and Plaintiff drew four weeks (and his wife drew one). (App. 5, Plf. Dep. 83-87; App. 6, 2011 Limited Public Forum Schedule)[4] In 2012, King received fifty-nine requests, and Plaintiff was drawn for four weeks and his wife one. (App. 7, Plf. Dep. 88; App. 8, 2012 Limited Public Forum Schedule). In 2013, King received eight-nine requests, and Plaintiff was drawn for five weeks. (Compl. ¶40; App. 9, 2013 Limited Public Forum Schedule). Since its inception in 2011 through the week of November 25, 2013, there have been 152 weeks of the limited public forum flagpole. Plaintiff has been the weekly speaker thirteen times and his wife two. But despite his family controlling the forum for 10% of the time (a month each year), Plaintiff "disagree[s] with anybody's beliefs being reflected on the memorial" (App. 10, Plf. Dep. 75), and through this lawsuit he seeks to silence all references to belief by any speaker.

### III.   QUESTIONS PRESENTED

1. Does Plaintiff lack standing to challenge the limited public forum flagpole policy?

2. Are Plaintiff's claims for equitable relief moot with respect to King's discontinued invocations at veterans' holidays?

3. Does King's Veterans Memorial comply with the Establishment Clause?

### IV.   ARGUMENT[56]

---

[4]    In 2011, for example, Plaintiff initially requested to fly the "Buddhist," "Muslim," "Jewish" and "Atheist" flags, but later decided to fly no flag on his approved weeks. King accommodated his request. (*Id*.). He did fly the Buddhist flag in 2012.

[5]    Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material

6

## A. Plaintiff Lacks Standing.

Under Article III, the federal courts have power to decide only "cases" or "controversies." *Ariz. Christian Sch. Tuition Org. v. Winn*, 131 S. Ct. 1436, 1441 (2011). To demonstrate a case or controversy a plaintiff must demonstrate standing, which encompasses both the "essential and unchanging part of the case-or-controversy requirement of Article III" and "prudential considerations that are part of judicial self-government." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). Plaintiff fails to meet his burden of establishing the "irreducible constitutional minimum" of standing to challenge the limited public forum policy because he has not suffered an "injury in fact" that is "concrete and particularized" and "actual or imminent," not merely "conjectural" and "hypothetical." *Lujan*, 504 U.S. at 560 & 561. Nor does Plaintiff's "offended observer" status grant him standing to challenge parts of the Memorial because he lacks frequent contact with it. *See Suhre v. Haywood Cnty.*, 131 F.3d 1083, 1085 (4th Cir. 1997) (a "mere abstract objection to unconstitutional conduct is not sufficient to confer standing.").

### i. Plaintiff Has Not Suffered an Injury-in-Fact Due to the Flag Policy.

Plaintiff's claims against the limited public forum policy lack the requisite injury because they are "conjectural" and "hypothetical." *Lujan*, 504 U.S. at 560. Plaintiff fails to provide any evidence that he was injured by the flag policy such that he can challenge it facially or as-applied. To bring a successful facial challenge to the policy, Plaintiff would

---

fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).
[6] As Plaintiff pleads in his Complaint, claims arising under the North Carolina Constitution are to be analyzed under similar framework to claims from the First Amendment. (Plf. Compl. ¶67; *Appeal of Springmoor, Inc.*, 498 S.E. 2d 177, 180 (N.C. 1998) (although "the religion clauses of the state and federal Constitutions are not identical, they secure similar rights and demand the same neutrality on the part of the State"); *Heritage Village Church & Missionary Fellowship, Inc. v. State*, 263 S.E. 2d 726, 730 (N.C. 1980)). Thus, for the reasons stated below explaining why Plaintiff's federal law claims fail, his State law claims are equally invalid and summary judgment for King is warranted.

have to show that the policy, by its terms, injured him. But King's neutral policy creates a limited public forum for *private* speech honoring veterans. A "government entity may create a forum that is limited to use by certain groups or dedicated solely to the discussion of certain subjects," as King has done here. *Pleasant Grove City, Utah v. Summum*, 555 U.S. 460, 470 (2009). The Establishment Clause only restrains government speech. *Id*. at 468. Here, private citizens, including Plaintiff, are speaking, not the City of King. While Plaintiff may dislike King's policy, he fails to articulate any injury caused by the text of the policy. In essence, Plaintiff's complaint comes down to disapproving of how others have exercised their speech in the forum.

Plaintiff also lacks standing to challenge the policy as-applied to his speech because King never denied him an opportunity to speak in the forum. In *ACLU Student Chapter-University of Maryland College Park v. Mote*, 321 F. Supp. 2d 670, 675 (D. Md. 2004), the court held that a student and his student organization lacked a sufficient injury-in-fact to confer standing to challenge a university policy governing a speech forum because the record contained no evidence that the plaintiffs were rejected from speaking in the forum. Since 2011, Plaintiff has submitted multiple applications to use the limited public forum, and King's lottery system granted him multiple opportunities each year. For example, in each year since its inception, four of Plaintiff's applications were selected in the lottery, meaning his speech has dominated the forum for an entire month each year. (Compl. ¶40). Plaintiff fails to establish "an invasion of a legally protected interest" due to the flag policy that is "concrete and particularized" and "actual or imminent." *Lujan*, 504 U.S. at 560. Thus, his claims against this policy must be dismissed for lack of jurisdiction.

### ii. "Offended Observer" Status Is an Insufficient Injury-in-Fact Because Plaintiff Lacks Frequent Contact with the Veterans Memorial.

Even an Establishment Clause plaintiff must establish a "personal injury" suffered "as

8

a consequence" of the government policy or action—something "other than the psychological consequence presumably produced by observation of conduct with which one disagrees. That is not an injury sufficient to confer standing under Article III." *Valley Forge Christian Coll. v. Am. United for Separation of Church & State, Inc*., 454 U.S. 464, 485 (1982). Article III injury "is not measured by the intensity of the litigant's interest or the fervor of his advocacy." *Id*. at 486. In general, when plaintiffs allege as injury something with which they disagree, courts refuse to allow standing precisely because it turns the courts into a super-legislature to review generalized grievances with the executive and legislative branches of government.[7]

In Establishment Clause cases, courts consistently hold that merely being offended, aware, or having hurt feelings alone does not constitute Article III injury.[8] The Fourth Circuit requires a plaintiff to show an injury "caused by unwelcome direct contact with a religious display." *Suhre*, 131 F.3d at 1086. The plaintiff's "proximity" to the conduct is a critical factor. *Id*. at 1087. Thus, daily proximity may confer a sufficient injury, *see Sch. Dist. of Abington v. Schempp*, 374 U.S. 203, 224 (1963) (daily Bible reading), but less frequent contact does not, *Valley Forge*, 454 U.S. at 486-87 (out-of-state plaintiff

---

[7] *See Allen v. Wright*, 468 U.S. 737, 755-756 (1984) (no Article III injury for mere "abstract stigmatic injury"); *Schlesinger v. Reservists Comm. to Stop the War*, 418 U.S. 208, 223 n.13 (1974) (Article III burden not met for "abstract injury in nonobservance of the Constitution"); *United States v. Richardson*, 418 U.S. 166 (1974) (no standing to challenge reporting rules governing CIA as violation of requirement under Art. I, § 9, cl. 7 of the Constitution for regular statement of account of public funds).

