# IN THE UNITED STATES COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
### CIVIL ACTION NO. 1:12-CV-1179

<table>
<tr><td>

STEVEN HEWETT,
        **Plaintiff,**

   v.

CITY OF KING,
        **Defendant.**

THE AMERICAN LEGION AND
AMERICAN LEGION POST 290
OF KING, NORTH CAROLINA,
        **Defendant-Intervenors.**

</td><td>

**BRIEF IN SUPPORT OF DEFENDANT-INTERVENORS THE AMERICAN LEGION AND AMERICAN LEGION POST 290 OF KING, NORTH CAROLINA'S MOTION FOR SUMMARY JUDGMENT (KNEELING SOLDIER STATUE)**

</td></tr>
</table>

## I. STATEMENT OF THE CASE

The American Legion, the nation's largest veterans' service organization representing approximately 2.4 million members, along with American Legion Post 290 of King, North Carolina (collectively, "the Legion") have intervened in this case to defend the right of communities like Defendant City of King, North Carolina ("City of King") to honor those who have fought and died for our nation. As part of a community tribute to our nation's veterans, the City of King has erected a small statue that depicts a member of our military paying homage to a fallen comrade at a gravesite. But because the grave marker in that statue is in the shape of a cross—the very sort of grave marker that marks the burial site of thousands of our fallen soldiers who died on foreign soil— Plaintiff Steven Hewett demands that the City of King take the statue down. Mr. Hewett contends that the mere appearance of a cross grave marker as part of a war memorial—no

1

matter how historically accurate the depiction and no matter how minor role the cross plays as part of a secular tribute to those who have died in service of their country—renders the memorial inappropriate in the public square. Mr. Hewett thus claims that the statue violates the First Amendment Establishment Clause and Sections 13 and 19 of Article I of the North Carolina Constitution.

But Mr. Hewett, however sincerely held his beliefs, is simply wrong as a matter of undisputed fact and law. Even were this Court to consider only the evidence produced by Mr. Hewett and his expert witness, there would still be no genuine issue about the Statue's constitutionality. The City of King erected the Statue for the purpose of commemorating veterans. The scene that the Statue depicts—a soldier, likely from World War II or the Korean War, kneeling at a cross that marks a fallen comrade's grave—is both historically accurate and reflective of the experiences of thousands of veterans. The Statue is also consistent with the cross headstone's long-accepted role in America's permanent overseas cemeteries and with cross war memorials here at home, both of which symbolize the sacrifice made by those who fought and died for our nation.

While Mr. Hewett challenges other aspects of the war memorial and practices by the City of King, intervenors take no position on those aspects of this case. But it is critical that communities be able to honor those who served where their memorials are consonant with the experiences of our veterans and evoke imagery familiar to many Americans, even where that imagery may happen to contain a religious symbol. The constitution does not require that we scour the public square of all imagery that may have religious significance, especially where, as here, it serves the predominantly secular

2

purpose of honoring those who have died in service of this great nation. Regardless of the merits of Mr. Hewett's other claims, summary judgment in the Defendants' favor is appropriate for his claims against the Statue.

## II. STATEMENT OF FACTS

### A. The Historic Use of the Cross as a Grave Marker for American War Dead

Both the Legion's and Mr. Hewett's experts agree that, during World War II and the Korean War, soldiers were commonly buried under cross grave markers in temporary overseas cemeteries.

Dr. Joseph T. Glatthaar, an expert in the field of American military history, provided ample evidence that crosses commonly marked the graves of American soldiers who lost their lives fighting in World War I, World War II, and the Korean War. *See generally*, Glatthaar Report, Ex. A; Glatthaar Surrebuttal Report, Ex. B. As Plaintiff's expert, Dr. G Kurt Piehler, testified, during World War I and World War II the Army Graves Registration Services buried fallen soldiers in temporary overseas cemeteries, which served as the soldiers' resting place until the war ended. Piehler Dep., Ex. E at 36–37. Dr. Piehler further testified that the cross "was among the most widely used" symbols for marking graves in the temporary cemeteries, although other markers were available such as a Star of David for Jewish soldiers. *Id.* at 38–40. This practice of burying soldiers in temporary cemeteries and using predominantly cross grave markers continued through the beginning of the Korean War until 1951, when the government called for the immediate repatriation of all war dead. Glatthaar Surrebuttal, Ex. B at 8–9; *see also* Piehler Surrebuttal, Ex. D at 8. Based on the demographic realities of the time,