[8] *See Freedom from Religion Found., Inc. v. Obama*, 641 F.3d 803, 807 (7th Cir. 2011) ("hurt feelings differ from legal injury. The value interests of concerned bystanders do not support standing to sue.") (internal citations and quotation marks omitted); *In re Navy Chaplaincy*, 534 F.3d 756, 764 (D.C. Cir. 2008) (noting that Article III does "not allow anyone who becomes aware of a government action that allegedly violates the Establishment Clause to sue over it…"); *Kurtz v. Baker*, 829 F.2d 1133, 1141 (D.C. Cir. 1987) (secular humanist lacked standing to challenge exclusion of atheists from Congressional guest speakers program based on suggestion that exclusion stigmatizes secular humanists and atheists).

9

complaining of land transfer). Instead, a plaintiff must show that he is "'subjected to un-welcome religious exercises or [is] forced to assume special burdens to avoid them.'" *Suhre*, 131 F.3d at 1086 (quoting *Valley Forge*, 454 U.S. at 487).

Plaintiff fails to demonstrate the requisite frequent "unwelcome direct contact" with the Memorial. Plaintiff displayed a "Christian" religious flag *in his own front yard* and a flag with a Buddhist emblem on the limited public forum flagpole; thus, his alleged dis-taste for religious symbols is specious at best. In addition, Plaintiff claims offense be-cause he must drive by the Memorial and used to hear invocations at City events. But Plaintiff must make a special trip to Central Park to view the Memorial, especially the statue, which cannot be seen from the road. Nor does Plaintiff establish direct and continuing contact with King's discontinued practice of solemnizing veterans' holidays with invocations. Mere exposure to prayer does not constitute an injury in fact. *See Marsh*, 463 U.S. at 794-95 ("The content of the prayer is not of concern to judges where, as here, there is no indication that the prayer opportunity has been exploited to proselytize or advance any one, or to disparage any other, faith or belief…. [I]t is not for us to embark on a sensitive evaluation or to parse the content of a particular prayer.").

Plaintiff also fails to prove that he will experience future harm from the Memorial. *See City of Los Angeles v. Lyons*, 461 U.S. 95, 102-06 (1983) (finding threat of injury must be "'real and immediate,' not 'conjectural' or 'hypothetical'"). Plaintiff will never come into contact with the discontinued invocations—those events are now operated by private parties. While Plaintiff may drive by Central Park every day, he cannot see the kneeling soldier from the road, nor has he proved any facts showing regular and repetitive requirements for him to be present in Central Park and near the Memorial. *See Suhre*, 131 F.3d at 1091 (requiring pattern of exposure to courthouse Ten Commandments display based on plaintiff's repeated involvement in lawsuits).

10

In short, Plaintiff failed to establish a sufficient injury-in-fact sufficient to grant him standing to challenge the Veterans' Memorial and invocations. He does not have frequent and direct contact with the allegedly offending conduct, nor do King's practices directly regulate or alter his daily activity.[9]

## B. Plaintiff's Claims for Equitable Relief Against King's Veterans Gatherings Are Moot Because King Discontinued Those Events.

Plaintiff's Complaint pleads a Constitutional violation for three items: the limited public forum flagpole; the display of the kneeling solider; and King's alleged "…Christian prayer at annual City memorial events, held at the Veterans' Memorial." (Compl. ¶ 63, 68). As for the latter, this portion of his Complaint emanates from his objection to invocations at certain Veteran's Day, Memorial Day and September 11 commemorative events held at the Veterans' Memorial (Compl. ¶ 47-55). However, the record is undisputed that King discontinued holding any September 11 remembrances after 2009. (App. 11, Warren Dep. Ex. 8). Beginning in 2012, King ceased its involvement with the Veteran's Day ceremony and did so for the Memorial Day event beginning in 2013. Those events are now operated by the Stokes County Arts Council and the American Legion. (App. 12, Cater Dep. 97; App. 13, Hatley Dep. 452-453, 463-464; App. 14, Hatley Depo Ex. 81; App. 15, Hunsucker Dep. 71).

"A court is deprived of jurisdiction over a case when the case becomes moot." *Williams v. Ozmint*, 716 F.3d 801, 809 (4th Cir. 2013). "A case becomes moot when the is-

---

[9] Plaintiff lacks standing to challenge the flag policy for an additional prudential reason. He cannot "rais[e] another person's legal rights." *Allen*, 468 U.S. at 751. King granted Plaintiff multiple opportunities to display his choice of flag. Thus, Plaintiff is attempting to raise another person's legal rights concerning denial from participation in the forum. The court should not entertain such a generalized grievance.

sues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." *Id.* (quotation marks and citation omitted). Plaintiff's claims for relief against the invocations held at City veterans' celebrations are moot because King discontinued those practices. Plaintiff has already received the relief he seeks from this Court, and no facts in the record indicate that King has any intention of restarting those practices. The Court should grant summary judgment in King's favor on these moot claims.

## C. King Has Complied with the Establishment Clause by Creating a Limited Public Forum for Private Parties to Express Their Commemorative Messages on a Flag in the Veterans Memorial.

King's limited public forum allows private citizens to express messages on a flag within the Veterans' Memorial. While Plaintiff attributes this flag to King, he ignores the flag's context and source which connect the flag to private parties. This connection is vital because, as private speech, the flag necessarily complies with the Establishment Clause. *See Capitol Square Review & Advisory Bd. v. Pinette*, 515 U.S. 753, 765 (1995) (noting the "crucial difference" between government speech and private speech for Establishment Clause analysis). Thus, Plaintiff's Establishment Clause objection falters at the threshold level since the flag is private speech, not government speech.[10]

The Fourth Circuit has identified four, non-exhaustive factors to spot private speech: (1) the central "purpose" of the program in which the speech occurs; (2) the degree of "editorial control" exercised by the government or private parties over the speech's content; (3) the identity of the "literal speaker"; and (4) whether the government or the private party bears "ultimate responsibility" for the speech's content. *Sons of Confederate*

---

[10] The burden rests with Hewitt to prove the existence of government speech. *See Delano Farms Co. v. Cal. Table Grape Com'n*, 546 F.Supp.2d 859, 864-65 (E.D. Cal. 2008) (explaining that plaintiffs carry burden at summary judgment to prove that defendant is subject to First Amendment scrutiny in context of government speech analysis).

*Veterans, Inc. v. Comm'r of Va. DMV* (*SCV*), 288 F.3d 610, 618 (4th Cir. 2002); *see also ACLU v. Conti,* 912 F. Supp. 2d 363, 368-73 (E.D.N.C. 2012) (affirming validity of four factor test). Other circuits have folded these factors into a simplified test that asks, "[u]nder all the circumstances, would a reasonable person consider the speaker to be the government or a private party?" *Choose Life Ill., Inc. v. White*, 547 F.3d 853, 863 (7th Cir. 2008); *accord Roach v. Stouffer*, 560 F.3d 860, 867 (8th Cir. 2009).[11] Applying this test with the Fourth Circuit factors, a reasonable person would perceive the eleventh flag in the Memorial to be private speech because the flag is a temporary display, owned and controlled by private parties, nearby a disclaimer and other private speech, and erected under a policy giving private parties discretion to express their viewpoint on the flag.[12]

First, the flag display is private speech because it is temporary. As the Supreme Court

---

[11]  This reasonable person would grasp the history, source, and context of the flag and thus would be familiar with King's forum policy. *See Chabad-Lubavitch of Ga. v. Miller*, 5 F.3d 1383, 1390 n.11 (11th Cir. 1993) (noting that reasonable person analysis "is not based on perceptions of the ill-informed, first-time visitor who simply views a religious symbol in a government building without regard to public forum issues.").