3

Dr. Glatthaar concluded that soldiers in World War II and the Korean War who paid respects to their fallen comrades in temporary cemeteries would have done so in most cases over graves marked with crosses. Glatthaar Surrebuttal, Ex. B at 10; *see also id.* at Appendix III (photograph of a soldier visiting a temporary cemetery during World War II).

Dr. Glatthaar and Dr. Piehler also agree that the majority of American soldiers buried in permanent overseas cemeteries are buried under cross gravestones. Following World War I and World War II, the American Battle Monuments Commission ("ABMC") created permanent overseas cemeteries. The permanent cemeteries were intended to be "a symbol of nationalism" representing the sacrifices made by the American soldiers who lost their lives in those wars. Piehler Dep., Ex. E at 73–75; Glatthaar Report, Ex. A at 7–8. The ABMC made the decision to "adopt[] the Cross as the primary gravestone" for soldiers buried overseas in national cemeteries. Piehler Report, Ex. C at 13. As Dr. Piehler wrote, "[t]he cross gravestone replaced the widely used wooden crosses that served as temporary grave markers and quickly emerged as a cultural image of the battlefield." Piehler Dep., Ex. E at 106–07.

Family members who chose to have their loved ones buried in permanent overseas cemeteries could choose either a cross or Star-of-David gravestone. Piehler Dep., Ex. E at 306. As Dr. Piehler testified, "[C]rosses were used for those who were not Jewish, even if they were . . . Christians who view the cross as a graven image [and] for those who were atheists." Piehler Dep., Ex. E at 61; *see also id.* at 69. Following World War I, the ABMC placed unidentified soldiers under crosses or Stars of David in proportion to

4

the percentages of the identified Jewish and Christian fallen. Piehler Report, Ex. C at 13. However, following World War II, "[t]he determination [was made] to put crosses on all unknown soldiers." Piehler Dep., Ex. E at 65–66, 69. As a result of the ABMC's practices, crosses made up "the majority of gravestones in the permanent cemeteries." *Id.* at 66, 307.

While these national overseas cemeteries contain individual soldiers' graves, they also symbolize and memorialize the sacrifices of American soldiers generally. *Id.* at 74. According to Dr. Piehler, the permanent overseas cemeteries are "one of the important ways that the war is memorialized." *Id.* at 86–87. Following World War II, the ABMC had "a very active press office" which sent images back to the public of the overseas cemeteries "to . . . show the sacrifice of Americans, the graves of American soldiers and the sacrifices [of] those buried overseas." *Id.* at 275, 311. Americans who viewed these images of the national cemeteries following World War II would have seen mostly cross gravestones. *Id.* at 283–84. For Memorial Day 2013, a photograph displayed on the ABMC website portrayed a U.S. Marine kneeling before a cross gravestone in a national cemetery. Glatthaar Surrebuttal, Ex. B at Appendix IV.

As a result of the widespread use of crosses to mark soldiers' graves during the mid-Twentieth Century (both in the temporary and permanent cemeteries), the cross became a cultural symbol of sacrifice and of "the loss of life on the Western Front." Piehler Dep., Ex. E at 106–07. Dr. Piehler testified that, particularly in the World War II context, "the cross is . . . one of the symbols of the nature of the war," although "there are other symbols of the war." *Id.* at 109–10, 104, 141–42. Dr. Piehler conceded that for

5

some Americans the cross acquired a second meaning associated with World War II and that the image of a soldier kneeling before a cross grave marker "certainly is an image that some Americans would identify with." *Id.* at 110–12, 204–05, and 241.