[12]  Plaintiff may ask this Court to ignore this four-factor test and King's forum policy because of *Joyner v. Forsyth County* which assumed legislative invocations were government speech even though the city invited private parties to give their invocations pursuant to a neutral selection policy. 653 F.3d 341, 353 (4th Cir. 2011). But legislative invocations and passive displays are fundamentally different. While the government *seeks out* invocations for a time and place intimately associated with government speech (a legislative session), private parties *apply* to erect passive displays usually in an area historically associated with private speech (a public park). Because of these different locations and catalysts, some courts consider legislative invocations government speech, but courts routinely find passive, temporary displays to be private speech, especially when they erected in a public park by private parties pursuant to a neutral forum policy. *Compare Simpson v. Chesterfield Cnty. Bd. of Sup'rs*, 404 F.3d 276, 288 (4th Cir. 2005) (finding legislative invocations to be government speech) *with Pinette*, 515 U.S. at 765 (finding temporary cross erected in courthouse plaza to be private speech). And at the very least, courts closely scrutinize passive displays using the four-factor test. *See Wells v. City & Cnty. of Denver*, 257 F.3d 1132, 1142 (10th Cir. 2001) (applying test to government-erected display). This Court should also apply the four-factor test and not assume that passive displays, like legislative invocations, are government speech.

13

recently explained, a reasonable person would likely perceive a temporary display to be private speech. *See Summum*, 555 U.S. at 478-80 (noting forum analysis generally does not apply to the "installation of permanent monuments on public property" but to a program like the "temporary displays" evaluated in *Pinette*). And the flag in the Memorial is quite temporary since it is subject to change in any given week. (Compl. Ex. B at 4 ¶¶8, 9). Such variety and removability favors private speech.

This point also explains why flags and banners erected by private parties on city-owned utility poles are private speech. *See Cimarron Alliance Found. v. City of Okla. City*, 290 F. Supp. 2d 1252, 1256-60 (W.D. Okla. 2002) (applying same four factors used by Fourth Circuit to rule that banners displayed on city utility poles were private speech); *see also Sons of Confederate Veterans v. City of Lexington,* 722 F.3d 224, 229 (4th Cir. 2013) (applying forum analysis to flags erected by private parties on city light poles); *accord Snowden v. Town of Bay Harbor Islands*, 358 F. Supp. 2d 1178, 1193 (S.D. Fla. 2004); *Heartbeat of Ottawa Cnty., Inc. v. City of Port Clinton,* 207 F. Supp. 2d 699, 701-06 (N.D. Ohio 2002). The temporary flag in King's forum is no different from these flag displays and should be considered private speech just like these other flag displays.

Second, the purpose of King's forum policy is to allow private individuals to commemorate different veterans. (Compl. Ex. B at 2 ¶3 (noting that eleventh flag pole "will be available to *family members in the City*…for the limited purpose of *identifying honorably discharged veterans*, and to recognize the faith tradition *of that veteran*") (emphasis added); *id*. at 3 ¶5 (noting that flying flag "shall be considered the *private expression* of the person who has requested to have the flag flown.")). This purpose is evident because the policy enables *different* private citizens to commemorate *different* veterans by displaying one flag (or no flag) from a selection of many *different* flags—fifty-eight in

14

total.[13] Meanwhile, King cannot choose which flag to erect on the eleventh flagpole. (Compl. Ex. B at 5 ¶11). Since the policy allows citizens to display many different flags and *prohibits* King from displaying a flag, the forum's purpose cannot possibly be to express King's viewpoint about any particular flag. Its purpose must be to facilitate private expression. *See Planned Parenthood of S.C. Inc. v. Rose*, 361 F.3d 786, 793, 799 (4th Cir. 2004) (noting that program's purpose of "promot[ing]" particular "pro-life viewpoint" favored government speech, but the "array of choices makes the license plate forum appear increasingly like a forum for private speech.").[14]

King's policy limits the subject matter about which private parties may express their viewpoints. (Compl. Ex. B at 2 ¶3). But that is true in every limited forum. By definition, a limited forum arises when the government "creates a channel" for private parties to communicate their messages about "certain subjects" or limits the forum to "certain speakers." *Child Evangelism Fellowship of Md., Inc. v. Montgomery Cnty. Pub. Sch.*, 457 F.3d 376, 382 (4th Cir. 2006). And King's policy does precisely this. It allows private parties to commemorate particular veterans and their faith traditions because those messages fall within the "commemorating veterans" topic. Thus, like any other limited forum, King's forum allows private parties to express different viewpoints about a particular topic.

Third, King's policy empowers private parties to exercise editorial control over expression in the forum. The policy does so by empowering private individuals to choose which flag to erect on the eleventh flagpole and which veteran to commemorate on the temporary sign nearby. (Compl. Ex. B at 2 ¶4 & 5 ¶11). Thus, King does not exercise any

---

[13]  King's policy allows any emblem recognized by the Department of Veterans Affairs (Compl. Ex. B at 4 ¶10b) which now includes 58 different emblems. *See* http://www.cem.va.gov/cem/docs/emblems.pdf (last visited Nov. 14, 2013).

[14]  Nor does the policy serve any other purpose such as raising revenue. *See SCV*, 288 F.3d at 619-20 (noting program's revenue raising purpose supported government speech).

control over which veteran or which of the fifty-eight permitted flags individuals choose. Nor does King retain any power to reject a flag so long as the flag complies with the forum policy. In this respect, private parties have complete discretion to choose which veteran to commemorate and which commemorative flag to erect in the forum.

Of course, speakers never retain *unlimited* discretion to speak any way they want in a limited forum. Like any limited forum policy, King's policy restricts the forum's subject matter (Compl. Ex. B at 2 ¶¶3, 4) and imposes other viewpoint neutral restrictions: limiting a flag's size and color scheme, prohibiting excess words, and selecting the universe of emblems a forum applicant may choose from (*id*. at 4 ¶10(a)-(d)).[15] But these viewpoint neutral restrictions do not limit an applicant's editorial control since they still allow applicants to pick an emblem from a vast "array of choices"—fifty-eight total emblems. *Rose*, 361 F.3d at 799. This diverse array covers almost every conceivable faith and philosophical tradition including an atheist emblem. And, of course, residents may choose to fly no flag at all, as Plaintiff has done on occasions. Thus, private parties still retain the editorial control necessary to express any viewpoint that conceivably falls within forum's subject matter.[16] In this respect, King's policy resembles other forum policies that restrict what private parties may say but still provides private parties with the editorial control necessary to express many different viewpoints. *See Robb v. Hungerbeeler*, 370 F.3d 735, 745 (8th Cir. 2004) (noting that restrictions limiting what could be

---

[15]   This last limitation is quite practical since it obviates the need for King to make case-by-case judgments whether a proposed emblem actually commemorates a veteran's faith tradition. Thus, the restriction avoids avoid unbridled discretion problems.

[16]   For this reason, King's policy actually gives private parties much more editorial control than the policy in *Rose*. While the state in *Rose* allowed private parties to express just the pro-life and a few other messages on license plates and thereby excluded countless messages including the pro-choice message, King has selected every conceivable emblem that could fall within the subject matter of its forum. Thus, King has allowed the maximum number of viewpoints possible in its forum.

16

placed on adopt-a-highway signs did not eviscerate private speech on signs). And by giving private parties the control to select and express many different viewpoints, King's policy connects those viewpoints to private parties.