Memorials commemorating American soldiers containing a cross can also be found on domestic federal property. For example, the Irish Brigade Monument at Gettysburg consists of a Celtic Cross and commemorates an Irish-American unit that fought in the Civil War. Piehler Dep., Ex. E at 212–14. Other examples include the Argonne Cross, which commemorates the American units that fought in the Argonne in World War I, and the Canadian Cross of Sacrifice, which commemorates the Americans who served with Canadian soldiers in World War I, both at Arlington National Cemetery. *Id.* at 223, 227–28.

### B. The Kneeling Soldier Statue

The Kneeling Soldier Statue portrays a combat soldier kneeling before a cross grave marker. *See* Ex. F. In March of 2010, at a meeting of the City Appearance Commission, Ricky Lewis, a citizen of the City of King, suggested erecting the Statue. The Commission unanimously decided to recommend the proposed Statue to the City Council. Hunsucker Dep., Ex. G at 31, 34, 40. One of the members of the Appearance Commission, Ms. Barbara Hunsucker, recalled that she found the proposal appropriate "[b]ecause it was paying tribute to our fallen soldiers." *Id.* at 34. She felt the design reflected a scene "on the battlefield" and evoked "the emotions that might have gone through a soldier's mind" when "paying tribute to his fallen comrade." *Id.* at 34; *see also id.* at 30, 48.

6

In April of 2010, the City Council unanimously approved the construction of the Kneeling Soldier Statue. *See id.* at 40. King's Mayor, Mr. Jack Warren, testified that he felt the Statue represented a soldier "kneeling at a grave" and "honoring a fallen comrade." Warren Dep., Ex. H at 55, 60. He supported the construction of the Statue as a monument to honor veterans. *Id.* at 57.

An officer of the American Legion Post 290, Mr. Carl F. ("Butch") Calloway, volunteered his time and skill to create the Statue out of sheet metal from a pattern provided by the Appearance Commission. Briefs of the Legion, Docket Nos. 21 at 4 and 40 at 2. The pattern was obtained from the Winfield Collection, a company selling patterns for use in wood and metal craft projects. *Id.* The Kneeling Soldier Statue was erected near the City of King's Veterans' Memorial on a mounded area with a gravel base. Hunsucker Dep., Ex. G at 29–30; Ex. F.

Both Dr. Piehler and Dr. Glatthaar agree that the Kneeling Soldier Statue is historically accurate. They concluded, based on the soldier's helmet and weapon, that the Statue depicts a combat soldier from either World War II or the Korean War. Glatthaar Report, Ex. A at 13–14; Piehler Report, Ex. C at 6. Dr. Piehler testified that the Statue depicts a scene that could have occurred in a temporary cemetery during World War II and that the cross "most likely depicts a grave." Piehler Dep., Ex. E at 42–43, 144, 146, 180–81, 286. Dr. Piehler also testified that the soldier depicted in the Statue is not necessarily praying and could be simply reflecting, remembering, or paying his respects to his fallen comrade. *Id.* at 169–70. Further, he testified that the soldier depicted in the Statue could be a non-Christian individual. *Id.* As Dr. Piehler stated:

> [The Statue] could easily be – it could be a grave in a temporary cemetery, it could also be a grave in a battlefield burial possibly, or it could even be a symbolic representation of those buried in the [American] Battle Monuments Commission [cemeteries]. And it could also be interpreted as just – as a memorial to those – all those who died in wartime.

*Id.* at 150. Dr. Glatthaar concluded that the Kneeling Soldier Statue is "an accurate depiction of the experiences of untold numbers of our countrymen in World War II and Korea, a combat soldier paying tribute to a fallen comrade." Glatthaar Surrebuttal, Ex. B at 12.

## III. QUESTION PRESENTED

Does a statue depicting a World War II or Korean War–era soldier kneeling before a small cross-shaped grave marker, installed as a public memorial honoring the sacrifices of American war veterans, violate the Establishment Clause of the First Amendment?