Fourth, the identity of the "literal speaker" in the forum is completely private because the literal speaker is the flag paid for, supplied, erected, removed, and owned by private parties. (Compl. Ex. B at 2 ¶¶3, 4). Such private ownership and control squarely support private speech. *See SCV*, 288 F.3d at 621 (noting that "ownership of the means of communication was a valid consideration in determining whether it contained government speech"). And to make matters even more obvious, the flag appears nearby other forms of private speech: the temporary placard identifying the honored veteran and the pavers bearing the names of private veterans. (Compl. Ex. B at 4 ¶§10(h)).[17] The flag also appears near a disclaimer connecting the flag to private parties. (Compl. Ex. B. at 4 ¶10h). Seeing this explicit disclaimer and the private speech nearby, an onlooker could not reasonably associate the flag with King.[18] *See Pinette*, 515 U.S. at 769 (noting that disclaimers prevent misattribution of speech to government). In fact, even Plaintiff thinks the flag speaks for private parties since he displayed his own "Buddhism" flag in the

---

[17] Plaintiff has never disputed that the temporary placard and pavers are private speech. Nor could he. *See Robb*, 370 F.3d at 745 (concluding that adopt–a–highway signs alongside road were private speech); *Tong v. Chi. Park Dist.*, 316 F. Supp. 2d 645, 653 (N.D. Ill. 2004) (applying forum analysis to bricks affixed to city property); *Demmon v. Loudoun Cnty. Pub. Schs.*, 342 F. Supp. 2d 474, 479-81 (E.D. Va. 2004) (applying forum analysis to bricks affixed to public school walkway).

[18] Of course, the eleventh flag also appears near government speech, *i.e.*, the other flags and the kneeling soldier statute. But physical proximity to government speech does not always transform private speech into government speech. Private speech regularly appears near government speech in public fora. *See Pinette*, 515 U.S. at 765-66 (finding private speech despite close proximity to government seat); *Kreisner v. City of San Diego*, 1 F.3d 775, 776 (9th Cir. 1993) (considering holiday display private speech despite government display 250 feet away). And the reasonable observer can easily distinguish the eleventh flag from the other flags since that observer is aware of the disclaimer, King's forum policy, and the unique source and history of the eleventh flag.

17

forum. (Compl. ¶40). If Plaintiff knew enough to understand that he could access the forum and display his own flag there, then certainly the reasonable and fully informed observer would too.

Fifth, private parties bear ultimate responsibility for the speech in the forum because these parties ultimately select which commemorative flag to erect on the eleventh flagpole. *See Rose*, 361 F.3d at 794 (noting that specialty license plate was private speech because the plate program "gives private individuals the option to identify with, purchase, and display one of the authorized messages."). Such additional effort associates the flag with the private parties expending that effort. *See id*. (finding specialty plate to be private speech because "the private individual chooses to spend additional money to obtain the plate and to display its pro-life message on her vehicle.").

The close association between the flag and private parties makes King's policy resemble the federal government's policy of allowing private parties to select an "emblem of belief" that the government places on veterans' gravestones in national cemeteries. *See* 38 U.S.C. § 2306; 38 C.F.R. § 38.630; 38 C.F.R. § 38.632.[19] The federal government pays for and erects these permanent gravestones with the religious and non-religious emblems. And this policy is appropriate because private individuals select the emblems. Therefore, the emblems are private speech. *See Summum*, 555 U.S. at 487 (Souter, J., concurring) (characterizing Arlington Cemetery grave markers as private speech).[20]

Now if emblems selected by private parties and placed on gravestones are private speech, then certainly the exact same emblems selected by private parties and placed on a

---

[19] The application form to select a gravestone and emblem of belief is available at http://www.va.gov/vaforms/va/pdf/VA40-1330.pdf (last visited Nov. 14, 2013). For a visual list of all the permissible emblems, see *supra* note 12.

[20] Even the ACLU admits that these emblems are private speech. *See* https://www.aclu.org/sites/default/files/images/asset_upload_file399_26244.pdf (last visited Nov. 13, 2013).

18

flag are private speech. In fact, the flag is more clearly private speech than the gravestone emblems because the former is temporary and paid for by private parties while the latter are permanent and funded by the government. Thus, because the reasonable person views the gravestone emblems as private speech, that same reasonable person must be deemed to view the eleventh flag in King's forum as private speech.[21] Reaching any other conclusion would empower Plaintiff and others like him to run to the nearest courthouse to sandblast the emblems on gravestones in our national cemeteries on the theory that these gravestones convey a government message endorsing religion. This Court simply should not accept Plaintiff's legal theory which would produces such absurd results.

**D. Even the Portions of the Memorial that Are City Speech Comply With the Establishment Clause Because King Intended the Memorial to Honor Veterans,**

---

[21]  This similarity between the flag and the gravestone emblems undercuts any argument that the privately-chosen Christian flag so "dominates" King's forum that King violates the Establishment Clause. (Answer ¶39 (admitting display of Christian flag 47 of 52 weeks in 2011 and 2012)). *See also Pinette*, 515 U.S. at 777 (O'Connor, J., concurring) ("a private religious group may so dominate a public forum that a formal policy of equal access is transformed into a demonstration of approval."). If any symbol dominates a forum, it is surely the countless cross gravestones in Arlington Cemetery. *See* http://www.arlingtoncemetery.mil/Image.aspx?ID=1de96fa2-8df6-4f1e-b034-0132b1af24ad&t=h (last visited Nov. 18, 2013). As this cemetery example and Supreme Court cases prove, forum domination cannot occur so long as private parties make independent choices pursuant to a religiously neutral policy. *See Zelman v. Simmons-Harris*, 536 U.S. 639, 658 (2002) (finding it irrelevant that "vast majority of program benefits" went to religious persons so long as program was religiously neutral); *Good News Club v. Milford Cent. Sch.*, 533 U.S. 98, 119 n.9 (2001) (rejecting forum domination argument); *Pinette*, 515 U.S. at 765-70 (rejecting forum domination argument). King cannot be blamed if most people in the area want to honor one particular faith tradition. In fact, their decision to repeatedly display the Christian flag in the forum for the past few years is hardly surprising because of all the media attention surrounding this case. (Compl. ¶¶ 25-31). But Plaintiff cannot prove this trend will continue. *See Peck v. Upshur Cnty. Bd. of Educ.*, 155 F.3d 274, 286 (4th Cir. 1998) (rejecting forum domination argument because lawsuit caused aberration in applicants that would dissipate "[o]nce this legal challenge is resolved"). Plaintiff cannot even prove one particular religion dominates the forum. The repeated selection of the "Christian" flag may accurately reflect or even under-reflect the religious demographics in the King area. Without knowing this demographic information, Plaintiff cannot carry his burden to prove forum domination.

**the Memorial Conveys that Message, and the Memorial Does Not Entangle King with Religion.**

Even if all aspects of King's Memorial were considered government speech rather than the private speech of citizens, the Memorial still complies with the Establishment Clause because King intended the Memorial to honor veterans, which is a secular purpose, the Memorial actually conveys this message, and the Memorial does not excessively entangle King with religion. Under the Fourth Circuit's precedent, this issue is properly analyzed under the test set forth by the Supreme Court in *Lemon v. Kurtzman*, 403 U.S. 602 612-13 (1971). *See Lambeth v. Bd. of Comm'rs of Davidson Cnty.*, 407 F.3d 266, 268-69 (4th Cir. 2005) (applying *Lemon* test to analysis of Establishment Clause challenge to inscription of "In God We Trust" on the façade of a government building).

In *Lemon*, the Court assessed the constitutionality of a statute benefiting parochial school teachers by examining whether it satisfied three conditions: (1) whether there was a secular purpose behind the statute; (2) whether the statute's principal or primary effect was one that neither advanced nor inhibited religion; and (3) whether the statute fostered an "excessive government entanglement with religion." 403 U.S. at 612-13. To pass muster under the Establishment Clause, a challenged government action must satisfy each of these three prongs. Later, the Court elaborated on the *Lemon* test by examining whether the governmental use of an object with religious meaning (there, a crèche) had the effect of "endorsing" religion. *Cnty. of Allegheny v. ACLU*, 492 U.S. 573, 593-94 (1989). The Fourth Circuit has treated *Allegheny's* "endorsement" test as an "enhancement of *Lemon's* second prong." *See Mellen*, 327 F.3d at 370-71.