## IV. STANDARD OF REVIEW

A court should grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In making this determination, the court "must consider the evidence in the light most favorable to the non-moving party and draw all reasonable inferences from the facts in the non-movant's favor." *Matvia v. Bald Head Island Mgmt., Inc.*, 259 F.3d 261, 266 (4th Cir. 2001).

## V. ARGUMENT

Mr. Hewett has raised two claims with respect to the Kneeling Soldier Statue. Given the evidence before this Court, it is impossible for him to succeed on either.

Mr. Hewett's first claim is that the Statue violates the Establishment Clause of the

8

First Amendment, which states: "Congress shall make no law respecting an establishment of religion." This requires Mr. Hewett to prove, using the context-focused approach for passive monuments established in *Van Orden v. Perry*, 545 U.S. 677 (2005), that the Statue impermissibly promotes religion. Mr. Hewett cannot make such a showing: the Statue's content, location, and history all show that its primary purpose is to honor the sacrifices of our nation's veterans, not to promote Christianity. Indeed, the Statue is constitutional even under the traditional three-part test for Establishment Clause challenges announced in *Lemon v. Kurtzman*, 403 U.S. 602, 612–13 (1971).

Mr. Hewett's second claim is that the Statue violates the North Carolina Constitution. Article I, Section 13 of the North Carolina Constitution provides that "[a]ll persons have a natural and inalienable right to worship Almighty God according to the dictates of their own consciences, and no human authority shall, in any case whatever, control or interfere with rights of conscience." Article I, Section 19 of the North Carolina Constitution provides that "[n]o person shall be denied the equal protection of the laws; nor shall any person be subjected to discrimination by the State because of . . . religion." North Carolina courts interpret these two clauses as creating a requirement of "secular neutrality toward religion" that has "been most thoroughly defined in the jurisprudence of the First Amendment's Establishment Clause." *Heritage Vill. Church & Missionary Fellowship, Inc. v. State*, 263 S.E.2d 726, 730 (N.C. 1980); *see also In re Appeal of Springmoor, Inc.*, 498 S.E.2d 177, 180 (N.C. 1998). Accordingly, for the same reasons that Mr. Hewett cannot prove his claim under the First Amendment, he also cannot prove his claim under the North Carolina Constitution.

9

### A. The Kneeling Soldier Statue does not violate the Establishment Clause

#### 1. *Van Orden* is the controlling legal standard

The Supreme Court has made clear that, when evaluating an Establishment Clause challenge to a passive monument like the Kneeling Soldier Statue, a court should not apply any rigid legal "test" like that found in *Lemon v. Kurtzman*. Rather, it should undertake a holistic inquiry that examines how the monument fits both with our nation's history and with the Establishment Clause's underlying purposes of protecting religious liberty and preventing religious strife. This rule comes from *Van Orden*, in which five justices rejected an Establishment Clause challenge to a public monument that featured an inscription of the Ten Commandments. Writing for four justices, Chief Justice Rehnquist explained that the *Lemon* test "was not useful in dealing with the sort of passive monument that Texas has erected" and that analysis should instead be "driven both by the nature of the monument and our Nation's history." *Id.* at 686 (plurality opinion). Justice Breyer, who provided the majority's fifth vote, similarly declined to apply *Lemon* and explained that in such cases there was "no test-related substitute for the exercise of legal judgment." *Id.* at 700 (Breyer, J., concurring in the judgment).

Fourth Circuit case law is in accord. Since *Van Orden*, the Fourth Circuit has not applied *Lemon* to any cases involving passive monuments like the Kneeling Soldier Statue. It has instead restricted *Lemon* to cases involving either legal preferences or financial support for religious organizations. *See Liberty Univ., Inc. v. Lew*, 733 F.3d 72 (4th Cir. 2013) (rejecting challenge to religious exemptions in the Affordable Care Act); *Moss v. Spartanburg Cnty. Sch. Dist. Seven*, 683 F.3d 599 (4th Cir. 2012) (rejecting

10

challenge to public high school's giving of academic credit for off-campus religious instruction); *Glassman v. Arlington Cnty., Va.*, 628 F.3d 140 (4th Cir. 2010) (rejecting challenge to government involvement in development of church property).  In the only post-*Van Orden* case to involve symbolic religious conduct—a challenge to the required recitation of the Pledge of Allegiance in Virginia public schools—the Fourth Circuit declined to apply *Lemon* and instead cited to *Van Orden*.  *See Myers v. Loudon Cnty. Pub. Sch.*, 418 F.3d 395, 402 (4th Cir. 2005) (upholding recitation requirement).  Under Fourth Circuit law, *Van Orden* controls this case.