### i. The Memorial Has a Secular Purpose

Under applicable Supreme Court precedent, a "legitimate secular purpose" supporting a challenged governmental action will suffice to satisfy the *Lemon* test's first prong.

20

*Lynch v. Donnelly*, 465 U.S. 668, 681 (1984). The demonstration of such a legitimate se-
cular purpose is "a fairly low hurdle." *Brown v. Gilmore*, 258 F.3d 265, 276 (4th Cir.
2001). Indeed, the Fourth Circuit has held that the first prong of the Lemon test should
be deemed to be violated "only if [the action] is '*entirely* motivated by a purpose to ad-
vance religion.'" *See Mellen*, 327 F.3d at 372 (quoting *Wallace v. Jaffree*, 472 U.S. 38,
56 (1985) (emphasis added)). A legitimate secular purpose is thus sufficient to pass
muster under the first prong of the *Lemon* test, unless the alleged secular purpose is in
fact pretextual. *See Santa Fe Ind. Sch. Dist. v. Doe*, 530 U.S. 290, 308-09 (2000). But the
burden rests with the Plaintiff to show that the stated secular purpose is a sham. *Wein-
baum v. City of Las Cruces*, 541 F.3d 1017, 1031 (10th Cir. 2008).

Even a cursory look at the Memorial illustrates its secular purpose: to honor veterans,
specifically those from King who lost their lives in battle. The Memorial pays tribute to
the memory of these individuals through secular symbolism: a star, a pentagon, flowing
water, engraved pavers, and patriotic and military flags. The objects of Plaintiff's
displeasure must be viewed in light of the entire memorial, which provides their context.

The context of the statue and public forum policy amidst the setting of a completely
secular memorial clearly demonstrates King's primary purpose for the Memorial is to
honor veterans, not to "entirely to advance" Christianity. The ability of private citizens to
fly one flag with an emblem among the many approved by the DVA , with the later
addition of a statue portraying a kneeling soldier at a grave marked by a cross does not
transform that clear purpose into a sham.

First, the iconic use of a cross as grave marker next to a kneeling soldier in the context
of a veterans' memorial is not necessarily religious or an endorsement of religion, as
Justice Kennedy speaking for the Supreme Court pointed out:

> But a Latin cross is not merely a reaffirmation of Christian beliefs. It is a symbol
> often used to honor and respect those whose heroic acts, noble contributions, and

patient striving help secure an honored place in history for this Nation and its people. Here, one Latin cross in the desert evokes far more than religion. It evokes thousands of small crosses in foreign fields marking the graves of Americans who fell in battles, battles whose tragedies are compounded if the fallen are forgotten.

*Salazar v. Buono*, 559 U.S. 700, 721 (2010).

Second, the mere fact that many of the applicants to use the limited public forum have chosen to fly the "Christian" flag during the week they obtained through the lottery system does not show that King had a "sham" purpose in creating the forum. Obviously, there are passionate feelings on both sides of the issue in King, and simply creating a public forum and allowing individual citizens to express themselves was the most fair and open-minded approach King could have followed to balance all of these competing interests. That King chose to limit the forum to flags containing DVA approved emblems of belief is no indication of sham purpose—it is merely to preserve the solemnity of the memorial, and is in keeping with the practices of other public areas honoring fallen soldiers. For example, the Federal Government's limiting available symbols this way in federal cemeteries preserves the solemn purpose of those hallowed locations. And the fact that the vast majority of tombstones contain a Latin cross does not show that the federal government has a secret purpose of advancing Christianity.

With respect to the kneeling soldier statue, the cross depicted there is clearly one of the gravestones mentioned by *Salazar*, given its small size relative to the figure of the soldier.[22] And although some references in the record describe a "praying" soldier, such a description reflects an assumption not supported by the actual image. The silhouette is not folding his hands, bowing with his head touching the ground, or doing any other activity particular to prayer. If some people interpret this artwork as depicting a praying soldier, it does not mean King has violated the Establishment Clause by allowing its

---

[22] *See*, *e.g.*, American Battle Monuments Commission, *Cemeteries*, http://www.abmc.gov/cemeteries/cemeteries.php (last visited Nov. 11, 2013) (depicting the vast numbers of small Latin cross gravestones in military cemeteries).

display.  *See ACLU of Ohio Found. v. Bd. of Comm'rs of Lucas Cnty.*, 444 F. Supp. 2d 805, 813–14 (N.D. Ohio 2006) ("While some may read its text as a proclamation of faith, and give it a measure of devotion, the Lucas County Decalogue neither compels that interpretation nor commands that response on the part of an objective observer.").  The depiction of a soldier kneeling at a gravestone is reflective of the general purpose of the entire Memorial—honoring the memory of fallen veterans—and does not show any illegal religious purpose.[23]

## ii.  King's Memorial Has the Effect of Honoring Veterans, Not of Endorsing Religion.

The questioned components of the Memorial also pass *Lemon's* second prong because their "principal or primary effect" is to honor veterans, not "to advance or inhibit religion."  *Lambeth*, 407 F.3d at 270.  The Memorial does not have "the effect of 'endorsing' religion," in that it does not convey "that religion or a particular religious belief is favored or preferred."  *Pinette*, 515 U.S. at 773 (quoting *Allegheny*, 492 U.S. at 592–93).  Hence, the Memorial "with [its] religious content, would [not] cause a reasonable observer to fairly understand it in its particular setting as impermissibly advancing or endorsing religion."  *Lambeth*, 407 F.3d at 270 (quotations omitted); *Santa Fe*, 530 U.S. at 308.

To show that the Memorial violates this "effects" or "endorsement" test, Plaintiff faces four difficult (and ultimately insurmountable) challenges.  First, the endorsement test relies on the "reasonable observer," not the sensibilities of a "hypersensitive plaintiff," *ACLU of Ky. v. Mercer Cnty*, 432 F.3d 624, 639 (6th Cir. 2005),[24] or those of

---

[23]  Ill-advised or flippant remarks by individual city officials cannot be read to indicate an improper governmental motive.  In *Simpson,* the court disregarded comments by county officials directly denigrating the religious beliefs of the plaintiff where the practice of the county was non-sectarian and inclusive.  404 F.3d at 285 n.4.

[24]  *Accord Books v. Elkhart Cnty*. 401 F.3d 857, 867 (7th Cir. 2005) (noting that the reasonable person is not the "hypersensitive or easily offended").

23

his counsel, *id.* at 638 ("[T]he ACLU an organization whose mission to 'ensure that . . . the government [is kept] out of the religion business,' does not embody the reasonable person."). This "reasonable observer," like the "reasonable person" of tort law, "is not to be identified with any ordinary individual who might occasionally do unreasonable things, but is rather a personification of the community ideal of reasonable behavior." *Pinette*, 515 U.S. at 779–80 (O'Connor, J. concurring). He "must be deemed aware of the history and context of the community and forum in which the religious display appears," and thus, he knows more than what someone might glean just by viewing the Memorial itself. *Id.* at 780 (O'Connor, J. concurring). This includes the "text, legislative history, and implementation of the [Memorial]," *Santa Fe*, 530 U.S. at 308, and "all of the pertinent facts and circumstances surrounding the symbol and its placement," *Salazar*, 559 U.S. at 721.