2.  <u>The Kneeling Soldier Statue is constitutional under <em>Van Orden</em></u>

As Justice Breyer's concurring opinion in *Van Orden* explains,[1] determining whether a passive monument is constitutional under the Establishment Clause requires a holistic analysis that considers, among other things, the monument's content, purpose, physical setting, and history.  *Id.* at 701–03 (Breyer, J., concurring in the judgment).  This analysis permits monuments to have religious content.  Indeed, a contrary rule would "exhibit a hostility toward religion that has no place in our Establishment Clause traditions."  *Id.* at 704; *see also id.* 690 (plurality opinion) ("Simply having religious content or promoting a message consistent with a religious doctrine does not run afoul of the Establishment Clause.").  The monument in *Van Orden*, for example, contained an inscription of the Ten Commandments.  But it also had donors who "sought to highlight the Commandments' role in shaping civic morality," a physical setting that "suggests

---

[1] Other circuits have recognized Justice Breyer's concurring opinion to be the controlling opinion in *Van Orden*.  *See, e.g.*, *Staley v. Harris Cnty., Tex.*, 485 F.3d 305, 308 n.1 (5th Cir. 2007) (en banc).

11

little or nothing of the sacred" and "does not readily lend itself to meditation or any other religious activity," and no history of provoking any legal controversy other than the litigation before the Court. *Id.* at 701–02. It was thus constitutional. *Id.* at 704.

The Kneeling Soldier Statue is likewise constitutional under *Van Orden*'s holistic approach. While the Statue is not as old as the Ten Commandments monument in *Van Orden*, it represents a government practice—burying soldiers under cross-shaped grave markers—that has an over ninety-year history. Both experts agree that the Kneeling Soldier Statue is historically accurate in this respect. *See* Piehler Dep., Ex. E at 41–44; Glatthar Surrebuttal Report, Ex. B, at 5–8. The United States military began burying fallen soldiers in temporary overseas cemeteries in World War I, and continued the practice through World War II and the early Korean War. *See* Piehler Dep., Ex. E at 36–38. Mr. Hewett's expert witness agrees that, while these temporary cemeteries contained different kinds of grave markers, cross grave markers were "among the most widely used." *Id.* at 38–40.

Moreover, thanks to the ubiquity of cross headstones in United States permanent overseas cemeteries, the Kneeling Soldier Statue evokes symbolism long associated with the sacrifices of American soldiers, and particularly of those who served in World War II. According to the American Battle Monuments Commission's website, the United States has twenty-four permanent overseas cemeteries, which inter 124,905 American war dead. *See* American Battle Monuments Commission, http://www.abmc.gov/cemeteries/index.php. The vast majority of the headstones in these cemeteries are crosses. These crosses play a prominent role in Americans' memory of

12

World War II. Mr. Hewett's own expert witness admitted that the cross headstones in America's permanent overseas cemeteries "quickly emerged as a cultural image of the battlefield" and became one of the lasting symbols of World War II. Piehler Dep., Ex. E at 106–110, 141–42.