Plaintiff's second challenge is that he "bear[s] the burden of producing evidence sufficient to *prove* . . . that an objective observer would understand the [Memorial] to be motivated predominantly by religion." *ACLU of Ky. v. Grayson Cnty.*, 591 F.3d 837, 856 (6th Cir. 2010). It is not enough for Plaintiff to show that "there is *any* person who could find an endorsement of religion," that "*some* people may be offended by the [Memorial]," or that "*some* reasonable person *might* think [King] endorses religion." *Pinette*, 515 U.S. at 780 (O'Connor, J. concurring). He must prove that "*the* reasonable person *would* conclude that [the Memorial] has the effect of endorsing religion." *Mercer Cnty.*, 432 F.3d at 636. He must show that endorsing religion is the Memorial's "unmistakable message." *Grayson Cnty.*, 591 F.3d at 854 (quoting *Mercer Cnty.*, 432 F.3d at 637); *accord Van Orden v. Perry*, 545 U.S. 677, 701 (2005) (Breyer, J. concurring) (upholding a Ten Commandments display because its nonreligious aspects "predominate[d]"). Otherwise, the endorsement test operates as a heckler's veto for religious components of display, an

24

idea that numerous courts have rejected, *Good News Club*, 533 U.S. at 119,[25] as did Justice O'Connor (creator of the endorsement test). *Pinette*, 515 U.S. at 779 (O'Connor, J. concurring) ("[T]he endorsement inquiry is not about the perceptions of particular individuals or saving isolated nonadherents from the discomfort of viewing symbols of a faith to which they do not subscribe.").

As a third challenge, Plaintiff must show that the Memorial *as a whole* endorses religion. The Supreme Court has repeatedly cautioned courts against focusing "exclusively on the religious component of any activity" or display because that would "inevitably leave to its invalidation under the Establishment Clause." *Lynch*, 465 U.S. at 680.[26]

Plaintiff's last challenge is that this Court must not confuse recognition or acknowledgement of religion (which is permitted) with endorsement (which is not). *Koenick v. Felton*, 190 F.3d 259, 267 (4th Cir. 1999); *accord Mercer Cnty.*, 432 F.3d at 639 ("[T]he ACLU erroneously—though perhaps intentionally—equates recognition with

---

[25] *See Brown*, 258 F.3d at 278 (noting the endorsement test cannot be used as a "modified heckler's veto" (quoting *Good News Club*, 533 U.S. at 119)); *Books*, 401 F.3d at 867 ("[The endorsement test] does not mean . . . that to constitutionally display a religious item on public property the government must ensure that it offends no one. That would be asking the impossible. That some person or group might be uncomfortable with the presence of the Ten Commandments in this display is not enough to require their removal."); *Mercer Cnty.*, 432 F.3d at 638 ("Religion does not become relevant to standing in the political community simply because a particular view of a governmental display feels uncomfortable.").

[26] *See Salazar*, 559 U.S. at 721 (criticizing the district court for "concentrat[ing] solely on the religious aspects of the cross, divorced from its background and context"); *Van Orden*, 545 U.S. at 700–01 (Breyer, J. concurring) ("Focusing on the text of the Commandments alone cannot conclusively resolve this case. Rather . . . we must examine how the text is *used*. And that inquiry requires us to consider the context of the display."); *Lambeth*, 407 F.3d at 272 (affirming partly because of the overall context); *Books*, 401 F.3d at 864–65 (reversing partly because the district court focused only on the religious components, not the overall display); *ACLU Neb. Found. v. City of Plattsmouth*, 419 F.3d 772, 776 (8th Cir. 2005) (same); *Mercer Cnty.*, 432 F.3d at 639 (affirming because plaintiffs focused only on the religious components, not the overall display); *Harris v. City of Chi.*, 218 F. Supp. 2d 990, 994 (N.D. Ill. 2002) (same).

Case 1:12-cv-01179-JAB-JLW   Document 69   Filed 11/27/13   Page 25 of 36

endorsement."). After all, "the Constitution does not oblige government to avoid any public acknowledgement of religion's role in society," and the "goal of avoiding governmental endorsement does not require eradication of all religious symbols in the public realm." *Salazar*, 559 U.S. at 718.  Thus, "[s]imply having religious content or promoting a message consistent with a religious doctrine does not run afoul of the Establishment Clause." *Van Orden*, 545 U.S. at 690; *accord id.* at 699 (Breyer, J. concurring) ("[T]he Establishment Clause does not compel the government to purge from the public sphere all that in any way partakes of the religious.").[27] Thus, Plaintiff is simply wrong to claim that the Memorial is unconstitutional simply because it acknowledges the role of religion in our history and in the lives of our veterans. *See Myers v. Loudon Cnty. Pub. Schs.*, 418 F.3d 395, 408 (4th Cir. 2005) ("The notion that official acknowledgements of religion and its role in the founding of our nation . . . 'pose any real danger of establishment of a state church' is simply 'farfetched.'" (quoting *Lynch*, 465 U.S. at 686)); *accord Brown*, 258 F.3d at 274 (noting that "the Religion Clauses must not be interpreted with a view that religion be suppressed in the public arenas in favor of secularism"). After all, the "reasonable observer" "appreciates the role religion has played in our governmental institutions, and finds it historically appropriate and traditionally acceptable for a state to include religious influences . . . in honoring American legal [and historical] traditions." *Mercer Cnty.*, 432 F.3d at 639–40.

   a. **The Memorial's physical context honors veterans without endorsing religion.**

With these principles in mind, what would the reasonable observer know about

---

[27]   *See Plattsmouth*, 419 F.3d at 776–78 (upholding a Ten Commandments monument because it is a "passive acknowledgment of the roles of God and religion in our Nation's history," like many throughout our history and Washington D.C.); *Grayson Cnty.*, 591 F.3d at 855 ("The Establishment Clause . . . permits government displays to include religious influences as they honor other elements of our country's legal and political history.").

26

King's Memorial? First, he would consider the context of the Memorial, *Pinette*, 515 U.S. at 780 (O'Connor, J. concurring), especially its "physical setting." *Van Orden*, 545 U.S. at 702 (Breyer, J. concurring); *Lynch*, 465 U.S. at 694 (noting that the "particular physical setting" is critical). He would notice that the Memorial is located near a large park, miles away from city hall. This distances King from any religious message the Memorial contains. *See Allegheny*, 492 U.S. at 599–600 (placing the crèche in the "main" and "most beautiful" part of the county courthouse conveyed endorsement); *Smith v. Cnty. of Albemarle*, 895 F.2d 953, 958 (4th Cir. 1990) (same).[28] In this setting, even a Ten Commandments monument can be constitutional, let alone a statue of a soldier and a flagpole for private speech. *See Plattsmouth*, 419 F.3d at 774 (noting that Ten Commandments monument, which was ultimately upheld, stood in a park containing "recreational equipment, picnic tables and shelters, and a baseball diamond").

Second, he would notice that the flagpole to which Plaintiff objects is surrounded by countless other symbols,[29] all of which are focused on honoring veterans. He would notice the pavers, given in memory of or in tribute to veterans. Looking up, he would see the inscription, "All gave some, some gave all," around the base of the fountain, which unmistakably show that the Memorial is dedicated to honoring veterans—both living and dead—for their sacrifice for freedom. This impression would be confirmed when he inspected the five-sided black granite wall, where the names of local veterans killed in

---

[28] Of course, the Establishment Clause does not impose a religion-free zone around government buildings. *See Van Orden*, 545 U.S. at 691–92 (upholding Ten Commandments at state capitol); *Lambeth*, 407 F.3d at 273 (upholding display of "In God We Trust" on county building); *Mercer Cnty.*, 432 F.3d at 640 (upholding display including Ten Commandments in courthouse); *Books*, 401 F.3d at 869 (same); *Grayson Cnty.*, 591 F.3d at 856–57 (same); *Twombly v. City of Fargo*, 388 F. Supp. 2d 983, 983–85 (D.N.D. 2005) (upholding a Ten Commandments monument near city hall).