In short, just as the Ten Commandments monument in *Van Orden* carried a secular message about proper social conduct, *see* 545 U.S. at 700 (Breyer, J., concurring in the judgment), the cross in the Kneeling Soldier Statue serves as a historically accurate and widely recognizable shorthand for American soldiers who died in the wars of the mid-Twentieth Century. The predominant message conveyed by the cross as part of a City veterans' memorial is not its religious symbolism, but its importance as a grave marker of a fallen soldier. As Justice Kennedy, writing for a plurality of the Supreme Court in a case concerning a cross war memorial, observed:

> But a Latin cross is not merely a reaffirmation of Christian beliefs. It is a symbol often used to honor and respect those whose heroic acts, noble contributions, and patient striving help secure an honored place in history for this Nation and its people. Here, one Latin cross in the desert evokes far more than religion. It evokes thousands of small crosses in foreign fields marking the graves of Americans who fell in battles, battles whose tragedies are compounded if the fallen are forgotten.

*Salazar v. Buono*, 559 U.S. 700, 721 (2010) (plurality opinion).

Indeed, since the Kneeling Soldier Statue features both a cross and the much larger figure of a soldier, it is even more closely tied to America's overseas cemeteries and less connected to religion than the freestanding cross at issue in *Buono*. It is also readily distinguishable from the war memorial found unconstitutional by the Ninth Circuit in *Trunk v. City of San Diego*, 629 F.3d 1099 (9th Cir. 2011). That memorial was a forty-

13

three-feet-tall freestanding cross that, according to the Ninth Circuit, "physically dominates" the structures beneath it and "evokes a message of aggrandizement and universalization of religion, and not the message of individual memorialization and remembrance that is presented by a field of gravestones." *Id.* at 1116 n.18. By contrast, the Kneeling Soldier Statue depicts an individual soldier kneeling at an individual grave. Rather than "aggrandize" or "universalize" the cross, the Statue connects the cross to the personal experiences of thousands of American veterans of all faiths who saw their comrades buried under the same type of marker.

The physical location of the Kneeling Soldier Statue further demonstrates that it is meant to honor veterans, not promote Christianity. As Exhibit F shows, the Statue is an independent structure: an observer facing it sees nothing else but the trees behind it. *See* Ex. F. But even were an observer to view the Statue together with the Veterans' Memorial also located in Central Park, she would most immediately connect the Statue to the Memorial's large, prominent statement of "ALL GAVE SOME . . . AND SOME GAVE ALL," accompanied by a list of veterans from the City of King who gave their lives in fighting for our nation. *See* Ex. I. Any context that the Veterans' Memorial provides for the Kneeling Soldier Statue, if at all, is accordingly one of remembrance and commemoration for all fallen American soldiers. *See Van Orden*, 545 U.S. at 702 (Breyer, J., concurring in the judgment) (noting that numerous other monuments and markers located in same area "provides a context of history and moral ideals").

Finally, the people responsible for the Kneeling Soldier Statue intended to honor the sacrifices of American veterans. Both Ms. Hunsucker, a member of the City

14

Appearance Committee that approved the statue, and Mr. Warren, the mayor of King, explained that they supported the Statue because they thought it honored American soldiers. *See* Hunsucker Dep., Ex. G at 34; Warren Dep., Ex. H at 55, 57, 60. Mr. Hewett cannot plausibly argue that their desire to honor American veterans was a "sham . . . secondary to a religious objective." *McCreary Cnty., Ky. v. ACLU of Ky.*, 545 U.S. 844, 864 (2005).

In summary, the City of King decided to commemorate the sacrifices of American veterans by erecting a statue that accurately portrays the experiences of thousands of servicemen and women—including, most likely, some of the very same fallen soldiers whose names are listed on the Veterans' Memorial itself. That this statue reflects a historical reality—that many of the soldiers who died overseas during World War II and the Korean War were buried under crosses—does not make it unconstitutional. Indeed, to hold otherwise would "exhibit a hostility toward religion that has no place in our Establishment Clause traditions," and "create the very kind of religiously based divisiveness that the Establishment Clause seeks to avoid." *Van Orden*, 545 U.S. at 704 (Breyer, J., concurring in the judgment).