[29] As previously explained, the statue has an unmistakably secular meaning focusing on veterans, as it shows a soldier paying respects to a fallen comrade. *See Cemeteries*, *supra* note 22.

27

action are engraved. Then the abundance of military symbols—from the pentagon shape of the memorial (a shape so associated with the American military that is the name of its headquarters in Washington, D.C.), to the American star that has symbolized our troops for decades, to the military service flags, to the POW and American legion flags—would only buttress this conclusion. As such, the reasonable observer would see when a flag displaying an emblem of belief is included by private persons in this Memorial, those flags "are part of an otherwise secular display." *Mercer Cnty.*, 432 F.3d at 637.[30]

Third, the reasonable observer would quickly discern that the Memorial contains no religious texts. Instead, it features only a flag chosen by a citizen and including an emblem of belief recognized by the Department of Veterans' Affairs and a small gravestone marker on the soldier statue. In so doing, King diminished any religious message the Memorial might communicate. *See McCreary Cnty. v. ACLU of Ky.*, 545 U.S. 844, 869 (2005) ("Displaying that text is thus different from a symbolic depiction. . . . Where the text is set out, the insistence of the religious message is hard to avoid in the absence of a context plausibly suggesting [another] message. . . ."). "This [symbols versus text] distinction is material for the effects test" because when only symbols are involved, "the reasonable observer is less likely to focus on the religious aspects of [a display]." *King v. Richmond Cnty.*, 331 F.3d 1271, 1286 (11th Cir. 2003) (upholding the use of Ten Commandments in a county seal).

Fourth, upon closer inspection, the reasonable observer would notice the inscriptions at the Memorial. There he would see the flag is being flown temporarily to honor a specific veteran and that honoree's name, rank, area of service, service dates, and status. He would see that the flag is being flown to honor the faith traditions of the men and

---

[30] *See Demmon v. Loudon Cnty. Pub. Schs.*, 342 F. Supp. 2d 474, 493 (E.D. Va. 2004) (holding that brick pavers in a public school walkway, some of which included crosses, "were part of a much larger secular display").

women who served and sacrificed to secure our freedoms, freedoms which include the free exercise of religion. And he would know that our nation has a long-standing tradition of honoring the faith traditions of our servicemen, evident from the headstones in Arlington National Cemetery and countless other military cemeteries worldwide.

Importantly, he would also see the disclaimer informing that a private citizen requested and selected the flag being flown and that the flag does not represent the views or expression of King. *See Van Orden*, 545 U.S. at 701–02 (Breyer, J. concurring) (noting that inscription showing that the monument was donated "further distances the State itself from the religious aspects of the [Ten] Commandment's message"); *Peck v. Upshur Cnty. Bd. of Educ.*, 155 F.3d 274, 282 (4th Cir. 1998) (holding that school board took "pains to disassociate itself" from Bible distribution by posting disclaimer signs). Indeed, numerous courts have found that similar inscriptions (and some far less detailed) have lessened or eliminated any endorsement possibilities from religious displays.[31]  Hence, the reasonable observer will likely attribute any religious message he perceives from this flag to veteran being honored or his family, not King. *See Demmon*, 342 F. Supp. 2d at 493 ("An observer would first connect the symbol [on an inscribed paving stone] with the name on the brick," even in the context of a public school walkway.).

In sum, "there is nothing about the setting of the [Memorial] that would be viewed as encouraging or lending itself to prayer, meditation, or other religious activity." *Grayson*

---

[31]  *See Card*, 520 F.3d at 1020 (noting that "prominent inscription" showing the monument was donated "serves to send a message . . . that it did not sprout from the minds of City officials"); *Twombly*, 388 F. Supp. 2d at 990–91, 993 (noting that a similar inscription "serves to weigh against the probability that the religious message will be attributed to the state"); *Lucas Cnty.*, 444 F. Supp. 2d at 813–14 (same); *Summum*, 297 F.3d at 1011 (discounting endorsement arguments because a disclaimer sign would eliminate any misapprehensions); *Plattsmouth*, 358 F.3d at 1049 (Bowman, J. dissenting), *vacated and dissent adopted in* 419 F.3d 772, 778 n.8 (noting that inscription on Ten Commandments monument shows it is a gift, which "clearly diminishes any perception of endorsement).

*Cnty.*, 591 F.3d at 854 (citing *Van Orden*, 545 U.S. at 702 (Breyer, J. concurring)).  Indeed, the only suggestion of the sacred comes from the sacrifice that the Memorial honors, from both those who gave some and those who gave all. Instead, "[t]he setting"—from its location, to the abundance of patriotic and military symbolism, to the limited acknowledgement of the role faith traditions played for so many veterans, "provide(s) a context of history" and of commemorating veterans.  *Van Orden*, 545 U.S. at 702 (Breyer, J. concurring).  Put simply, "a reasonable observer of the [Memorial] will think history [and veterans], not religion." *Books*, 401 F.3d at 869.

### b. The Memorial's historical context honors veterans without endorsing religion.

But the reasonable observer would also consider the Memorial's history, including the City's removing the "Christian flag" as a regular display after the Plaintiff's objection. *Pinette*, 515 U.S. at 780 (O'Connor, J. concurring). This includes the "text, legislative history, and implementation" of the resolution establishing the flagpole forum to which Plaintiff objects. *McCreary Cnty.*, 545 U.S. at 862 (quoting *Santa Fe*, 530 U.S. at 308).

First, the reasonable observer would know that King recognized that for many veterans, their "devotion to duty and call to sacrifice is . . . driven by a conscientious fidelity and purpose that exceeds devotion to self, family, and country." Nothing in the resolutions creating the memorial or flagpole policy suggest an attempt to endorse religion.  In fact, the flagpole resolution disclaims any intent to "advance . . . [or] show hostility towards any or all religions or faiths."  It certainly does not send the "unmistakable message of endorsing religion," which is what Plaintiff must show to succeed.  *Mercer Cnty.*, 432 F.3d at 637 (quoting *Allegheny*, 492 U.S. at 600).

Next, the reasonable observer would reflect on the history (legislative and otherwise) that led to this flagpole forum. He would know that the original memorial included the "Christian" flag and that no one objected to this for five years after it opened. This lack of

30

controversy suggests that no one perceived it as an endorsement, but rather as a part of a broader historical and commemorative display. *See Weinbaum*, 541 F.3d at 1031 ("If a government symbol has long gone unchallenged, there is a suggestion that an objective observer would not think that the symbol endorses a religious message." (citing *Van Orden*, 545 U.S. at 702–03 (Breyer, J. concurring)). But when Plaintiff objected, King reviewed the applicable law and removed the flag. Despite pressure from their constituents, King leaders "tr[ied] to follow the law." (App. 16, Warren Dep. 182). But recognizing citizens' desires to honor the faith traditions of their veterans with their own private speech, they sought a constitutional method to allow this.[32] Rather than adopting a trial and error approach, which tends to produce a parade of problematic displays, *see McCreary Cnty.*, 454 U.S. at 866, 869–72, they took several months to craft one policy (*i.e.*, the limited public forum policy now in effect) and pass one resolution. *See Mercer Cnty.*, 432 F.3d at 631–32. And as they passed a resolution and did so before this lawsuit was filed, their efforts cannot be derided as a mere "litigation position." *McCreary Cnty.*, 454 U.S. at 872. Instead, they should be praised for addressing the defects of their original design in a constitutional manner. *Books*, 401 F.3d at 869 (upholding display that included the Ten Commandments after its predecessor had been invalidated). This history shows King acted circumspectly, balancing the demands of the Establishment Clause with the desires of its citizens. It certainly does not send the "unmistakable message of endorsing religion" that Plaintiff must show to succeed. *Mercer Cnty.*, 432 F.3d at 637 (quoting *Allegheny*, 492 U.S. at 600).