### 3. The Kneeling Soldier Statue is also constitutional under *Lemon*

Even were this court to disregard *Van Orden* and apply *Lemon*, the Kneeling Soldier Statue would still be constitutional. As articulated by the Fourth Circuit, the "*Lemon* test" requires that government conduct "(1) must be driven in part by a *secular purpose*; (2) must have a *primary effect* that neither advances nor inhibits religion; and (3) must not *excessively entangle* church and State." *Moss*, 683 F.3d at 608 (emphases in

15

original).  The Statue meets all three of these requirements.

The City of King clearly had a secular purpose for erecting the Kneeling Soldier Statue.  The Fourth Circuit has stated that the "a 'legitimate secular purpose' supporting a challenged governmental action will suffice to satisfy the *Lemon* test's first prong," and that "the demonstration of such a legitimate secular purpose is 'a fairly low hurdle.'" *Lambeth v. Bd. of Comm'rs of Davidson Cnty., N.C.*, 407 F.3d 266, 270 (4th Cir. 2005). (citing *Brown v. Gilmore,* 258 F.3d 265, 276 (4th Cir. 2001)).  In fact, the Fourth Circuit "deem[s] the first prong of the *Lemon* test to be contravened only if the action is entirely motivated by a purpose to advance religion." *Id.* (citations omitted).  Here, the City employees who approved the Statue were motivated by the secular purpose of honoring veterans.  As described above, government officials testified that they understood the Statue to depict a soldier paying tribute to a fallen comrade.  The City of King did not act with an illegitimate purpose of endorsing religion in erecting the Statue.  Thus, the Statue easily meets the first prong of the *Lemon* test.

Nor does the Kneeling Soldier Statue have a primary effect of advancing religion. As the Fourth Circuit has acknowledged, the Supreme Court "has consistently concluded that displays with religious content—but also with a legitimate secular use—may be permissible under the Establishment Clause."  *Id.* at 271.  Therefore, the second prong analyzes "whether a particular display, with religious content, would cause a reasonable observer to fairly understand it in its particular setting as impermissibly advancing or endorsing religion." *Id.*  This "reasonable observer" is "deemed aware of the history and context of the community and forum in which the religious [speech takes place]." *Id.* at

271–72 (quoting *Good News Club v. Milford Cent. Sch.,* 533 U.S. 98, 119 (2001)

(quoting *Capitol Square Review & Advisory Bd. v. Pinette*, 515 U.S. 753, 779-80 (1995)

(O'Connor, J., concurring))).  Thus, in *Lambeth*, the Fourth Circuit found that "the

reasonable observer must be deemed aware of the patriotic uses, both historical and

present, of the phrase 'In God We Trust.'"  *Id.* at 271.  Similarly here, a reasonable

observer must be deemed aware of the widespread historical use of cross grave markers

in the military.  The context of a World War II or Korean War soldier evokes the historic

and patriotic use of the cross as a grave marker for fallen soldiers in both temporary and

permanent overseas cemeteries.  Given this context, a reasonable observer would not

view the Statue as promoting religion, but would instead understand that the Statue

symbolizes the loss and sacrifice of those who died defending our nation.

Additional factors support that the Kneeling Soldier Statue does not impermissibly

advance religion.  The Statue is not located near a government building or other symbol

of public authority.  *See Smith v. Cnty. of Albermarle*, 895 F.2d 953, 958 (4th Cir. 1990).

The size of the religious symbol (the cross grave marker) is small and does not dominate

the scene depicted in the Statue.  Instead, the presence of the combat soldier creates an

overall patriotic message of the loss of a fallen comrade and the sacrifice of veterans.  *See*

*Suhre v. Haywood Cnty., N.C.*, 55 F. Supp. 2d 384 (W.D.N.C. 1999) (finding a display of

the Ten Commandments did not endorse religion because the Lady Liberty statue was the

overwhelming feature of the courthouse display).  Indeed, the Statue's message of

patriotism and respect for veterans would remain the same even with a different grave

marker.