In sum, Plaintiff has failed to show that the Memorial violates *Lemon's* second prong

---

[32] The reasonable observer also knows not to "impute an impermissible purpose to advance religion to an elected official merely because he responds to a religiously motivated constituent request," particularly when King has "taken . . . 'pains to disassociate itself from the private speech' at issue in this case." *Peck*, 155 F.3d at 281–82 (quoting *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 841 (1995)).

by endorsing religion, because he cannot prove that the portions of the memorial to which he objects send an "unmistakable message of endorsing religion." *Mercer Cnty.*, 432 F.3d at 637 (quoting *Allegheny*, 492 U.S. at 600).

### iii.     The Memorial Does Not Foster Excessive Entanglement With Religion.

In order to determine whether the government is excessively entangled with religion, the court "must examine the character and purposes of the institutions that are benefited, the nature of the aid that the State provides, and the resulting relationship between the government and the religious authority." *Lemon*, 403 U.S. at 615. The objective of the excessive entanglement inquiry is to prevent, as far as possible, the intrusion of either government or religion into the precincts of the other. *Id.* at 614.  Supreme Court precedent does "not call for total separation between church and state; total separation is not possible in an absolute sense. Some relationship between government and religious organizations is inevitable." *Id.* (citations omitted); *accord Brown*, 258 F.3d at 274; *Myers*, 418 F.3d at 403.

Here, there is virtually no relationship between King and any religious entity as a result of the Veterans Memorial as a whole or the flag policy.  King is not entangled with religion through its administration of a viewpoint neutral limited public forum allowing individuals to display a flag of their choosing which reflects the beliefs of a veteran they seek to honor.  Its passive display of the donated kneeling soldier statue also does not result in an improper entanglement with religion.  In *Lynch*, the Court held that a city's passive display of a crèche did not excessively entangle government with religion.  *See Lynch*, 465 U.S. at 684 ("There is no evidence of contact with church authorities concerning the content or design of the exhibit prior to or since Pawtucket's purchase of the crèche. No expenditures for maintenance of the crèche have been necessary; and since the City owns the crèche, now valued at $200, the tangible material it contributes is de

minimis."). Hence, there is no excessive entanglement under these facts.

### iv. This Court Should Refrain From Ruling on King's Invocations Until Case Law Is Settled.

*Marsh v. Chambers*, 463 U.S. 783 (1983), and not *Lemon,* controls the outcome of King's former commemorations or ceremonies which included invocations. *Simpson*, 404 F.3d at 280-82. After reviewing the 200 year history of legislative prayer in this country, *Marsh* held that legislative prayers generally do not violate the Establishment Clause because of the tradition of legislative prayer and the fact that the prayers serve the secular purposes of "'solemnizing public occasions, expressing confidence in the future, and encouraging the recognition of what is worthy of appreciation in society.'" *Id.* at 283 (quoting *Lynch*, 465 U.S. at 693 (O'Connor, J., concurring)). *Marsh* approved of legislative prayer so long as "there is no indication that the prayer opportunity has been exploited to proselytize or advance any one, or to disparage any other, faith or belief." *Marsh*, 463 U.S. at 794-95. The Fourth Circuit has examined this aspect of *Marsh* a few times, albeit in somewhat contradictory opinions.

Notwithstanding *Marsh*, in *Joyner v. Forsyth County*, the Fourth Circuit found that a county's invocations, wherein the speakers repeatedly referenced Christian beliefs and prayed in the name of Jesus Christ, violated the Establishment Clause, despite the fact that the county had a neutral policy governing the prayer similar to the county in *Simpson*.

The court's decision in *Joyner* is now part of a circuit split on this precise issue that the Supreme Court has chosen to address this Term. *See Galloway*, 681 F.3d 20 (2d Cir. 2012), *cert. granted,* 133 S. Ct. 2388 (2013) (No. 12-696) (argued Nov. 6, 2013).[33]

---

[33] *Galloway* involves a challenge to a town's practice of inviting community clergy and citizen volunteers to lead the invocation at town council meetings without censoring the content of the prayers given. The result has been that roughly two-thirds of the invocations have been overtly Christian or referencing Jesus Christ. 681 F.3d 20.

33

Because of the lack of clarity from the law within this Circuit, and the pending case before the Supreme Court regarding this exact issue, Defendant moves that this Court refrain from ruling on the invocations and content of the now abolished King commemorative ceremonies until the ruling in the *Galloway* case is issued.

<u>CONCLUSION</u>

Plaintiff lacks standing to challenge King's limited public forum flag policy, and his claims against King's veterans' events are moot. In addition, the Memorial, including the limited public forum and kneeling soldier statue, complies with the First Amendment's Free Speech and Establishment clauses. King respectfully requests that the Court grant its Motion for Summary Judgment on all claims in the Complaint.

Respectfully submitted this 27th day of November, 2013.

<div style="margin-left:40%">

/s/ Elizabeth A. Martineau
Elizabeth A. Martineau
NC Bar 26394
/s/ Crystal M. Trotter
NC Bar 40200
MARTINEAU KING PLLC
P. O. Box 31188
Charlotte, NC 28231
emartineau@martineauking.com
P: (704) 247-8520
F: (704) 943-0543

Bryan H. Beauman
STURGILL, TURNER, BARKER &
MOLONEY, PLLC
333 West Vine Street, Suite 1400
Lexington, Kentucky 40507
P: (859) 255-8581
bbeauman@sturgillturner.com

Joseph P. Infranco
ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street

</div>

34

Scottsdale, AZ 85260
jinfranco@alliancedefendingfreedom.org

*Attorneys for Defendant*

<u>**CERTIFICIATE OF SERVICE**</u>

I hereby certify that the foregoing document was served via electronic mail as addressed below and I electronically filed the foregoing document using the CM/ECF system. Notice of filing will be sent to all parties by operation of the Court's electronic filing system, including:

| | |
|---|---|
| John M. Moye<br>Kilpatrick Townsend<br>4208 Six Forks Road, Suite 1400<br>Raleigh, NC 27609<br>jmoye@kilpatricktownsend.com | Ayesha N. Khan<br>Gregory M. Lipper<br>Americans United for Separation of Church & State<br>1301 K Street NW, Suite 850<br>Washington, DC 20005<br>lipper@au.org<br>khan@au.org |
| Joe Infranco<br>Senior Counsel, Vice President of Alliance Coordination<br>Alliance Defending Freedom<br>15100 N. 90th Street<br>Scottsdale, AZ 85260<br>jinfranco@alliancedefendingfreedom.org | Bryan H. Beauman<br>Sturgill, Turner, Barker & Maloney, PLLC<br>333 West Vine Street, Suite 1400<br>Lexington, KY 40507<br>bbeauman@alliancedefendingfreedom.org |
| Hiram Sasser<br>Liberty Institute<br>2001 Plano Parkway, Suite 1600<br>Plano, Texas 75075<br>hsasser@libertyinstitute.org | Richard K. Willard<br>Steptoe & Johnson LLP<br>1330 Connecticut Ave, NW<br>Washington, DC 20036<br>rwillard@steptoe.com |
| Kearns Davis<br>Brooks Pierce<br>2000 Renaissance Plaza, 200 N. Elm Street<br>Greensboro, NC 27401<br>kdavis@brookspierce.com | D.J. O'Brien III<br>Brooks Pierce<br>2000 Renaissance Plaza, 200 N. Elm Street<br>Greensboro, NC 27401<br>dobrien@brookspierce.com |

This 27th day of November 2013.

/s/Elizabeth A. Martineau