17

Finally, the presence of the Kneeling Soldier Statue does not excessively entangle Church and State. "The kind of excessive entanglement of government and religion precluded by *Lemon* is characterized by comprehensive, discriminating, and continuing state surveillance of religious exercise." *Lambeth*, 407 F.3d at 273 (internal quotation marks and citation omitted). In *Lambeth*, the Fourth Circuit found that authorizing the phrase "In God We Trust" to be inscribed on the façade of a government center did not cause excessive entanglement because the display neither "require[d] pervasive monitoring or other maintenance by public authorities" nor "required any other sort of continued and repeated government involvement with religion." *Id.* The same is true here: keeping a Statue at a public park requires neither pervasive monitoring and maintenance by the City of King nor repeated involvement with religion. *See also Suhre*, 55 F. Supp. 2d at 398.

## B. Mr. Hewett's claim under the North Carolina Constitution fails for the same reasons as does his Establishment Clause claim

As Mr. Hewett's Establishment Clause claim against the Kneeling Soldier Statue fails, so does his claim against the Statue under the North Carolina Constitution. The North Carolina Supreme Court had explained that "while the religion clauses of the state and federal Constitutions are not identical, they secure similar rights and demand the same neutrality on the part of the State." *Appeal of Springmoor*, 498 S.E.2d at 180. North Carolina courts have accordingly followed Establishment Clause case law when evaluating similar claims under the North Carolina Constitution. *See id.* at 183 (state constitutional challenge to statute granting tax preferences to religious organizations);

18

*Heritage Vill. Church*, 263 S.E.2d at 731 (state constitutional challenge to charitable solicitation law). North Carolina courts have given no indication that, when considering a challenge to a passive monument like the Kneeling Soldier Statue, the North Carolina Constitution departs from the Establishment Clause. A ruling that Mr. Hewett's claim fails under the Establishment Clause should thus likewise compel a ruling that his claim fails under the North Carolina Constitution.

## V. CONCLUSION

As explained above, there is no genuine issue of material fact as to whether the Kneeling Soldier Statue violates the Establishment Clause of the First Amendment and the North Carolina Constitution. Regardless of the merits of Mr. Hewett's other claims, the Court should grant summary judgment on this distinct and separate issue.

This the 29th day of November, 2013.

/s/ Kearns Davis
Kearns Davis
kdavis@brookspierce.com
N.C. State Bar No. 22014
D.J. O'Brien III
dobrien@brookspierce.com
N.C. State Bar No. 35481
BROOKS, PIERCE, MCLENDON, HUMPHREY & LEONARD, LLP
2000 Renaissance Plaza
230 North Elm Street
Greensboro, North Carolina, 27401
Tel. (336) 373-8850
Fax (336) 378-1001

19

Of Counsel:

Hiram Sasser
Liberty Institute
2001 W. Plano Parkway
Suite 1600
Plano, TX 75075

*/s/ Richard Willard*

Richard Willard
Shannen Coffin
Joseph Hicks
Glenna Riley
Steptoe & Johnson LLP
1330 Connecticut Avenue, NW
Washington, DC 20036
(202) 429-6263 (Phone)
(202) 429-3902 (Fax)
rwillard@steptoe.com

Attorneys for Defendant-Intervenors The American Legion and American Legion Post 290 of King, North Carolina

<u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that the foregoing document was filed electronically with the Clerk of Court using the CM/ECF system, which will send notification of such filing to the following:

Ayesha N. Khan
  khan@au.org
Gregory M. Lipper
  lipper@au.org
John M. Moye
  jmoye@kilpatricktownsend.com
*Attorneys for Plaintiff*

Elizabeth A. Martineau
  emartineau@graykinglaw.com
Bryan H. Beauman
  bbeauman@sturgillturner.com
Crystal-Gaye M. Trotter
  ctrotter@martineauking.com
Joseph Paul Infranco
jinfranco@alliancedefendingfreedom.org
*Attorneys for Defendant*

This the 29th day of November 2013.

*/s/ Glenna Riley*
Glenna Riley
Steptoe & Johnson LLP
1330 Connecticut Avenue, NW
Washington, DC 20036
(202) 429-6454 (Phone)
(202) 429-3902 (Fax)
griley@steptoe.com