IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

STEVEN HEWETT,                          )
                                        )
            Plaintiff,                  )
                                        )
      v.                                )
                                        )
CITY OF KING,                           )
                                        )      1:12CV1179
            Defendant,                  )
                                        )
      and                               )
                                        )
THE AMERICAN LEGION and                 )
AMERICAN LEGION POST 290 OF             )
KING, NORTH CAROLINA,                   )
                                        )
            Defendant-Intervenors.      )

<u>MEMORANDUM OPINION AND ORDER</u>

BEATY, District Judge.

      On November 2, 2012, Plaintiff Steven Hewett ("Plaintiff") filed his Complaint in

this case against Defendant City of King ("Defendant City of King" or "the City") seeking

declaratory and injunctive relief under 42 U.S.C. § 1983, the First Amendment of the United

States Constitution, and Article I, §§ 13 and 19 of the North Carolina Constitution. This

matter is before the Court on Motions for Summary Judgment [Docs. #68, #70, #72] filed

by (1) Defendant City of King, (2) the American Legion and American Legion Post 290 of

King, North Carolina ("Defendant-Intervenors"), and (3) Plaintiff. The Motions for

Summary Judgment are fully briefed and ripe for adjudication by this Court. Also before the

Court is a Motion in Limine to Exclude Expert Testimony [Doc. #88] filed by Plaintiff

requesting that the Court exclude the expert testimony of Professor Joseph T. Glatthaar, the

expert witness retained by Defendant-Intervenors.  Furthermore, Defendant City of King has filed a Motion to File Supplemental Brief [Doc. #113].  Plaintiff has filed a Response in Opposition  to Defendant City of King's Motion for Supplemental Briefing [Doc. #117] and Defendant City of King has filed its Reply Brief [Doc. #118].  For the reasons set forth below this Court will grant in part and deny in part Plaintiff's Motion for Summary Judgment [Doc. #72], the Court will grant in part and deny in part Defendant City of King's Motion for Summary Judgment [Doc. #68], and deny Defendant-Intervenors' Motions for Summary Judgment [Docs. #70].  Though Plaintiff requests that this Court grant its Motion in Limine to Exclude Expert Testimony [Doc. #88] of Dr. Joseph T. Glatthaar, the Court will defer disposition of that Motion to the trial court, as this Court finds that based on the evidence of Plaintiff's expert witness alone, Dr. Kurt Piehler, and other evidence in the record, that there is a genuine issue of material fact relating to the issue that is subject to such evidence.  Thus, the Court will defer all outstanding evidentiary motions in this case to the trial court.  Finally, the Court will deny Defendant City of King's Motion to File Supplemental Brief [Doc. #113].

I.      FACTUAL BACKGROUND

        The following is a presentation of the undisputed facts in this case.  However, to the extent any disputed facts must be resolved in the light most favorable to the nonmoving party, the Court will address those additional facts in the relevant and appropriate context below.

Plaintiff, a resident of King, North Carolina initiated the instant action by filing a Complaint [Doc. #1] with the Court on November 2, 2012. Plaintiff alleges that Defendant City of King violated his First Amendment rights by promoting religion, specifically Christianity, by (1) allowing the Christian flag to fly in the City's Central Park at the Veterans Memorial[1]; (2) placing a statue depicting a soldier kneeling in front of a cross in the City's Central Park at the Veterans Memorial; and (3) hosting invocations, benedictions, and other alleged Christian practices at memorial events held at the Veterans Memorial. The Court will discuss the factual background of each alleged violation in turn.

A.      Flag Display

In 2003, Defendant City of King initiated plans to build a Veterans Memorial in the City's Central Park and designated five members[2] to head the Veterans Memorial committee to create the Memorial. (See August 4, 2003 Committee Minutes [Doc. #75-5], Ex. R6 at 2; August 14, 2003 Committee Minutes [Doc. #74-1], Ex. I1 at 5.)[3] The Memorial was

---

[1] The Court notes that many documents on the record before the Court alternatively refer to the Veterans Memorial as "Veteran's Memorial", "Veterans' Memorial", or "Veterans Memorial." To the extent possible, without consistently altering the language of the cited evidence, the Court will use the designation "Veterans Memorial."

[2] The five members of the committee were (1) Coley A. Hunsucker, (2) Dean Hartgrove, (3) Bobby McGee, (4) Eligah Epperson, and (5) Colonel James Ingram. (See August 4, 2003 Committee Minutes [Doc. #75-5], Ex. R6 at 2; American Legion Post 290 Resps. to Pl.'s First Set of Interrogs. [Doc. #74-4], at 2.)

[3] For the purposes of this Opinion and to maintain consistency, pin citations to the documents filed on the CM/ECF electronic filing system will generally refer to the pagination created by the electronic filing system. However, to the extent some of the documents including deposition testimony provided by Plaintiff contain multiple pages per sheet, the Court will cite to the deposition testimony pages with regard to those documents.

completed in 2004 and consists of three platforms "(1) a large stone pentagonal platform, (2) a smaller black granite pentagonal platform atop the stone platform, and (3) an even smaller black granite platform atop the other two platforms." (Compl. at ¶ 14.) The two larger platforms supports flagpoles on each of the pentagonal corners and the smallest platform support one flagpole at its center. The members of the Veterans Memorial committee recommended that the Memorial display eleven flags: (1) five flags from the five branches of the armed forces, (2) the American flag, (3) the State flag, (4) the City flag, (5) the American Legion flag, (6) the Prisoner of War flag, and (7) the Christian flag. (American Legion Post 290 Resps. to Pl.'s First Set of Interrogs. [Doc. #74-4], at 4.) Veterans Memorial committee member Eligah Epperson ("Epperson") recommended that the Christian flag be flown, which some of the other committee members supported, and Epperson felt that the Christian flag "represented the morals and beliefs of their community." (American Legion Post 290 Resps. to Pl.'s Second Set of Interrogs. [Doc. #74-5], at 2.) However, committee member Colonel James Ingram had reservations about flying the Christian flag on the eleventh flagpole, recommending that the committee choose a flag with a "closer connection to the military or veterans" and did not vote for the recommendation that the Christian flag be flown, due to his reservations. (Id. at 3.) The City adopted the recommendation that the Christian flag be flown on the eleventh flagpole. (Id.)

From 2004 until 2010, the Christian flag was consistently flown at the Veterans Memorial, without complaint, until the City took it down in the fall of 2010. The decision to remove the Christian flag from the Veterans Memorial was prompted by Plaintiff's

anonymous call to City Manager John Cater ("Cater") to voice his concern about the Christian flag being flown at the Veterans Memorial. (Video Recording KK5, <u>available at</u> http://tinyurl.com/ExhibitKK5. In discussing his concern with Cater, Plaintiff's essential complaint was that he believed the display of the Christian flag at the Veterans Memorial was a misrepresentation of veterans and that the City was likely "in violation of separation of church and state." (<u>Id.</u> at 4:55-5:03). Cater noted that Plaintiff was the only person to complain of the Christian flag aspect of the Memorial and Cater told Plaintiff that he, Plaintiff, was ashamed of his complaint because he would not give Cater his full name. However, Cater also acknowledged that he heard arguments similar to Plaintiff's and that "legally speaking [Plaintiff is] probably correct." (<u>Id.</u> at 12:00-12:32). Subsequent to the phone call between Cater and Plaintiff, Cater informed the City Council about Plaintiff's phone call and the city attorney recommended that the City remove the flag. On August 2, 2010, the City Council held a council meeting and discussed, among other things, Plaintiff's phone call to Cater and the city attorney's recommendation. (Aug. 2, 2010 City Council Minutes [Doc. #74-11], at 5.) The City Council voted 3 to 0 to keep the Christian flag at the Veterans Memorial. (<u>Id.</u>) Mayor Pro Tempore Dillard Burnette ("Burnette"), in referring to the anonymity of Plaintiff's phone call, stated that "[t]his shows how cowardly these people are" and Mayor Jack Warren ("the Mayor" or "Mayor Warren") stated that Plaintiff "definitely needs us to pray for him." (Aug. 4, 2010 News Article [Doc. #75-7]; Def.'s Resp. to Pl.'s First Reqs. for Admissions [Doc. #74-10], at 1, 2 (admitting that Mayor Warren and Burnette made statements discussed in news article).) However, after receiving letters from

the American Civil Liberties Union ("ACLU") and upon advice of the City Attorney, the City Council voted the next month, 3 to 1, to remove the Christian flag from the Memorial. (Sept. 15, 2010 City Council Minutes [Doc. #74-13].) Councilman Wesley Carter, the only council member to vote against the removal of the Christian flag at the September 15, 2010 meeting, stated that he felt that it was his and others' "religious right and the religious freedom that we are granted by the Constitution to fly that flag" and that the nation "was founded on Christian principles, and [the] flag represents those principles." (The Stokes News Article [Doc. #81-4], at 1; Def.'s Resp. to Pl.'s First Reqs. for Admissions [Doc. #74-10], at 2 (admitting statement).)

After the City voted to remove the Christian flag, it received phone calls (approximately fifty to one hundred), letters, emails, and a petition with hundreds of signatures, the bulk of which expressed grievances with removal of the Christian flag from the Veterans Memorial. (Petition [Doc. #76]; Letters and Emails [Doc. #76-1]; Cater Email [Doc. 76-2], at 43 (stating that the City received fifty to one hundred phone calls regarding the removal of the Christian flag).) Plaintiff also alleged that he faced repercussions after it was determined that he lodged the complaint regarding the Christian flag. In Plaintiff's deposition testimony, he states that such repercussions included (1) being assaulted by a neighbor; (2) having an abnormal amount of traffic in front of his home; and (3) internet blogs threatening his life. (Pl.'s Dep. [Doc. #81-6], at 14-15.) To some, it appeared that the community was angry with the City Council for taking down the Christian flag. (Hatley Dep. [Doc. #73-3], at 344.) Additionally, protest vigils were held outside of the Veterans

Memorial. (Cater Dep. [Doc. #73-4], at 239.) Cater gave the protesters permission to hold the vigil because the protest had gained so much public support that Cater was concerned that if he made them leave, that the City would risk negative media exposure and fights. (Id. at 240.) However, at least one King resident expressed that she was upset about the "protest taking over of [sic] a public memorial by Christians" via email to the City Clerk, Tammy Hatley ("City Clerk Hatley" or "Hatley") (October 26, 2010 Email [Doc. #76-5].) On October 23, 2010, a rally was held regarding the removal of the Christian flag from the Veterans Memorial, which drew a crowd of thousands of people, where many who spoke at the rally expressed their opposition to the removal of the Christian flag.[4] On October 11, 2010, the City Council held a meeting to discuss the issue regarding the Christian flag, which was open to members of the community for public comment. At the meeting, three options were presented to the public regarding the Christian flag: (1) "Permanently remove the Christian flag from the memorial"; (2) "Create a limited public forum and policy which would designate the single flag pole to display flags of religions, religious symbols or emblems recognized by the U.S. military for placement on government markers"; or (3) "Transfer the memorial to a private entity such as a veteran's group." (October 11, 2010 City Council Minutes [Doc. #74-15], at 1.) At that meeting, 400 to 500 members of the community and people outside of the City of King community attended the meeting and many voiced their support of the Christian flag. For example, Raymond Martini, a resident

---

[4] (See Video Recordings M2, P5, P6, P7, P8, P9, available at http://tinyurl.com/ExhibitM2, http://tinyurl.com/ExhibitP5, http://tinyurl.com/ExhibitP6, http://tinyurl.com/ExhibitP7, http://tinyurl.com/ExhibitP8, http://tinyurl.com/ExhibitP9.)

of Winston-Salem, stated that "[w]hen he heard they were going to take the cross off the fallen soldier monument and had already taken down the Christian flag . . . he was upset and got a permit from the City to stand guard over the monument." (Id. at 5.) Other citizens thanked Mayor Warren for previously stating that the City of King was a Christian community, however the City only admits that Mayor Warren stated that "in [his] opinion King is a Christian community." (Id. at 2, 4; Def.'s Resp. to Pl.'s First Requests for Admissions [Doc. #74-10], ¶ 15 (admitting statement).)

At a November 1, 2010 City Council meeting, members of the City Council voted unanimously 4 to 0 to approve Resolution 2010-21, "a resolution to approve a 'Limited Public Forum Approach for the City of King's Veteran's Memorial at Central Park' " subject to the review of the City's attorneys and the approval of the Council. (November 1, 2010 City Council Minutes [Doc. #96-5], at 3.) Thus, the City Council opted to move forward with the purported limited public forum option to address the ongoing issues with the Christian flag at the Memorial. At that meeting, Mayor Warren stated that he wanted to move forward with the limited public forum approach because it "would give citizens of King access to the Veterans' Memorial for the express and limited purpose of honoring their veterans and the faith traditions that inspired and sustained the service and sacrifice made by their veteran, that they have represented at the Memorial." (Id. at 2.) Councilmen Fowler and Carter stated that the public forum option would be the best way to "honor our veterans." (Id.) Mayor Pro Tempore Burnette agreed with the statements of Councilmen Fowler and Carter and stated that "[w]e have to remember that this memorial is to honor

veterans. Some other issues have gotten in the way and we're going to work through those the best we can." (Id.) The Limited Public Forum Flag Policy ("Flag Policy") was formally adopted on December 6, 2010. (December 6, 2010 City Council Minutes [Doc. #74-19], at 4.) Relevantly, the Flag Policy states that "the eleventh flag pole [of the Veterans Memorial] shall be designated as a limited public forum for the purpose of flying, on a rotating basis . . . , flags which represent the faith traditions of men and women who have served in the U.S. military." (Flag Policy [Doc. #1-2], at ¶ 2.) An "eligible person"[5] may enter into a lottery to fly the flag of their choice for one week at a time. (Id. at ¶¶ 2.b, 8.) The flag displayed on the eleventh flagpole "[s]hall be limited to a flag that displays the emblems of belief recognized by the U.S. Department of Veterans Affairs, as may be amended from time to time, as an available emblem of belief for placement on government headstones or markers." (Id. at ¶ 10.b.) The Flag Policy requires that the individuals flying a flag provide their own flag at their own expense. (Id. at ¶ 10.e.) When the flag is displayed on the eleventh flagpole, relevantly, the following requirements must be followed:

> A temporary sign or placard will be placed on or near the flagpole which will
> identify the name, rank, area served, service dates, and status applicable to the

---

[5] Eligible persons include persons that certify (1) that "they are domiciled in the City of King or that they are family members of veterans who have been memorialized by having a name inscribed on a quarry tile at the Veterans Memorial"; (2) that "the veteran was honorably discharged or killed/missing in action"; and (3) that "they are the veteran or the family member of the veteran being honored." (Flag Policy, at ¶ 7.) Additionally, "[v]eterans domiciled in the City can request a flag be flown on their own behalf." Id. Also, "[f]amily members of veterans who were memorialized by having their name inscribed on a quarry tile at the Memorial and/or those whose name is inscribed on the Memorial itself" can request to have a flag flown in the name of such veterans as long as the quarry tile was inscribed prior to November 30, 2010 or the date of the Flag Policy, whichever date comes first. Id.

veteran in whose honor the flag is being flown. The marker shall also state that the flag is temporarily displayed to honor the role that faith traditions play for men and women who have served and sacrificed to secure the freedoms enjoyed by the citizens of King and the United States of America. . . . A placard or sign, as described in paragraph 4 above, shall be posted on or near the flagpole and contain a legend that reads "This flag is being flown at the request of a private citizen and is the private expression of such individual and is not an official view or expression of the City," or words substantially to that effect.

(Id. at ¶¶ 4, 10.h.)  Finally, the policy states that neither the City Council nor its city representatives or employee "shall participate in their official capacity in the selection of flags chosen by requesters." (Id. at ¶ 11.)  However, the policy does allow such representatives or employees to participate in the forum in their "private or individual capacity." (Id.) Members of the King community have been participating in the Flag Policy since January 2011.  In 2011, 2012, and 2013 the Christian flag has flown on the eleventh flagpole for 47 weeks out of 52 weeks of the year.  (See 2011 – 2013 Limited Public Forum Schedules [Docs. #76-7, #76-8, #76-9].)  In 2011, Plaintiff was selected, pursuant to the lottery, to participate in the limited forum four times and decided not to fly a flag each time.  One other person decided not to fly a flag in 2011.  (2011 Limited Public Forum Schedule [Docs. #76-7].)  In 2012, Plaintiff was again selected to participate in the forum four times and his wife was selected to participate once.  (2012 Limited Public Forum Schedule [Docs. #76-8].)  Plaintiff decided not to fly a flag three times in 2012 and the Buddhist flag one time in 2012.  (Id.)  Plaintiff's wife decided not to fly a flag when she was selected to participate in the forum in 2012.  (Id.)  In 2013, Plaintiff was selected to participate in the forum five times and decided not to fly a flag each time.  (2013 Limited Public Forum Schedule [Docs. #76-9].)  In

2014, the Christian flag is slated to fly 46 weeks out of 52 weeks of the year, with Plaintiff being selected to participate in the forum four times and his wife being selected to participate twice. (2014 Limited Public Forum Schedule [Docs. #83-12].) Each time, Plaintiff and his wife are scheduled to fly a flag in 2014, they have chosen to fly no flag.

B. Cross Statute

In March 2010, the City's Community Appearance Advisory Commission (CAAC) recommended that "a yard shadow figure of a praying soldier made out of metal be commissioned and placed at the King Veteran's Memorial." (March 18, 2010 Commission Minutes [Doc. #74-2], at 5.) On April 5, 2010, the City Council unanimously "approve[d] the construction and placement of a metal Yard Shadow Figure at the Veteran's Memorial." (April 5, 2010 City Council Minutes [Doc. #75], at 3-4.) The CAAC provided American Legion (Local Legion) Trustee, Carl F. Calloway ("Calloway") with the pattern for the cross statue figure. (American Legion Post 290 Interrog. Resps. [Doc. #74-4], at 6.) Defendant City of King paid Calloway for the materials to create the statue.[6] ([Doc. #84-4], at 1; American Legion Post 290 Interrog. Resps. [Doc. #74-4], at 5-6.) The Kneeling Cross Statue ("Cross Statue") is within the vicinity of the main display of flags at the Veterans

---

[6] However, facts are disputed regarding whether Calloway was paid for the material and labor or labor only. Plaintiff has produced a copy of the original receipt, which describes the amount paid by the City to Calloway, stating that the City paid Calloway $225.00 to "cut from steel plate" and "paint[ ] a cut out of soldier kneeling." (Original Receipt [Doc. #84-4], at 1.) However, a second receipt was also produced in evidence, stating that Calloway donated his labor to produce the cross statue figure, [Doc. #84-4], at 2, although an American Legion representative, Donald Holland admits that the second invoice was created in June of 2012 or 2013 to clarify that Calloway was paid for the materials only. (Holland Dep. [Doc. #73-7], at 88-89.)

Memorial. (Cross Statue Photographs [Doc. #77-5, -6]; <u>see</u> April 5, 2010 Minutes [Doc. #75], at 3.) The Cross Statue depicts a soldier kneeling in front of a Latin cross.

C.     Annual Commemorative Events

Plaintiff also complains about the annual ceremonies held in the King Central Park to commemorate Memorial Day, Veterans Day, and September 11. From 2004 until 2012, the City co-sponsored the Veterans Day and Memorial Day annual events with the American Legion, and the Stokes County Arts Council ("Arts Council"). (Def.'s Supplemental Answers to Pl.'s First Interrogs. [Doc. #74-8], at 4.) It appears from the record, that the City also hosted the September 11 annual event until 2010. (Compl. at ¶ 54; Def.'s Answer [Doc. #13], ¶ 54; Hatley Dep. [Doc. #73-3], at 253-55.) Three days after Plaintiff initiated this lawsuit, the City Council voted "to designate all Arts Council events be held at City of King facilities as City sponsored." (November 5, 2012 Council Meeting Minutes [Doc. #75-3], at 6.) A few months after Plaintiff initiated this lawsuit, the City prepared a memorandum, which transferred the "sponsorship, planning, and organization" of the Veterans Day and Memorial Day ceremonies to the American Legion Post 290 and the Arts Council. (April 2013 Mem. [Doc. #79].) Prior to 2013, the event programs have included the City of King as a host of the Veterans Day and Memorial Day events, but the City of King's name is no longer included as a host or sponsor for the programs. (<u>See</u> Event Programs [Doc. #78-7].)

The Veterans Day and Memorial Day ceremonies in the past, specifically, ceremonies that were hosted by the City, have contained prayers by chaplains and speakers that invoke

the name of Christ, have asked the audience to bow their heads in prayer and discussed "the selfless sacrifice of Your Son, Jesus Christ", have stated that fallen soldiers have "followed in the footstep of your Son", and have stated that the fallen soldiers are an "image, reflection, and extension of [God's] love and grace." (Video Recording MM2, available at http://tinyurl.com/ExhibitMM2.) At the more recent 2013 Memorial Day event, after the City purported to transfer sponsorship of the events to third parties, Mayor Warren and the guest speaker acknowledged that the event was put on by the Arts Council and the American Legion; Mayor Warren also thanked both organizations for inviting him to speak at the event and for inviting him "to help the commander lay the wreath." (Video Recording OO3, available at http://tinyurl.com/ExhibitOO3 (5:20 – 5:48, 30:30-31:15).) The speaker at the 2013 Veterans Memorial ceremony also told the audience that "there are two that died for you: the U.S. soldier [and] the Son of God, Jesus Christ" (Video Recording, available at http://tinyurl.com/ExhibitPP4 (00:59 – 1:07) and he asked the audience "to teach your children to respect God, older folks, and the military", (Video Recording, available at http://tinyurl.com/ExhibitPP4 (18:10 – 18:54).)

Despite the City's purported transfer of sponsorship of the annual commemorative events to third-party organizations, the City is still involved, to some degree, with these events. For the 2013 Memorial Day ceremony, the Arts Council requested that several news outlets, organizations, and local municipalities—including the City of King—advertise the event flyer on their websites and electronic bulletin boards. (May 13, 2013 Email [Doc. #79-4], at 1.) The 2013 Memorial Day ceremony flyer only included the names of the Arts

Council and the American Legion Post #290 as the hosts of the event. For the 2013 Veterans Day ceremony, the advertisement the City posted on its website stated "[c]ome join us as we honor and pay our respect to the brave men and women of our armed forces and dedicate the new tiles for the Veterans Memorial." (King Website Advertisement [Doc. #79-8].) However, that flyer also stated that the event was sponsored by the American Legion Post #290 and the Arts Council.

The City has a Special Events Application packet that it requires those requesting to hold special events to fill out and submit for final approval. (See Special Events Packet [Doc. #83-6].) However, Defendant has not presented evidence that the Arts Council has previously submitted applications for its interest in using Defendant City of King's property or facilities for these commemorative events. Given that the Arts Council provides many community and public programs at the King Central Park, the City of King does not require the Arts Council to submit an application for these events. (Doc. Requests [Doc. 79-6], ¶ 4.) The Arts Council is only required to call to reserve the Central Park to hold events. (Id.) Additionally, the Arts Council is also not required to request permits for these events. (Id. at ¶ 5.) From the perspective of Mayor Warren, the City's transfer of the ceremonial events to the Arts Council and American Legion serves as a perpetual reservation for all future Memorial Day and Veterans Day services at the park. (Warren Dep. [Doc. #73-7], at 124-125.) Plaintiff asserts that the City's involvement is further evidenced by the fact that the members of the Fire Department displayed a large American flag from one of its fire trucks during the 2013 Memorial Day ceremony. However, the City did not charge the American

14

Legion or the Arts Council for that service and the fire truck was provided without a prior request from the American Legion or the Arts Council. (Holland Dep. [Doc. #73-7], at 121-22; American Legion Post 290 Interrog. Resps. [Doc. #74-5], at 4.) However, the City's Special Events Application Packet includes a request to the have the City of King Fire Department available, but this request also requires an associated fee. (Special Events Application [Doc. #83-6], at 10.) Furthermore, City Clerk Hatley has also assisted the Arts Council by providing its members with contact lists, a planning checklist, and program templates from past ceremonies for the 2013 Memorial Day ceremony. (See Email [Doc. #79-4]; Hatley Dep. [Doc. #73-3], at 455-56; Warren Dep. [Doc. #73-5], at 84-85.)

Mayor Warren has participated in the annual commemorative events in the past, (see Event Programs [Doc. #78-7] (listing Mayor as a participant in the ceremonies for various events)), and he has participated in the events in 2013, even after the City transferred sponsorship of these events to third parties, (see id. at 9, 24). Mayor Warren's participation has included giving remarks and the welcome, laying of the wreath, and introducing the guest speakers. The speaker at the 2013 Veterans Memorial ceremony also thanked Mayor Warren for introducing him. (Video Recording PP3, available at http://tinyurl.com/ExhibitPP3 (0:00 - 0:09).) Mayor Warren has acknowledged his participation by stating that he accepted an invitation to attend the 2013 Memorial Day ceremony because it was "part of [his] duties as the mayor to be represented [at the ceremony]." (Warren Dep. [Doc. #73-5], at 79.) The 2013 Veterans Day ceremony also continued the City's past practice of dedicating pavers to

veterans, which are installed at the Veterans Memorial and are purchased from the City. (Event Programs [Doc. #78-7]; Hatley Dep. [Doc. #73-3], at 287-289.)

## II.    PROCEDURAL BACKGROUND

In light of the above factual events, Plaintiff filed his Complaint [Doc. #1] with this Court on November 2, 2012.  In his Complaint, Plaintiff seeks the following relief: (1) a "declaratory judgment that the City's practices of displaying the Christian flag and the Cross Statue, and sponsoring prayers and religious activities at official City events are unconstitutional" under the United States and North Carolina Constitutions; (2) a permanent injunction "barring the City from displaying or allowing the display of the Christian flag at the Veterans' Memorial, from displaying the Cross Statue at the Veterans' Memorial, and from sponsoring, directing, or otherwise facilitating prayers and other religious activities at City memorial events"; (3) nominal damages of one dollar; (4) attorneys' fees and costs pursuant to 42 U.S.C. § 1988 and 28 U.S.C. § 2412; and (5) "any other relief that the Court deems just and proper." (Compl. at ¶¶ 72-77.)[7]  On January 3, 2013, the City filed its Answer

---

[7]  In his Complaint, Plaintiff briefly discusses that the City promoted Christianity in other settings ("additional acts and practices"), specifically (1) the City opened City Council meetings with invocations that "regularly invoked Jesus Christ", (2) the City sponsored a National Day of Prayer Service in 2011, (3) the City displayed the Ten Commandments in the lobby of the King Police Department from 1999 to 2010, and (4) the King Police Department's official Facebook page contained quotes and links to the Bible and promotion of local churches. However, Plaintiff only mentions these events in his Complaint as a means to support his allegations that such additional acts and practices "reinforced the message already conveyed by the City's display of the Christian flag, its building of the Cross Statue, and its inclusion of Christian prayers at memorial events . . . ." (Compl. at ¶ 60.)  Thus, it does not appear that Plaintiff's requested relief includes the Court's consideration of these additional acts and practices, which is only reaffirmed by Plaintiff's lack of argument regarding the constitutionality of these issues in his Motion for Summary Judgment [Doc. #72] or in his Brief in Opposition

[Doc. #13].   On February 20, 2013, Defendant-Intervenors filed a Motion to Intervene [Doc. #20][8] and their Answer [Doc. #22].   Ultimately, on September 23, 2013, the Court entered an Order [Doc. #56] allowing Defendant-Intervenors to intervene in this case, which allowed Defendant-Intervenors to join the City in defending the Cross Statue at issue in this case.   After the discovery period, the City, Defendant-Intervenors, and Plaintiff submitted Motions for Summary Judgment [Docs. #68, #70, #72].   The Motions are now fully briefed and ready for adjudication.

---

to Defendant City of King's Motion for Summary Judgment [Doc. #80].   Additionally, these additional acts and practices are not mentioned as part of Plaintiff's requested relief.   As such, the Court will not consider such additional acts and practices, to the extent Plaintiff only requests relief for the matters currently before the Court for summary judgment review.

[8] The Court notes that Plaintiff, in his Brief in Opposition to Defendant-Intervenors' Motion for Summary Judgment [Doc. #84], contends that an adverse inference may be drawn by the Court because American Legion's attorneys failed to instruct the American Legion to preserve discoverable information.  Specifically, Plaintiff points to the fact that American Legion recorded over a November 2012 recorded meeting in which American Legion decided to intervene in the current case.  (See Pl.'s Br. in Opp'n to Def.-Intervenors' Mot. for Summ. J. [Doc. #84], at 5 n.2 (citing Holland Dep. [Doc. #73-], at 106-107).)  It is true that "[u]nder the spoliation of evidence rule, an adverse inference may be drawn against a party who destroys *relevant* evidence." Vodusek v. Bayline Marine Corp., 71 F.3d 148, 155 (4th Cir. 1995).  However, it is not clear to the Court why a recording of a meeting in which Defendant-Intervenors decided to intervene in this case would be relevant to a triable issue before the Court.  Id. at 156 ("To draw an adverse inference from the absence, loss or destruction of evidence, it would have to appear that the evidence would have been relevant to an issue at trial or otherwise would naturally have been introduced into evidence.").  Thus, even if the Court accepted Plaintiff's argument that the Court could draw an adverse inference regarding the alleged spoliation of evidence, Plaintiff has not made it clear what adverse inference should be drawn.  Also, Plaintiff argues that Defendant-Intervenors' Motion to Intervene contained false information, which Plaintiff brought to the attention of the Court in its Motion to File a Supplemental Brief.  However, as it appears that the Magistrate Judge considered Plaintiff's assertions with regard to such false information in entering his Order [Doc. #56] allowing Defendant-Intervenors to intervene, it is not clear why Plaintiff is again bringing this issue to the Court's attention.

III.    SUMMARY JUDGMENT STANDARD OF REVIEW

When the district court is presented with cross-motions for summary judgment "[t]he court must rule on each party's motion on an individual and separate basis, determining, for each side, whether a judgment may be entered in accordance with the Rule 56 standard." 10A Charles Alan Wright, Arthur R. Miller, & Mary Kay Kane, Federal Practice and Procedure § 2720, at 335 (3d ed. 1998). "When considering each individual motion, the court must take care to 'resolve all factual disputes and any competing, rational inferences in the light most favorable' to the party opposing that motion." Rossignol v. Voorhaar, 316 F.3d 516, 523 (4th Cir. 2003) (quoting Wrightman v. Springfield Terminal Ry. Co., 100 F.3d 228, 230 (1st Cir. 1996)). As such, the Court will consider the City's Motion for Summary Judgment and Plaintiff's Motion for Summary Judgment separately. However, as Defendant-Intervenors have filed a Motion for Summary Judgment only to assist the City in defending the Cross Statue, the Court will consider the City and Defendant-Intervenors' Motions for Summary Judgment together.

Federal Rule of Civil Procedure 56(a) states that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Once a party moves for summary judgment and the movant properly supports its motion, the opposing party has the burden of showing that a genuine dispute exists for trial. Matsushita Elec. Indus. Co., v. Zenith Radio Corp., 475 U.S. 574, 586-87, 106 S. Ct. 1348, 1356, L. Ed. 2d 538 (1986). Specifically, the nonmovant must convince the Court that evidence exists creating a

genuine dispute for the fact finder.  See Anderson, 477 U.S. at 252, 106 S. Ct. at 2512.  If no

rational trier of fact could find for the nonmovant, based on the available evidence, there is

no genuine dispute for trial.  Matsushita, 475 U.S. at 587, 106 S. Ct. at 1356.  Thus, "[i]n

order to successfully oppose a motion for summary judgment, the nonmoving party is

required to make a showing sufficient to establish the existence of an essential element to

that party's case, and on which that party will bear the ultimate burden of proof at trial."

English v. Pohanka of Chantilly, Inc., 190 F. Supp. 2d 833, 840 (E.D. Va. 2002) (citing

Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552, 91 L. Ed. 2d 265 (1986)).

Moreover, the Court should not grant a motion for summary judgment " 'unless the entire

record shows a right to judgment with such clarity as to leave no room for controversy and

establishes affirmatively that the adverse party cannot prevail under any circumstances.' "

Campbell v. Hewitt, Coleman & Assocs., Inc., 21 F.3d 52, 55 (4th Cir. 1994) (quoting

Phoenix Sav. & Loan, Inc. v. Aetna Cas. & Sur. Co., 381 F.2d 245, 249 (4th Cir. 1967)).

IV.    DEFENDANT CITY OF KING'S AND DEFENDANT INTERVENORS'
       MOTIONS FOR SUMMARY JUDGMENT

In Defendant City of King's Motion for Summary Judgment, it raises three primary

issues: (1) that Plaintiff lacks standing to bring this action; (2) that, to the extent Plaintiff

challenges invocations at the annual commemorative events, that Plaintiff's claims are moot

because Defendant City of King no longer hosts those events; and (3) that the Veterans

Memorial complies with the Establishment Clause.  Furthermore, in Defendant-Intervenors'

Motion for Summary Judgment, Defendant-Intervenors request that the Court find that the

Cross Statue does not violate the Establishment Clause and the North Carolina Constitution as a matter of law. The Court will address each issue in turn, starting with the City's assertion that Plaintiff lacks standing to bring his claims.

A. Standing

Defendant City of King primarily contends that Plaintiff lacks standing to bring the present action by primarily asserting that Plaintiff has not suffered the requisite injury to bring the instant action.[9] "To meet the constitutional minimum for [Article III] standing, '[a] plaintiff must allege personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief.' " Friends of the Earth, Inc. v. Gaston Copper Recycling Corp., 204 F.3d 149, 154 (4th Cir. 2000) (quoting Allen v. Wright, 468 U.S. 737, 751, 104 S. Ct. 3315, 82 L. Ed. 2d 556 (1984)). In this case, Defendant City of King primarily contends that Plaintiff has not suffered an injury-in-fact and thus does not

_____

[9] To the extent Defendant City of King raises other standing arguments in response to Plaintiff's Motion for Summary Judgment [Doc. #72], the Court will address them in the instant section, regarding Defendant City of King's Motion for Summary Judgment, as standing is a threshold inquiry that the Court must resolve to determine if it has jurisdiction to hear the merits of any case. See United States v. Richardson, 418 U.S. 166, 173, 94 S. Ct. 2940, 41 L. Ed. 2d 678 (1974); Ashley v. Nat'l Labor Relations Bd., 454 F. Supp. 2d 441, 444 (M.D.N.C. 2006), aff'd on other grounds, 255 F. App'x 707 (4th Cir. 2007) ("Standing is a necessary and essential element of the jurisdictional requirements of Article III." (quoting Lujan v. Defenders of Wildlife, 504 U.S. 555, 560, 112 S. Ct. 2130, 119 L. Ed. 2d 351 (1992)). Similarly, the Court will address all mootness arguments made throughout the parties' briefing, prior to addressing the merits of the claim currently before the Court. See Simmons v. United Mortg. & Loan Inv. LLC, 634 F.3d 754, 763 (4th Cir. 2011) (" '[T]he doctrine of mootness constitutes a part of the constitutional limits of federal court jurisdiction.' " (quoting United States v. Hardy, 545 F.3d 280, 283 (4th Cir. 2008)).

have standing. "It has been repeatedly noted that 'the concept of injury for standing purposes is particularly elusive in Establishment Clause cases.' " Suhre v. Haywood Cnty. (Suhre II), 131 F.3d 1083, 1085 (4th Cir. 1997) (quoting Murray v. City of Austin, 947 F.2d 147, 151 (5th Cir. 1991)). Indeed, because "the Establishment Clause plaintiff is not likely to suffer physical injury or pecuniary loss . . . . [the] rules of standing recognize that noneconomic or intangible injury may suffice to make an Establishment Clause claim justiciable." Id. at 1086. Additionally, in Moss v. Spartanburg County School District Seven, the Fourth Circuit stated:

> Feelings of marginalization and exclusion are cognizable forms of injury, particularly in the Establishment Clause context, because one of the core objectives of modern Establishment Clause jurisprudence has been to prevent the State from sending a message to non-adherents of a particular religion 'that they are *outsiders*, not full members of the political community.'

683 F.3d 599, 607 (4th Cir. 2012) (quoting McCreary Cnty. v. ACLU of Ky., 545 U.S. 844, 860, 125 S. Ct. 2722, 162 L. Ed. 2d 729 (2005) (emphasis added in Moss)). With this foundation in mind, the Court will address the standing issue.

      i.    Whether Plaintiff is injured by the text of the Flag Policy or the Flag Policy as applied

Defendant City of King first asserts that Plaintiff lacks standing to challenge the constitutionality of the City's Flag Policy because it alleges that Plaintiff has not sustained an injury-in-fact. Specifically, the City argues that Plaintiff has not provided evidence that he was injured by the text of the Flag Policy and that the Flag Policy creates a limited public

forum for private speech. In addressing Defendant City of King's argument that Plaintiff does not have standing to challenge the Flag Policy by its terms because the City claims that the Flag Policy is a "neutral policy [that] creates a limited public forum for private speech honoring veterans", (Def. Br. in Supp. of Mot. for Summ. J. [Doc. #69], at 8 (emphasis removed)), the Court notes that such an argument is essentially an argument on the merits of Plaintiff's claim, which should be properly reserved for the Court's analysis only after it determines that Plaintiff has standing. See Miller v. Brown, 462 F.3d 312, 316 (4th Cir. 2006) ("It is well established that before a federal court can decide the merits of a claim, the claim must invoke the jurisdiction of the court."). Indeed, the Court must be careful in confusing the merits of Plaintiff's challenge with the threshold standing inquiry. Whitmore v. Arkansas, 495 U.S. 149, 155, 110 S. Ct. 1717, 109 L. Ed. 2d 135 (1990) ("Our threshold inquiry into standing 'in no way depends on the merits of the [petitioner's] contention that particular conduct is illegal.'" (quoting Warth v. Seldin, 422 U.S. 490, 500, 95 S. Ct. 2197, 45 L. Ed. 2d 343 (1975)). This is particularly true as Plaintiff argues that Defendant City of King's Flag Policy has the purpose and effect of endorsing Christianity within the City of King, and essentially argues that the speech involved in this case is government speech. Furthermore, as it relates to his alleged injury, Plaintiff asserts that he is unwillingly exposed to the Christian flag when he visits the Veterans Memorial and that he is "offended by a perceived government expression of religion . . . ." (Pl.'s Br. in Opp'n to Def.'s Mot. for Summ. J. [Doc. #80], at 24 (quoting Lambeth v. Bd. of Comm'rs of Davidson Cnty. (Lambeth. I), 321 F. Supp. 2d 688, 693 (M.D.N.C. 2004), aff'd, 407 F.3d 266 (4th Cir. 2005); see Suhre II, 131

F.3d at 1086 (stating that a plaintiff may satisfy the injury element for standing when the plaintiff comes into "unwelcome direct contact with a religious display that appears to be endorsed by the state")). Thus, in adhering to the Fourth Circuit's acknowledgment that courts should not adopt "a restrictive rule of standing [that] shuts the door on the meritorious and nonmeritorious [claims] alike", <u>id.</u>, the Court does not find that the City's assertion that it has created a neutral policy, allowing private speech, defeats Plaintiff's ability to challenge the display of the Flag Policy, at least on the basis that Plaintiff has not alleged an injury.

However, Defendant City of King also asserts that Plaintiff lacks standing to challenge the policy as applied to him, because he was never denied an opportunity to fly a flag, or to choose to fly no flag at all. In making such an argument, Defendant City of King cites to <u>ACLU Student Chapter-Univ. of Md. College Park v. Mote</u>, 321 F. Supp. 2d 670, 675 (D. Md. 2004), <u>aff'd on other grounds</u>, 423 F.3d 438 (4th Cir. 2005). In <u>Mote</u>, the district court declined to extend standing to a plaintiff who challenged a university policy to set limits on university outsiders' abilities to engage in public speech on the university campus. In concluding that the plaintiffs lacked standing, the district court determined

> The Plaintiffs . . . do not allege that they were unable to hear a particular viewpoint on the . . . campus that they wished to hear . . . . Nowhere in [the] record [was] there a suggestion that [the plaintiffs] attempted to sponsor an outsider and was rejected, nor does the record suggest that [the plaintiffs have] not been able to hear a specific viewpoint when he or she wished to do so.

Id. at 675.  Indeed, the facts of the instant case bear some resemblance to the facts in Mote, to the extent that the complaining parties in both cases challenged policies, which, as applied, do not appear to injure them.  Specifically, in this case, Plaintiff has been able to participate in the lottery under the Flag Policy multiple times, in fact, every year since the Flag Policy was put into effect Plaintiff was able to fly a flag of his own choosing, or he could choose to fly no flag at all, without interference from Defendant City of King.  Additionally, the Court notes that Plaintiff states, in his Reply Brief regarding his Motion for Summary Judgment [Doc. #94], that he "challenges the City's unlawful promotion of Christianity, not the denial of access to a public forum."  (Id. at 4 (citing to Compl. at ¶¶ 61-70)); see Doe v. Va. Dep't of State Police, 713 F.3d 745, 762 (4th Cir. 2013) ("An as-applied challenge attacks the constitutionality of a statute 'based on a developed factual record and the application of a statute to a specific person.' " (quoting Richmond Med. Ctr. for Women v. Herrig, 570 F.3d 165, 172 (4th Cir. 2009) (en banc))).  Therefore, because Plaintiff does not challenge the Flag Policy as applied to him, and because in the alternative, the Court finds that Plaintiff would not have standing to assert an as-applied challenge to the Flag Policy based on the facts and cases cited above, the Court will not address any issues relating to the application of the Flag Policy to Plaintiff.

ii.     Whether Plaintiff has suffered an injury because he once displayed a Christian flag in his yard and opted to fly a Buddhist flag under the Flag Policy

Defendant City of King also implies that because Plaintiff once displayed a Christian flag in his own yard and opted to fly a flag with a Buddhist emblem on the flag pole at issue

in this case, it makes Plaintiff's "alleged distaste for religious symbols . . . specious at best." (Def.'s Br. in Supp. of Mot. for Summ. J. [Doc. #69], at 10.)  Plaintiff attempts to combat the City's argument by pointing to one of his declarations, in which Plaintiff stated that he placed the Christian flag in his own yard for a few days to demonstrate that he objects to the City's advancement of religion but that he does "not object to religion in general or to individuals displaying religious symbols on their own private property."  (Hewett Second Decl. [Doc. #80-2], ¶ 3).  Plaintiff has also stated that he displayed the Buddhist flag once "to demonstrate that not everyone in the City of King is a Christian."  (Id. at ¶ 5.)  The Court finds that Defendant City of King's implication requires discussion, as it raises a meritorious argument regarding whether Plaintiff has actually suffered an injury as he has previously opted to display religious symbols voluntarily.  Although it appears that Plaintiff may object to the City's endorsement of religion in general, as can be gleaned from the Complaint and record, it appears that Plaintiff's primary contention is that he takes issue with the City's alleged endorsement of Christianity, which he believes makes non-Christians feel like outsiders.  Thus, the Court finds that Plaintiff's decision to fly the Buddhist flag pursuant to the Flag Policy is not inconsistent with his challenge that the City unlawfully promotes Christianity.

In addressing the City's argument that Plaintiff has not suffered an injury because Plaintiff briefly displayed the Christian flag on his yard, Plaintiff attempts to rebut the City's argument by citing to three cases in which religious leaders were allowed to bring Establishment Clause claims against a government entity or public official for advancing

religious beliefs. See, e.g., Adland v. Russ, 307 F.3d 471, 477-78 (6th Cir. 2002) (standing satisfied for Rabbi and reverends, among others, to challenge Ten Commandment monument on state capitol grounds); Smith v. Cnty. of Ablemarle, Va., 895 F.2d 953, 954-55 (4th Cir. 1990) (allowing Christian ministers, among other religious officials, to challenge a county display of a nativity scene); Kaplan v. City of Burlington, 891 F.2d 1024 (2d Cir. 1989) (allowing the Rabbi, among others, to bring an Establishment Clause claim for displaying a menorah on public property). However, the Court notes that in two cases cited by Plaintiff, Adland and Smith, the circuit courts, in their discussion of standing, did not address the specific question of whether a person of a certain religious belief can bring a claim alleging that the government has violated the Establishment Clause by endorsing or establishing the religion that the claimant also adheres to. Furthermore, Kaplan does not even address the standing inquiry. Nevertheless, the Court finds that Plaintiff's personal display of the Christian flag on his private property does not prevent a finding that Plaintiff has standing. First, Plaintiff has maintained, on the record, that he is not Christian, (Hewett Dep. [Doc. #81-6], at 19), and Defendant City of King does not argue that Plaintiff is Christian. The Court finds Plaintiff's lack of belief in Christianity important, as Plaintiff argues that the City's endorsement of Christianity has the effect of treating others, that are not Christian, as "second-class citizens." (Compl. [Doc. #1], at 26.) Second, the Court finds instructive the Ninth Circuit's decision in Buono v. Norton, 371 F.3d 543, 548 (9th Cir. 2004), in which the court noted that standing could be maintained by plaintiffs who "are members of religious sects but nonetheless are offended by religious displays on government

property." Id. (citing Ellis v. City of La Mesa, 990 F.2d 1518, 1523 (9th Cir. 1993) where the Ninth Circuit affirmed the district court's decision in finding that members of Catholic and Episcopalian faiths had standing to challenge the government's alleged endorsement of a cross symbol). Thus, the Court does not find that Plaintiff's decision to fly a Christian flag in his own yard, precludes him from challenging the display of the Christian flag at the Veterans Memorial.

iii.    Whether Plaintiff has prudential standing concerning the Flag Policy

Additionally, Defendant City of King argues that Plaintiff lacks standing to challenge the Flag Policy because of prudential concerns. Specifically, Defendant City of King asserts that Plaintiff, in objecting to the Flag Policy, is raising the legal rights of others because Plaintiff was given several opportunities to display a flag of his choice through the Flag Policy lottery system. As a general proposition, a person may lack standing if he or she seeks to raise the rights of others. See Moss, 683 F.3d at 606 (citing Barrows v. Jackson, 346 U.S. 249, 255, 73 S. Ct. 1031, 97 L. Ed. 1586 (1953)). However, as the Court noted above that Plaintiff argues that the City's perceived endorsement of Christianity, specifically through a display of the Christian flag, has injured him, the Court does not find that the City's prudential argument affects the Court's determination that Plaintiff has standing regarding the flying of the Christian flag.[10]

---

[10] The Court will note that Plaintiff has briefly asserted that another person, who is not a party to this litigation, was not allowed access to the forum because he did not meet the criteria under the forum's policy. (See Pl.'s Br. in Opp'n to City of King's Mot. for Summ. J. [Doc. #80], at 16). Plaintiff has also asserted that a separate individual, who is also not a party to this litigation, was confronted with interference when she opted not to fly a flag when she had access to the

iv.   Whether Plaintiff has suffered an injury because he attended annual commemorative events and Plaintiff previously participated in the City's Day of Prayer Ceremony

Defendant City of King also asserts that Plaintiff does not have standing to challenge the invocations at City events. Specifically, in its Reply Brief, Defendant City of King points to an audio recording of Plaintiff at the City's former National Day of Prayer Ceremony, where Plaintiff himself addressed the crowd and offered a Buddhist prayer and also invoked the name of Jesus. (Audio Recording of National Day of Prayer Service, App. 11, 1:13:00-1:17:02 (on file with Court).) Thus, it appears that Defendant City of King argues that because Plaintiff participated in past ceremonial events by offering an invocation, Plaintiff cannot show that he has been injured by Christian invocations and other Christian content involved at ceremonial events. However, in reviewing the audio recording offered by

---

flag forum. (See Compl. at ¶¶ 41, 42). However, the Court notes that those arguments are essentially assertions that the Flag Policy was impermissible or inconsistently applied to other individuals, who are not parties to this litigation. Thus, as stated by the Supreme Court in Barrows,

> Ordinarily, one may not claim standing . . . to vindicate the constitutional rights of some third party . . . Apart from the jurisdictional requirement, the Court has developed a complementary rule of self-restraint for its own governance . . . which ordinarily precludes a person from challenging the constitutionality of state action by invoking the rights of others . . . The common thread underlying both requirements is that a person cannot challenge the constitutionality of a statue unless he shows that he himself is injured by its operation.

346 U.S. at 255, 73 S. Ct. 1031. As Plaintiff has acknowledged that he is not contesting that he was denied access to the purported Flag Policy forum and the Court alternatively concludes that Plaintiff does not have standing to do so, the Court will not address Plaintiff's arguments, to the extent he suggests that the Flag Policy was applied to other individuals in an unconstitutionally manner.

Defendant City of King, the Court notes that the recording undercuts the City's argument. Specifically, the recording includes statements by Plaintiff calling on members of the City of King community to respect those with other, non-Christian beliefs and cultural backgrounds and to refrain from putting one religion above another. Although, Plaintiff invokes the name of Christ, Plaintiff refers to Christ in the context of acknowledging that the teachings of Christ show that "he who is without sin cast the first stone." (Video Recording of National Day of Prayer Service, 1:16:10-1:16:33.) As such, it appears that Plaintiff's invocation was a message of religious tolerance of all faiths and religions, which does not appear to be inconsistent with Plaintiff's claim that the commemorative events at issue in this case are overtly Christian, advance Christianity, and are in violation of the Establishment Clause. Furthermore, to the extent Defendant City of King argues that Plaintiff's participation in or attendance of the City memorial events precludes him from asserting standing, the Court notes that "Plaintiff[ ] need not allege that [he] changed [his] conduct to avoid contact with an offensive display [or religious activity]." Lambeth I, 321 F. Supp. 2d at 691 (quoting Suhre II, 131 F.3d at 1088 for the proposition that "[i]n evaluating standing, the Supreme Court has never required that Establishment Clause plaintiffs take affirmative steps to avoid contact with challenged displays or religious exercises.").

Defendant City of King also points to Plaintiff's deposition testimony where he acknowledged that he liked "f**king with these people", which based upon the related video recording was referencing his recitation of a Buddhist prayer at the National Day of Prayer Ceremony. (Hewett Dep. [Doc. #86-13]; Audio Recording of National Day of Prayer

29

Service, 1:32:30-1:35:00.)  Thus, Defendant City of King challenges the sincerity of Plaintiff's injury.  Although the Court acknowledges Plaintiff's off-color remark, the Court does not find that such a remark diminishes Plaintiff's asserted injury, that is, that he was unwillingly exposed to what he perceives as a government endorsement of religion.

v.      Whether Plaintiff has sufficient contact with the Christian flag,
Cross Statue, and the Veterans Memorial to show injury-in-fact

Defendant City of King also argues that Plaintiff lacks standing because he does not have "frequent, unwelcome contact" with the Cross Statue, the Christian flag display, and the Veterans Memorial in general.  (Def.'s Reply Br. [Doc. #86], at 15.)  Specifically, Defendant City of King appears to argue that because Plaintiff "must make a special trip to the Central Park to view the Memorial, especially the statue, which he cannot see from the road", Plaintiff lacks the requisite "unwelcome direct contact" required to show standing.  (Def.'s Br. in Supp. of Mot. for Summ. J. [Doc. #69], at 10.)  However, the Fourth Circuit has pointed out that "where there is a personal connection between the plaintiff and the challenged display in his or her home community, standing is more likely to lie."  Suhre II, 131 F.3d at 1087.  Additionally, in Suhre II, the Fourth Circuit noted that "personal contact with state-sponsored religious symbolism is precisely the injury that was sufficient to confer standing in School District of Abington v. Schempp."  Id. at 1086.  In this case, Plaintiff argues that he "challenges the promotion of Christianity by the City in which he lives, through displays and ceremonies to which he is repeatedly directly exposed."  (Pl.'s Br. in Opp'n to Def.'s Mot. for Summ. J. [Doc. #80], at 24.)  Additionally, Defendant City of King

cites to Suhre II for its proposition that Plaintiff must be repetitively required to be present at the Memorial to have standing. However, in Suhre II, the Fourth Circuit determined that Plaintiff had a cognizable injury as a "user of the court's" and as a "participant in local politics and government." Suhre II, 131 F.3d at 1090. Distinguishably, in Valley Forge Christian College v. Americans United for Separation of Church and State, Inc., 454 U.S. 464, 102 S. Ct. 752, 70 L. Ed. 2d 700 (1982), the plaintiffs in that case were denied standing because they had "absolutely no personal contact with the alleged establishment of religion." Suhre II, 131 F.3d at 1086. Thus, the Court finds the facts of this case to stand somewhere in between the facts of Suhre II (where the plaintiff sustained sufficient frequent contacts with the challenged religious displays in the courthouse because of his rights to seek judicial remedies in that courthouse and his participation in local politics) and Valley Forge (where the plaintiffs had no personal contact with the challenged activity and the plaintiffs resided in Maryland and Virginia, were headquartered in Washington D.C., and learned of the challenged activity through a news release). However, the Court finds that the facts of this case are closer to the facts of Suhre II, because here, Plaintiff has repeatedly faced the alleged religious displays within the past few years while attending the annual memorial events hosted by the City. Additionally, although the Court makes no finding as to whether Plaintiff has a legally recognized right to visit the Veterans Memorial to pay homage to fallen soldiers, finding that Plaintiff does not have standing because he is not required to visit the Memorial, which is in a city park open to all, particular those that wish to honor veterans, would likely be inconsistent with Suhre II. (See King Website page [Doc. #74-3], at 2 ("The memorial is

31

dedicated to all veterans who have served in any of the 5 branches of the armed services from World War I to the present.")); cf. School District of Abington Twp. v. Schempp, 374 U.S. 203, 224-25, 83 S. Ct. 1560, 10 L. Ed. 2d 844 (1963) (stating that standing to challenge required Bible readings was not "mitigated by the fact that individual students may be absent themselves upon parental request, for the fact furnishes no defense to a claim of unconstitutionality under the Establishment Clause."); Newdow v. Bush, 391 F. Supp. 2d 95, 103 (D.D.C. 2005) ("In the religious-display cases, a personal connection exists if a plaintiff is a member of the community in which the challenged religious exhibit is displayed, or if the plaintiff frequently visited the site of the display." (citing cases)).  Therefore, the Court finds that Plaintiff has had sufficient contacts to support his standing to pursue his claims.

> vi.  Whether Plaintiff has too much contact with the Veterans Memorial, the Christian flag, and the Cross Statue to confer an injury

Next, Defendant City of King argues that Plaintiff has too much contact with the Christian flag and the Cross Statue to confer standing.  Specifically, the City argues that because Plaintiff voluntarily visits the Memorial, he cannot show that the contact with the Christian flag and Cross Statue is unwelcomed.  However, as the Fourth Circuit noted in Suhre II, Plaintiff is not required to "take affirmative steps to avoid contact with challenged displays or religious exercises." Suhre II, 131 F.3d at 1088.  Also noted by the Fourth Circuit, "[a]bsent Supreme Court direction, we are unwilling to craft a rule of standing for religious display cases that would effectively add 'insult' to the existing 'injury' requirement . . . . Rules of standing that require plaintiffs to avoid public places would make religious minorities into

outcasts." Id. As Plaintiff has declared, he has visited the Veterans Memorial when he attends the City's annual commemorative events and will attend them in the future. (Pl.'s Decl. [Doc. #73-2], ¶ 10.) He also declared that he visits the Veterans Memorial to reflect on the memory of deceased friends. (Id. at ¶ 11.) The Court finds that Plaintiff's decision to continue visiting the Veterans Memorial to reflect on deceased friends despite his alleged unwelcome contact with aspects of the Memorial falls squarely within the Fourth Circuit's determination that "[f]orcing an Establishment Clause plaintiff to avoid the display of which he complains in order to gain standing to challenge it only imposes an extra penalty on individuals already alleged to be suffering a violation of their constitutional rights." Suhre II, 131 F.3d at 1088. As such, the Court finds no merit in the City's argument that Plaintiff has too much contact with the Memorial to confer standing.

Additionally, the Court notes the inherent conflict with the arguments asserted by the City. The City first asserts that Plaintiff does not have enough contacts with the Memorial to confer standing because he visits the Memorial for commemorative events only and Plaintiff is not required to visit the Memorial. However, the City subsequently argues that because Plaintiff voluntarily visits the Memorial during these ceremonies, that his contacts with the displays at the Veterans Memorial are not unwelcomed. However, the Fourth Circuit in Suhre II gives guidance on such a position. Specifically, the Suhre II court stated that "[a] stringent requirement that plaintiffs take steps to cure their own injury would create mootness problems in many an Establishment clause case." Suhre II, 131 F.3d at 1089. Thus, the Fourth Circuit in Suhre II stated that it was "unwilling to put potential

Establishment Clause plaintiffs to the task of precisely calibrating their reactions to offensive state-sponsored religious symbolism at the peril of either reacting too little to have standing or reacting so much that their constitutional claims are deemed moot." Id. Thus, the Court is unwilling to credit the City's argument that Plaintiff visits the Memorial too much to show that his contact is unwelcome for the purposes of standing, but that Plaintiff has visited the Memorial too little to show that his contacts were frequent for the purposes of standing.

vii.    Whether Plaintiff has shown a likelihood of future harm

Defendant City of King also asserts that Plaintiff fails to prove that he will experience future harm from the Memorial.  Specifically, Defendant City of King argues that because Plaintiff "has [not] proved any facts showing regular and repetitive requirements for him to be present in Central Park and near the Memorial" and because he "cannot see the soldier statue from the road" when he drives past Central Park every day, he cannot show any threat of a future injury.  (Def.'s Br. in Supp. of Mot. for Summ. J. [Doc. #69], at 10.)  Indeed, "the Supreme Court [has] held that standing to seek injunctive relief does not exist unless the plaintiff can show a substantial likelihood of future harm." Payne v. TR Assocs., LLC, 880 F. Supp. 2d 702, 705 (E.D.N.C. 2012) (citing City of Los Angeles v. Lyons, 461 U.S. 95, 111, 103 S. Ct. 1660, 75 L. Ed. 2d 675 (1983)).  However, as noted above, the Fourth Circuit has determined that standing is more likely for a plaintiff when there is "a personal connection between the plaintiff and the challenged display in his or her home community."  Suhre II, 131 F.3d at 1087.  Plaintiff is a veteran of the United States Army and has served his country in Afghanistan.  (Compl. at ¶ 1; Def.'s Answer at ¶ 1.)  Plaintiff has stated that he intends to

34

continue attending the events at the Veterans Memorial that commemorate veterans in the future, even though he believes that the "prayers and other Christian content at these ceremonies serve to honor only veterans who are Christian" and that "[e]xcept to attend the memorial ceremonies . . . [Plaintiff] no longer visit[s] the Veterans Memorial to reflect on deceased friends because [he] do[es] not wish to encounter the Christian flag and Cross Statue." (Pl.'s Decl. [Doc. #73-2], ¶¶ 10, 11.) Thus, as Plaintiff acknowledges that he will continue to participate in the ceremonies that honor veterans and he has declared that he has attended almost all of the City's [commemorative] events in the past since returning from Afghanistan in 2004, see Suhre II, 131 F.3d at 1091 (citing cases for the proposition that although "past injury [is] probative of likely future injury"), the Court finds that Plaintiff has adequately demonstrated a substantial likelihood of future harm.

Furthermore, Defendant City of King asserts that because it no longer hosts the commemorative events that include invocations, as they are currently hosted by third-party organizations, that Plaintiff will never suffer any future harm because of the City's asserted practice of engaging in prayer at public events. However, the Court notes that Plaintiff has stated that he intends to continue attending the events at the Veterans Memorial that commemorate veterans, even though the he believes that the "prayers and other Christian content at these ceremonies serve to honor only veterans who are Christian." (Pl.'s Decl. [Doc. #73-2], ¶ 10); see Suhre II, 131 F.3d at 1091. Additionally, to the extent Defendant City of King also asserts that it no longer hosts these events and thus Plaintiff will no longer suffer harm as caused by Defendant City of King, the Court notes that Plaintiff asserts, and

has provided evidence of what appears to be Defendant City of King's continued involvement in the most recent commemorative events, such that Plaintiff argues that the City's involvement still has the effect of endorsing these events.  Cf. Chambers v. City of Fredrick, 292 F. Supp. 2d 766, 770 (D. Md. 2003) (finding that the plaintiff had standing, in part, when the plaintiff argued that the city's sale of property to a third party was a sham "intended to remove [the city's] legal responsibility for the [Ten Commandments] monument").  Furthermore, to the extent Defendant City of King's argument is an attempt to assert that Plaintiff's claim regarding the commemorative events is moot, as it argues that those events are now hosted by third parties, the Court will address such an argument in its discussion of the mootness doctrine.

Therefore, in light of the foregoing, the Court finds that Plaintiff has suffered a sufficient injury-in-fact to confer standing to him to challenge the City's asserted display of the Christian flag, the City's erecting of the cross statue, and the City's alleged practice of engaging in Christian prayer and other Christian content at the annual commemorative events that are at issue in this case.  Additionally, the Court finds that the injuries Plaintiff has asserted are fairly traceable to the actions of the City and because Plaintiff will likely suffer future harm, these injuries can be redressed by Plaintiff's requested injunctive relief. Thus, the Court finds that Plaintiff has Article III standing.

B.      Mootness

Defendant City of King also contends, to the extent Plaintiff brings claims against it for violating the Establishment Clause and the North Carolina Constitution for hosting commemorative events that involve Christian content, that such an issue is moot because Defendant City of King no longer hosts such commemorative events.  Specifically, the City of King has stated that those events, particularly, the Memorial Day, Veterans Day, and September 11th events, are hosted by third parties, the Arts Council and the American Legion.   Indeed, Defendant City of King has even provided evidence, by way of a memorandum memorializing the City's agreement with the American Legion and the Arts Council, confirming that third parties would "take over sponsorship, planning, and organization of the Veterans Day and Memorial Day celebrations held annually with the City of King corporate limits.  (Memorialization Mem. [Doc. #79].)  Defendant City of King has also provided a letter signed by Mayor Warren from 2010, addressing whether the City would still host the September 11 commemorative ceremonies, in which Mayor Warren responded that "[f]uture memorial services of this type in the City of King will be sponsored and organized by private organizations."  (April 19, 2010 Letter [Doc. #69-12].)

"A case becomes moot—and therefore no longer a 'Case' or 'Controversy' for purposes of Article III—'when the issues presented are no longer "live" or the parties lack a legally cognizable interest in the outcome.' "  Already, LLC v. Nike, Inc., 133 S. Ct. 721, 726-27, 184 L. Ed. 2d 553 (2013) (quoting Murphy v. Hunt, 455 U.S. 478, 481, 102 S. Ct. 1181, 71 l. Ed. 2d 353 (1982) (per curiam) (some internal quotation marks omitted)).  The Supreme

Court has "recognized, however, that a defendant cannot automatically moot a case simply by ending its unlawful conduct once sued." Id. at 727 (quoting City of Mesquite v. Aladdin's Castle Inc., 455 U.S. 283, 289, 102 S. Ct. 1070, 71 L. Ed. 2d 152 (1982)); see Knox v. Serv. Emps. Intern'l Union, Local 1000, 132 S. Ct. 2277, 2287, 183 L. Ed. 2d 281 (2012) ("The voluntary cessation of challenged conduct does not ordinarily render a case moot because dismissal for mootness would permit a resumption of the challenged conduct as soon as the case is dismissed."). Thus, when a defendant argues that its voluntary compliance moots a case, such a defendant " 'bears the formidable burden of showing that it is absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur.' " Already, LLC, 133 S. Ct. at 727 (quoting Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc., 528 U.S. 167, 190, 120 S. Ct. 693, 145 L. Ed. 2d 610 (2000)). In this case, Defendant City of King argues that it transferred the sponsorship of the Memorial and Veterans Day ceremonies to the Arts Council and the American Legion in April 2013, several months after Plaintiff filed his Complaint with the Court—alleging, in part, that Defendant City of King's conduct of hosting Memorial and Veterans Day ceremonies violated the Establishment Clause—, and ceased hosting those events. Although Defendant City of King has offered a memorandum, which memorializes the transfer of the sponsorship of these two events to private parties, and witness testimony that the City did transfer such tasks to third parties, the Court finds that such evidence does not satisfy Defendant City of King's burden under the stringent "absolutely clear" standard discussed in Already, LLC. Specifically, in Already, LLC, the Court found that the defendant's trademark counterclaim was properly mooted

only after the plaintiff entered into an "unconditional and irrevocable covenant" which prohibited it from filing suit or making any claim or demand against the defendant, its affiliates, or any of the defendant's future designs. Already, LLC, 133 S. Ct. at 728. The Supreme Court determined that the challenged action "could not reasonably be expected to recur." Id. at 727.

The City argues that its burden to show that its behavior could not reasonably be expected to recur is "exceptionally light for government actors that this Court can presumptively trust." (Def.'s Br. in Response to Pl.'s Mot. for Summ. J. [Doc. #83], at 10.) Indeed, the City cites to two cases, America Cargo Transport, Inc. v. United States, 625 F.3d 1176, 1180 (9th Cir. 2010) and Troiano v. Supervisor of Elections in Palm Beach Cnty., 382 F.3d 1276, 1282-83 (11th Cir. 2004), where those courts determined that there was a presumption that the government acted in good faith and that the voluntary cessation exception to the mootness doctrine would be applied less stringently to government actors. Thus, the City argues that because the "record is absent of any intent by the City to re-initiate sponsorship in the future" the Court should "accept its representation about stopping sponsorship in the past and not re-initiating it in the future." (Def.'s Br. in Response to Pl.'s Mot. for Summ. J. [Doc. #83], at 10.) However, the Court notes that the Fourth Circuit, in Wall v. Wade, 741 F.3d 492, 497-498 (4th Cir. 2014), expressly declined to decide whether it would adopt an approach "employed by several of [its] sister circuits, in which governmental defendants are held to a less demanding burden of proof than private defendants," regarding the voluntary cessation doctrine. In Wall, the Fourth Circuit still applied the Already, LLC

39

and <u>Laidlaw</u> "absolutely clear" standard to the government defendant in that case and maintained that the court "ha[s] previously held that when a defendant retains the authority and capacity to repeat an alleged harm, a plaintiff's claim should not be dismissed as moot." <u>Id.</u> at 497. Still, Defendant City of King argues that its past practices of discontinuing previous acts that presented questions of constitutionality under the Establishment Clause "demonstrates that the City is willing to evaluate it laws and practices, and change [them] where it deems appropriate." (Def.'s Reply Br. [Doc. #86], at 12-13 n.6.) Specifically, Defendant City of King points to its past practice of delivering Christian prayer at city council meetings, which it later made more inclusive by giving nondenominational invocations at the city council meetings. (<u>Id.</u>; <u>see</u> Warren Dep. [Doc. #86-8].) Defendant City of King also points to the display of the Ten Commandments in the King Police Department, which it maintains has "been addressed by the City." (Def.'s Reply Br. [Doc. #86], at 12-13 n.6.) Based on the evidence cited by the City and its Answer [Doc. #13] to the Complaint, it appears that the City "addressed" the issue of having a Ten Commandments display in its Police Department by adding other documents, such as the Magna Carta and the Constitution, to the wall bearing the Ten Commandments display based on the advice of counsel. (Def.'s Reply Br. [Doc. #86], at 12 n.6 (citing Warren Dep. [Doc. #86-9] and Cater Dep. [Doc. #86-10]); Def.'s Answer [Doc. #13], ¶ 58.) However, based on the evidence before the Court, the City appears to have continued to engage in conduct, or at least acknowledged its ability to engage in such conduct, that it previously declared that it ceased. Specifically, Plaintiff has pointed to evidence that in April 19, 2010, in a letter

addressing the Americans United for Separation of Church and State inquiry regarding the annual September 11 memorial event, Mayor Warren told the organization that such an event in the City of King would "be sponsored and organized by private organizations." (April 19, 2010 Letter [Doc. #69-12].)  However, in a subsequent September 4, 2012 City of King Council meeting, a meeting held two years after Mayor Warren sent out the April 19, 2010 letter, Mayor Warren asked the City Council whether "they would like for the City of King to continue hosting a Patriot's Day (9-11) Memorial Service" and the Council voted to discontinue those events, at that 2012 meeting, because of low attendance and staffing issues. (September 4, 2012 City Council Minutes [Doc. #75-2], at 9.)  Thus, it appears that even after the Mayor officially told others that the City would no longer be sponsoring a September 11 event, the City Council still considered the City of King the actual sponsor of the September 11 event up until 2012.[11]  Thus, although the City has presented some evidence that it has, in the past, altered certain practices because of legal concerns, the Court does not find that Defendant City of King has met its "formidable burden of showing that it is absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur."  This is particularly true in light of the fact that it appears that the City had not given up its practice of sponsoring the September 11 ceremonies, a ceremony at issue in this case, until two years after Mayor Warren told a member of the public that the City ceased such a practice.  As such, the Court does not find that the City's purported transfer of the annual

---

[11] However, it appears based on the evidence on the record, that the City held its last September 11 ceremony, at the latest, in 2010.  (Compl. at ¶ 54; Def.'s Answer at ¶ 54; Hatley Dep. [Doc. #73-3], at 253-55.)

commemorative events to the American Legion and the Arts Council is enough to moot Plaintiff's claim challenging the annual commemorative events.

C.      Establishment Clause

The Establishment Clause provides that "Congress shall make no law respecting an establishment of religion." U.S. Const. amend. I.  "Although applicable originally only against the federal government, the Establishment Clause has been incorporated against the states by the Fourteenth Amendment." Myers v. Loudoun Cnty. Pub. Sch., 418 F.3d 395, 402 (4th Cir. 2005) (citing Everson v. Bd. of Educ., 330 U.S. 1, 8, 67 S. Ct. 504, 91 L. Ed. 711 (1947)). As such, the Court will analyze Plaintiff's claims of the City's alleged violations under the Establishment Clause.  The Court will address the purported violations in the following order (1) the Cross Statue, (2) the Christian Flag Display, and (3) the Annual Memorial Events.

i.      Cross Statue

Defendant City of King, and Defendant-Intervenors, argue in their respective Motions for Summary Judgment [Docs. #68, #70] that summary judgment should be granted in their favor with respect to the Cross Statue, by arguing that the presence of the Cross Statue at the Veterans Memorial does not violate the Establishment Clause.  As an initial matter, the Court notes that the parties do not dispute that placing the Cross Statue in the City of King Central Park was a government action, which is required to maintain an Establishment Clause action.  Cf. Lynch v. Donnelly, 465 U.S. 668, 672, 104 S. Ct. 1355, 79

L. Ed. 2d 604 (1984) ("In every Establishment Clause case, we must reconcile the inescapable tension between the objective of preventing unnecessary intrusion of either the church or the state upon the other, and the reality that, as the Court has so often noted, total separation of the two is not possible.").  However, it appears that the parties request that the Court apply two different tests in determining whether it should grant summary judgment as it relates to their arguments regarding the constitutionality of the Cross Statue under the Establishment Clause.  Plaintiff and Defendant City of King primarily argue that the traditional three-prong test in Lemon v. Kurtzman, 403 U.S. 602, 91 S. Ct. 2105, 29 L. Ed. 2d 745 (1971) should apply.  Defendant-Intervenors, however, argue that because the Cross Statue is a religious display, the fact-driven analysis set forth in Van Orden v. Perry, 545 U.S. 677, 125 S. Ct. 2854, 162 L. Ed. 2d 607 (2005) applies.  However, the Court need not resolve such a dispute in this case as both the Lemon and Van Orden analysis require the Court to inquire into the nature, context, and history of the Cross Statue at issue.  See Trunk v. City of San Diego, 629 F.3d 1099, 1107 (9th Cir. 2011) ("Ultimately, we need not resolve the issue of whether Lemon or Van Orden controls our analysis of the Memorial.  Both Lemon and Van Orden require us to determine Congress's purpose in acquiring the Memorial and to engage in a factually specific analysis of the Memorial's history and setting.").  Thus, the Court will address both standards in turn.

Under the Lemon framework, the Supreme Court assessed the constitutionality of a statute by examining whether it satisfied three conditions: (1) "whether there was a secular purpose behind the statute"; (2) "whether the statute's principal or primary effect was one

that neither advanced nor inhibited religion"; and (3) "whether the statute fostered an 'excessive government entanglement with religion.' " <u>Lambeth v. Board of Comm'rs of Davidson Cnty., N.C.</u> (<u>Lambeth II</u>), 407 F.3d 266, 269 (4th Cir. 2005) (quoting <u>Lemon</u>, 403 U.S. at 612-13, 91 S. Ct. 2105). "State action violates the Establishment Clause if it fails to satisfy any of these prongs." <u>Edwards v. Aguillard</u>, 482 U.S. 578, 583, 107 S. Ct. 2573, 96 L. Ed. 2d 510 (1987). With this framework in mind, the Court will address each prong in turn as it relates to the Cross Statue.

a.    Purpose

Plaintiff argues that Defendant City of King's purpose in adding the Cross Statue to the Veterans Memorial was to honor only Christian veterans and, thus, such a purpose is impermissible under the Establishment Clause. The City asserts that its purpose in adding the Cross Statue was consistent with the purpose of the entire Veterans Memorial, which is to honor "the memory of fallen veterans." (Def.'s Br. in Supp. of Mot. for Summ. J. [Doc. #69], at 23.) As discussed in the Fourth Circuit's opinion in <u>Lambeth</u>, "a 'legitimate secular purpose' supporting a challenged governmental action will suffice to satisfy the <u>Lemon</u> test's first prong." <u>Lambeth II</u>, 407 F.3d at 270 (citing <u>Lynch</u>, 465 U.S. at 681, 104 S. Ct. 1355). As such, "the demonstration of such a legitimate secular purpose is 'a fairly low hurdle.' " <u>Id.</u> (quoting <u>Brown v. Gilmore</u>, 258 F.3d 265, 276 (4th Cir. 2001)). In fact, the Fourth Circuit has stated that it will only find that the purpose prong has been violated if the action is " 'entirely motivated by a purpose to advance religion.' " <u>Id.</u> (citing <u>Mellen v. Bunting</u>, 327 F.3d 355, 372 (4th Cir. 2003) (quoting <u>Wallace v. Jaffree</u>, 472 U.S. 38, 56, 105 S. Ct. 2266, 86

44

L. Ed. 2d 29 (1985))). <u>Lynch</u>, 465 U.S. at 680, 104 S. Ct. 1355 ("The Court has invalidated legislation or governmental action on the ground that a secular purpose was lacking, but only when it has concluded there was no question that the statute or activity was motivated wholly by religious considerations."). Plaintiff points out that the Cross Statue was built the same year that the controversy arose surrounding the City's display of the Christian flag, in which the Mayor and several other City Council members defended the flag in "overtly" Christian terms. (Pl.'s Brief in Opp'n to Am. Legion's Mot. for Summ. J. [Doc. #84], at 20.) Thus, it appears that Plaintiff is attempting to impute the controversy relating to the City's purported motives regarding the flag display to the City's purpose for electing to include the Cross Statue as part of the Veterans Memorial. However, the Court notes that such controversy, regarding the Christian flag, started in August of 2010, several months after the City voted and decided to implement the Cross Statue as part of the Veterans Memorial. The Court is hesitant to find an impermissible purpose based on the evidence suggested by Plaintiff, specifically the City Council member's statements made after the City Council decided to implement the Cross Statue and because it is primarily related to a different display, particularly in light of the "fairly low hurdle" standard applicable to the first prong of the <u>Lemon</u> test.

Plaintiff, however, points to the fact that when the CAAC initially decided to recommend that the Cross Statue be added to the Veterans Memorial, the Commission voted "to recommend to the City Council that a yard shadow figure of a praying soldier" be placed at the King's Veterans Memorial. (March 18, 2010 Commission Minutes [Doc. #74-

2], at 5.) Thus, it appears that Plaintiff asserts that because the recommendation included the term "praying soldier", the City had a religious purpose for selecting the Cross Statue. However, there has been acknowledgment by certain members of the Supreme Court that "[i]n determining whether a secular purpose exists, we have simply required that the display[ ] not be 'motivated wholly by religious considerations.' The fact that the monument conveys some religious meaning does not cast doubt on the city's valid secular purposes for its display." City of Elkhart v. Books, 532 U.S. 1058, 1062, 121 S. Ct. 2209, 149 L. Ed. 2d 1036 (2001) (denial of certiorari) (Rehnquist, C.J., dissenting) (internal citation omitted); see also ACLU of Ky. v. Grayson Cnty., 591 F.3d 837, 851-52 (6th Cir. 2010) (finding that "references to avowedly religious acts such as 'prayer' " does not show religious purpose (quoting Croft v. Governor of Texas, 562 F.3d 735, 740-41 (5th Cir. 2009)). The Court also notes that Barbara Hunsucker, a member of the CAAC, who voted to recommend to the City Council that it should implement the Cross Statue into the Memorial, stated that when she saw the Cross Statue that she thought it was appropriate for the Memorial because "it was paying tribute to our fallen soldiers." (Hunsucker Dep. [Doc. #71-8], at 11.) She also stated that the religious aspect of the Cross Statue, when presented to her, "wasn't in [her] overall thought process when [she] saw [it]." (Id. at 13.) Furthermore, Mayor Warren stated that he believed that, in his opinion, the statue was "a good addition to the memorial memorializing our troops." (Warren Dep. [Doc. #71-9], at 60.) And contrary to Plaintiff's contention that the City Council voted to approve the addition of the "praying soldier" statue to the Veterans Memorial, the Court notes that on April 5, 2010, the City Council

46

unanimously "approve[d] the construction and placement of a metal Yard Shadow Figure at the Veteran's Memorial." (April 5, 2010 Minutes [Doc. #75], at 3-4.) Thus, the Court " 'will not lightly attribute unconstitutional motives to the government, particularly where [it] can discern a plausible secular purpose.' " American Atheists, Inc. v. Davenport, 637 F.3d 1095, 1118 (10th Cir. 2010) (quoting Weinbaum v. City of Las Cruces, 541 F.3d 1017, 1031 (10th Cir. 2008)). Therefore, the Court does not find that the City had an entirely religious purpose in erecting the Cross Statue and accepts Defendant City of King's argument that it erected the Cross Statue to honor fallen soldiers.

    b.    Effect/Endorsement

The Court will next inquire into whether the Cross Statue has the principal effect of advancing religion. In making such an inquiry, the Court will also address the endorsement test, a test created by the Supreme Court that "focuses on the perception of a reasonable observer in determining whether government action can be understood as an endorsement of religion." Lambeth I, 321 F. Supp. 2d at 691 (citing Lynch, 465 U.S. at 687-89, 104 S. Ct. 1355 (O'Connor, J., concurring) and Mellen, 327 F.3d at 370. The Fourth Circuit has applied this endorsement test analysis in tandem with its analysis of the second prong of the Lemon test. See Lambeth II, 407 F.3d at 272; Mellen, 327 F.3d at 371. When discussing the reasonable observer, the inquiry is not "whether there is *any* person who could find an endorsement of religion, whether *some* people may be offended by the display, or whether *some* reasonable person *might* think [the City] endorses religion." Capitol Square Review and Advisory Bd. v. Pinette, 515 U.S. 753, 780, 115 S. Ct. 2440, 132 L. Ed. 2d 650 (1995)

(O'Connor, J., concurring in part and concurring in judgment) (emphasis in the original). Instead, the reasonable observer is "similar to the 'reasonable person' in tort law, who "is not to be identified with any ordinary individual who might occasionally do unreasonable things," but is rather a personification of a community ideal of reasonable behavior, determined by the [collective] social judgment." Id. at 779-80, 115 S. Ct. at 2455 (O'Connor, J., concurring in part and concurring in judgment) (quoting W. Keeton, et al., Prosser and Keeton on Law of Torts 175 (5th ed. 1984)). Additionally, the reasonable observer is "aware of the *purpose, context, and history* of the symbol" at issue. Davenport, 637 F.3d at 1119 (emphasis in the original). Although, the reasonable observer is not necessarily "omniscient", id. (citations omitted), the reasonable observer would be apprised of several matters in this case. The reasonable observer would know that the Latin cross, which is a feature included in the Cross Statue, is a religious symbol of Christian faith. Id. at 1102 (stating that the cross " 'is unequivocally a symbol of Christian faith." (quoting Weinabum, 541 F.3d at 1022)). The reasonable observer would also be aware that the City Council decided to place the Cross Statue within the vicinity of the larger Veterans Memorial display, a memorial designed to honor veterans, but also within the vicinity of the Christian flag, which was flown by the City when the Cross Statue was originally erected and still flies in the same position for most of the year. The reasonable observer would also know the history of the Latin cross at issue with respect to this nation's history. See id. at 1119 (noting that the reasonable observer is "aware of the purpose, context, and history" of a symbol). However, the Court notes that several material issues regarding the Latin cross and its history are

disputed, which preclude the granting of summary judgment as it relates to the Cross Statue in this case.

First, the history of the cross, at least as it is supposed to be depicted in the Cross Statue, and its purpose in American war cemeteries is unclear based on the evidence provided in the record. Plaintiff argues that the Cross Statue only honors Christian soldiers because the Latin cross was used to mark the graves of Christian soldiers in America's twentieth century wars. However, Defendant-Intervenors argue that the Latin cross had a significant, historical presence in American wars, specifically, World War I, World War II, and the Korean War, particularly overseas. Plaintiff's expert, Dr. Kurt Piehler ("Dr. Piehler") gave the opinion that the Latin cross is a religious symbol that honors only Christian soldiers and that "[e]ven if the City of King's statue purported to represent the burial of a soldier at an overseas cemetery, it would not reflect universal burial practices, and instead would depict the burial of Christian soldiers." (Piehler Report [Doc. #77-11], at 10.) He also opines that graves within temporary cemeteries in World War II were marked using the cross (for Christian soldiers), Star of David (for Jewish soldiers), or the nondenominational marker (for soldiers with unknown religious affiliations or soldiers that were not Christian or Jewish). (See Piehler Dep. [Doc. #71-6], at 8; Piehler Report [Doc. #77-11], at 3, 13.) These expert conclusions, standing alone, would likely establish that the Cross Statue, which includes a Latin cross, at issue in this case was meant to honor Christian soldiers only. However, Dr. Piehler also (1) acknowledges that the cross was "the principal gravestone in the [permanent] overseas cemeteries", although the "majority of the war dead

in either World War I and World War II . . . rest within the United States" where fallen soldiers were required to use a "standard memorial headstone" if buried in national cemeteries, (Piehler Dep. [Doc. #71-6], at 24; Piehler Report [Doc. #77-11], at 13); (2) acknowledges that cemeteries are a "form of memory war and commemoration of war" and "were certainly conceived as symbol of nationalism, as one of their functions", (Piehler Dep. [Doc. #71-6], at 29); and (3) he concedes that the American Battle Monument Commission (ABMC), the organization that took charge of American overseas cemeteries after World War I, designated the cross as the marker for cemeteries overseas post World War I and that following World War II, the cross grave marker and the Star of David were even used for unidentified soldiers in overseas cemeteries, although this was a controversial decision but was, in some way, "following the precedence of World War I", (Piehler Dep. [Doc. #71-6], at 26.) Based on the evidence set forth, the historical significance of the Latin cross—either as a symbol that represents Christian soldiers or a symbol that represents an important symbol of nationalism of certain twentieth century wars—is unclear.

Second, this lack of clarity, relating to the historical significance of the Latin cross, is significant to the Court's determination that a genuine dispute of material fact exists, particularly as there is a dispute as to the time period that the Cross Statue is supposed to represent. Such a dispute is material because, based on the evidence discussed above relating to the historical significance of the Latin cross, the cross could potentially convey different symbolic messages depending on which American war the Cross Statue depicts. Defendant-Intervenors have represented that the Cross Statue depicts "a soldier, likely from World War

II or the Korean War." (Def.-Intervenors Br. in Supp. of Summ. J. [Doc. #71], at 2.) Plaintiff, however, cites to American Humanist Ass'n v. City of Lake Elsinore (Lake Elsinore I), where the district court rejected a similar argument that the Christian cross in that case were supposed to honor veterans of World War II because, based on the evidence available, there was no prior showing that the city intended that the display to represent World War II veterans in particular. No. 5:13cv-989-SVW-OP, slip op. at 26-29 (C.D. Cal. July 16, 2013) Plaintiff also points to evidence in the record where City of King officials and a member of the American Legion stated that the Cross Statue is supposed to honor all veterans. (Hatley Dep. [Doc. #73-3], at 297-298, 305; Warren Dep. [Doc. #73-5], at 59; Hunsucker Dep. [Doc. #73-6], at 35; Holland Dep. [Doc. #73-7], at 55.) However, the Court notes that there are other indicators in the record that the Memorial is dedicated to soldiers of a certain period. For example, the City of King website states that the Memorial "is dedicated to all veterans who have served in any of the 5 branches of the armed services from World War I to the present." (King Website page [Doc. #74-3], at 2.) Plaintiff's expert, Dr. Piehler states that, in reality, the soldier depicted in the Cross Statue is from a more recent U.S. war. (Piehler Report [Doc. #77-11], at 6.) While Plaintiff is correct that Mayor Warren stated that the Cross Statue was intended to pay tribute to all soldiers and not just soldiers from certain wars, he also acknowledged that the soldier depicted in the Cross Statue looked like he was from World War II or the Korean War, based on the type of rifle depicted in the statue. (Warren Dep. [Doc. #71-9], at 55-56, 59.) Finally, American Legion's designee, Donald Holland ("Holland") also stated that the statue depicts a soldier from "World War II, Korea,

or Vietnam" because of the type of rifle depicted in the picture, however, he follows this statement by stating that American Legion intended for the Cross Statue to honor all fallen soldiers. (Holland Dep. [Doc. #73-7], 54-55.) Thus, a reasonable observer looking at the Cross Statue could find that the statue depicts a soldier from either World War II or the Korean War, or any war based on the record before the Court.

Third, in support of the City's position, Defendant-Intervenors discuss "the ubiquity of cross headstones in United States permanent overseas cemeteries." (Def.-Intervenors Br. in Supp. of Summ. J. [Doc. #71], at 12.) Plaintiff responds that American Legion does not maintain that the Cross Statue "depicts a permanent cemetery, because the kneeling soldier in the Cross Statue is holding a rifle." (see Holland Dep. [Doc. #73-7], at 52-53.) However, the evidence that Plaintiff cites also reveals that Holland further stated that the cross marked a permanent grave in the statue because the "soldier was coming back to pay his respects." (Id. at 52.) However, after making this statement, Holland also stated that the cross grave depicted could have been on a battlefield or "buried someplace else very hastily." (Id. at 52-53.) Additionally, the Court notes that Plaintiff's expert also states that the Cross Statue could depict a "grave in a temporary cemetery, it could also be a grave in a battlefield burial possibly, or it could even be a symbolic representation of those buried in the Battle Monuments Commission", which as discussed previously, included permanent cemeteries. (Piehler Dep. [Doc. #71-6], at 65.)

Fourth, Plaintiff cites to cases hailing from other circuits that have held that the cross symbol, even when represented in a larger display,[12] has the effect of communicating that the "display as a whole endorses religion." Am. Hummanist Ass'n v. City of Lake Elsinore (Lake Elsinore II), No. 5:13-CV-00989-SVW-OPx, 2014 WL 791800, at *13 (C.D. Cal. Feb. 25, 2014)[13]; see Davenport, 637 F.3d at 1119-21; Trunk, 629 F.3d at 1110-11 (9th Cir. 2011).[14]

---

[12] Plaintiff also asserts that just because the other features of the Veterans Memorial could dominate the display, it is of no consequence in this case because the Cross Statue still sends a religious message. Again, Plaintiff cites to Lake Elsinore I for the proposition that "the secretarian features of a display need not dominate them to send a religious message." No. 5:13cv-989-SVW-OP, slip op. at 44-46. However, the Court notes that because it has determined that there are material factual disputes regarding the effect the Cross Statue as a whole, including the Latin cross, would have on the reasonable observer, the Court will leave for trial the determination of whether the size of the Latin cross in relation to the cross statue, or even the larger Veterans Memorial has any impact on its purported religious message. Additionally, Plaintiff argues that the Court should consider the fact that City of King officials agree that other secular soldier displays could also honor veterans. (See Hunsucker Dep. [Doc. #73-6], at 48-49; Warren Dep. [Doc. #73-5], at 62). Compare Cnty. of Allegheny v. ACLU Greater Pittsburgh Chapter, 492 U.S. 573, 616, 109 S. Ct. 3086, 106 L. Ed. 2d 472 (1989) ("Where the government's secular message can be conveyed by two symbols, only one of which carries religious meaning, an observer reasonably might infer from the fact that the government has chosen to use the religious symbol that the government means to promote religious faith.") (Blackmun, J opinion), abrogated on other grounds, Town of Greece v. Galloway, 134 S. Ct. 1811 (2014), with Salazar v. Buono, 559 U.S. 700, 718, 130 S. Ct. 1803, 176 L. Ed. 2d 634 (2010) ("The goal of avoiding governmental endorsement does not require eradication of all religious symbols in the public realm.") (Kennedy, J., opinion) and City of Elkhart v. Books, 532 U.S. at 1062, 121 S. Ct. 2209 (denial of certiorari) (Rehnquist, C.J., dissenting opinion) ("Even assuming that these aspects of the monument's appearance and history indicate that it has some religious meaning, the city is not bound to display only symbols that are wholly secular, or to convey solely secular messages."). However, such an argument should be addressed and taken into account at trial, specifically in the trial court's consideration of its ultimate determination of whether the Cross Statue display violates the Establishment Clause and in considering what, if any, relief would be granted.

[13] The Court notes that Plaintiff cites to the Lake Elsinore I, No. 5:13cv-989-SVW-OP, slip op., which was the district court opinion granting the plaintiff's motion for preliminary injunction to enjoin a display involving a cross statue that was very similar to the cross statue at issue in this case. However, since the parties in this case submitted their briefs, the district court in American

However, the Court accepts Defendant-Intervenors' position that the Court should not " 'focus exclusively on the inclusion of [a] religious symbol' " without considering the symbol's historical significance and its position as monument within a larger display. (Br. of Def.-Intervenors in Opp'n to Pl.'s Mot. for Summ. J. [Doc. #82], at 7 (quoting <u>Murray</u>, 947 F.2d at 154)[15]; <u>see also</u> <u>Davenport</u>, 637 F.3d at 1121 (stating that religious displays "can only be

---

<u>Humanist</u> issued its final order permanently enjoining the display at issue in this case. <u>See</u> <u>Lake Elsinore II</u>, No. 5:13-CV-00989-SVW-OP, 2014 WL 791800. However, the Court has generally reference the preliminary injunction order, <u>Lake Elsinore I</u>, to the extent the parties have cited to that order in their briefs.

[14] The Court also notes that the Ninth Circuit opinion in <u>Trunk</u>, which involved a "large white cross" on government land, Mount Soledad Veterans Memorial, was subject to a petition for certiorari on to the United States Supreme Court. <u>Mount Soledad Mem'l Ass'n v. Trunk</u>, 132 S. Ct. 2535, 2535, 183 L. Ed. 2d 692 (2012). In denying the petition for certiorari, Justice Alito noted that "the constitutionality of the Mount Soledad Veterans Memorial is a question of substantial importance." <u>Id.</u> Justice Alito acknowledged that "[t]he cross is of course the preeminent symbol of Christianity" but also noted that " '[t]he goal of avoiding governmental endorsement [of religion] does not require eradication of all religious symbols in the public realm . . . . The Constitution does not oblige government to avoid any public acknowledgment of religion's role in society.' " <u>Id.</u> (quoting <u>Salazar</u>, 559 U.S. at 718, 130 S. Ct. 1803 (Kennedy, J., plurality opinion)). Additionally, in his opinion addressing the denial of the petition for certiorari, Justice Alito noted that the petition came to the Supreme Court "in an interlocutory posture" but it invited the government party in that case to "raise the same issue in a later petition following entry of a final judgment" in the lower court. <u>Id.</u> Such a consideration, as delineated by Justice Alito, only emphasizes the importance in sharply analyzing the context and historical aspect of the Cross Statue at issue in this case.

[15] However, to the extent Defendant-Intervenors cite to <u>Murray</u>, 947 F.2d 147 and <u>Weinbaum</u>, 541 F.3d 1017 for the proposition that the Cross Statue in this case does not have the effect of endorsing religion, the Court notes that those cases involved decidedly different facts. Both of those cases involved scenarios in which the cross symbols had a direction relation to the cities' history. Specifically, in <u>Murray</u>, the Fifth Circuit found that the presence of the Christian cross did not violate the Establishment Clause because the insignia, which included a cross, was adopted from the city's founder's familial coat of arms. <u>Murray</u>, 947 F.2d at 155. Additionally, in <u>Weinbaum</u>, the Court found that the city's symbol, which included three Christian crosses, represented the city's name—which translated into "The Crosses"—and the city's unique history, as the city was founded near the site of a cemetery. 541 F.3d at 1033-35. Nevertheless,

allowed if their context or history avoid the conveyance of a message of governmental endorsement of religion."); <u>Trunk</u>, 629 F.3d at 1111 ("[E]ven a quintessentially secretarian symbol can acquire an alternate, non-religious meaning.").

Furthermore, the Court notes that in the Supreme Court case <u>Salazar</u>, the plurality admonished the district court in that case for concentrating "solely on the religious aspect of the cross, divorced from its background and context."[16] 559 U.S. at 721, 130 S. Ct. 1803. Also, the Supreme Court stated, in dicta:

> [A] Latin cross is not merely a reaffirmation of Christian beliefs. It is a symbol often used to honor and respect those heroic acts, noble contributions, and patient striving help secure an honored place in history for this Nation and its people. Here, one Latin cross in the desert evokes thousands of small crosses in foreign fields marking the graves of Americans who fell in battles, battles whose tragedies are compounded if the fallen are forgotten.

<u>Id.</u> at 721, 130 S. Ct. 1803. The Court notes that the "Establishment Clause jurisprudence remains a delicate and fact-sensitive one." <u>Lee v. Weisman</u>, 505 U.S. 577, 597, 112 S. Ct. 2649, 120 L. Ed. 2d 467 (1992). In this case, the Court has already acknowledged that there are materially inconsistent facts regarding the history of the Cross Statue that preclude the Court, at this time, from determining the effect the Cross Statue would have on a reasonable observer. Additionally, the Court notes that there is also a material dispute regarding the

the Court determines that there are material facts relating to the history of the cross statue in this case that are in dispute, require weighing of the evidence, which is within the province of the trial court.

[16] The Court notes that the Supreme Court was evaluating the Latin cross in <u>Salazar</u> in light of the congressional legislation in that case that created a national memorial on the land on which the cross sat and transferred the land on which the cross sat to private parties.

effect of the Cross Statue, in its context of the larger Veterans Memorial display. Plaintiff points to evidence in the record, particular a photograph of the Cross Statue, and argues that the Cross Statue is "just feet" away from the Veterans Memorial, particularly the Christian flag that flies for most of the year. (Pl.'s Br. in Opp'n to Def.'s Mot. for Summ. J. [Doc. #80], at 37; see Compl. at ¶ 45.) However, the City also argues that based on the position of the Cross Statue, someone walking towards the front of the Veterans Memorial would not see the Cross Statue. (Def.'s Br. in Supp. Mot. for Summ. J. [Doc. #69], at 4.) Indeed the Cross Statue does appear to be at least within the vicinity of the larger Memorial display; however, it also appears to be isolated by bushes and trees that may separate it from the rest of the display, which may affect whether a reasonable observer would associate the Cross Statue with the rest of the Memorial. Furthermore, the City and Defendant-Intervenors argue that even if one would view the Cross Statue and the rest of the Memorial together, they would connect the statue with the large statement in the front of the Memorial, "ALL GAVE SOME . . . AND SOME GAVE ALL." (Def.-Intervenors' Br. in Supp. of Mot. for Summ. J. [Doc. #71], at 14 (quoting text from Memorial Picture [Doc. #71-10], at 2); Def.'s Br. in Supp. of Mot. for Summ. J. [Doc. #69], at 27.) The City also asserts that the reasonable observer would also notice the "military symbols" and all the service flags reflected in the larger Memorial display. (Def.'s Br. in Supp. of Mot. for Summ. J. [Doc. #69], at 28.) However, it is unclear how the Cross Statue would be associated with the rest of the Memorial, based on the close range pictures addressed by the parties. Additionally, it is not clear from the pictures addressed by the parties whether someone walking towards the

front of the Memorial would notice the Cross Statue. Thus, the Court also finds that how closely the Cross Statue is associated with the rest of the Veterans Memorial display, which turns on a question of the Cross Statue's proximity and visibility from the Veterans Memorial, which is disputed, could impact whether or not the reasonable observer would find that the Cross Statue has the effect of showing government endorsement of religion.

Therefore, the Court acknowledges that it must look to the historical context of the cross; however, the parties dispute what part of history and what aspect of history the Cross Statue is supposed to depict, and the Cross Statue's association with the larger Veterans Memorial display in this case.[17] Thus, in acknowledging that the Establishment Clause cases, particularly religious display cases, present a fact intensive inquiry, the Court must address the facts before it in this case, and not merely accept the conclusions of other courts, even in cases involving similar displays, as they may have had materially different evidence before them. As such, the Court finds that there are material disputes regarding the second prong of the <u>Lemon</u> test, which preclude the Court from granting summary judgment on the issue of whether the Cross Statue has the primary effect of endorsing Christianity.

Additionally, notwithstanding the request made by Defendant-Intervenors, the Court need not conduct a second inquiry under <u>Van Orden</u>. In <u>Van Orden</u>, the Supreme Court upheld the display of the Ten Commandments in the Texas State Capitol grounds based on

_____

[17] Even Plaintiff's expert, Dr. Piehler, acknowledges that a vast majority of American public war memorials lack religious symbols but that "[o]ften when a cross is used in a war memorial it is part of a wider symbolic structure and is not the dominant symbol." (Piehler Report [Doc. #77-11], at 18).

the "nature of the monument and by our Nation's history." 545 U.S. at 686, 125 S. Ct. 2854. As the Court has already discussed such bases in the context of its <u>Lemon</u> analysis, it will not repeat its analysis here.

c.    Excessive Entanglement

Although the Court has determined that there is a material dispute regarding the second prong of the <u>Lemon</u> test, the Court must still look to see if the third prong has been violated because, as previously mentioned, a violation of any one part of the tripartite test is sufficient to conclude that the Establishment Clause has been violated. The Supreme Court has noted that "[e]ntanglement is a question of kind and degree." <u>Lynch</u>, 465 U.S. at 684, 104 S. Ct. 1355. "Because entanglement between church and state 'becomes constitutionally "excessive" only when it has the "effect of advancing or inhibiting religion," ' the third prong is 'properly treated as "an aspect" ' of the second." <u>American Atheists, Inc. v. Port Authority of NY and NJ</u>, 936 F. Supp. 2d 321, 335 (S.D.N.Y. 2013) (quoting <u>Skoros v. City of New York</u>, 437 F.3d 1, 36 (2d. Cir. 2006) (quoting <u>Agostini v. Felton</u>, 521 U.S. 203, 233, 117 S. Ct. 1997, 138 L. Ed. 2d 391 (1997))); <u>Suhre v. Haywood Cnty.</u> (<u>Suhre III</u>), 55 F. Supp. 2d 384, 394 (W.D.N.C. 1999) (stating that the question of whether "a reasonable observer of the display in its particular context perceive[s] the message of governmental endorsement or sponsorship of religion" is a question that "collapses" the effects and entanglement prongs of the <u>Lemon</u> test into one inquiry). Thus, as this Court finds that the City has advanced a valid secular purpose for erecting the Cross Statue and the Court finds that there are materially disputed facts regarding the effects prong of the <u>Lemon</u> test, the Court finds that

58

it cannot determine at this time, whether the government has fostered excessive entanglement in religion, as it relates to the Cross Statue.

However, the Court notes that the kind of excessive entanglement of government and religion precluded by <u>Lemon</u> is characterized by 'comprehensive, discriminating, and continuing state surveillance' of religious exercise." <u>Lambeth II</u>, 407 F.3d at 271 (quoting <u>Lemon</u>, 403 U.S. at 619, 91 S. Ct. 2105).  Given the genuine dispute that exists, this issue will be reserved for the trial court which will likely consider certain factors in determining whether the City has excessively entangled in religion as it relates to the Cross Statue.  First, the Court may consider whether or not the use of City funds to erect the Cross Statue constitutes excessive entanglement.  <u>Cf.</u> <u>Lynch</u>, 465 U.S. at 684, 104 S. Ct. 1355 ("No expenditures for maintenance of the crèche have been necessary, and, since the city owns the crèche, now valued at $200, the tangible material it contributes is *de minimis*." (emphasis in the original))  Second, the trial court, in addressing the excessive entanglement issue, will also likely consider the fact that the Cross Statue involves a religious symbol, specifically, a Latin cross.  <u>See</u> <u>Lambeth I</u>, 321 F. Supp. 2d at 705 (acknowledging that the "Fourth Circuit has consistently applied the <u>Lemon</u> test more stringently when evaluating government action that involved inherently religious acts or symbols" and citing cases).  Third, among other things, the trial court will also likely consider whether the Cross Statue requires "pervasive monitoring or other maintenance" by the City or any "repeated government involvement with religion."[18]  <u>Lambeth II</u>, 407 F.3d at 273.  However, all this must be considered in light

_____

[18] It does not appear, based on the record currently before the Court, that this factor creates a problem of excessive government entanglement in this case.

of the trial court's consideration of the dispute relating to whether the Cross Statue actually has the primary effect of endorsing Christianity.

Thus, in light of the Supreme Court's more recent jurisprudence requiring courts to conduct intensive, fact-specific inquiries on policies and displays that invoke Establishment Clause challenges, the Court will deny summary judgment to all parties as it relates to the Cross Statue. This is because of the disputes surrounding the message conveyed by the Cross Statue, which time period the Cross Statue is meant to represent, and the physical contours and setting of the statue, which the Court finds material to the disposition of this issue. However, this is by no means any suggestion by the Court that Defendant City of King and Defendant-Intervenors will ultimately prevail on the merits of their claim as it relates to the Cross Statue. Indeed, most of the current jurisprudence analyzing the Latin cross, in light of asserted Establishment Clause violations, is all but decidedly against the City and Defendant-Intervenors' position. Nevertheless, the Court will allow the issue to proceed to trial as the Court finds there are genuine issues of material fact that preclude entering summary judgment on this claim. This issue is proper for the trial, because the trial court will be in a position to weigh the evidence before it and appropriately analyze the history, context, and setting of the Cross Statue, based on the evidence before the Court, in light of current Establishment Clause jurisprudence.

ii.     Christian Flag Display

Defendant City of King also argues that the Christian flag display at the Veterans Memorial does not offend the Establishment Clause because the flag is flown as a part of a limited public forum, in which the purported forum allows private parties to fly the flag of their choice on the eleventh flagpole in the City's Veterans Memorial. Plaintiff argues that the display of the Christian flag is an action that is attributable to the City and such an action violates the Establishment Clause. As an initial matter, the Court notes that the issue before the Court is not whether the City's initial display of the Christian flag [19] (which the City itself and erected), which included the Latin cross—an inherently religious symbol, see Davenport, 637 F.3d at 1102—, in the Veterans Memorial violated the Establishment Clause.[20] But rather the issue currently before the Court is whether or not the display of the Christian flag, pursuant to the City's Flag Policy, is permissible. However, the parties dispute whether the

_____

[19] To the extent, the City, in its Brief Supporting its Motion for Summary Judgment, attempts to assert that the Christian flag is not actually a Christian flag by using the term "Christian" in quotes and making passing references that some may refer to the flag as a Christian flag, the Court notes that the record is full of references by city officials, Veterans Memorial committee members, and members of the community referring the Christian flag as a Christian flag. Furthermore, pursuant to the Flag Policy, the emblem of belief that is associated with the Christian flag is called a "Christian Cross." (See Flag Policy [Doc. #1-2], at 8.)

[20] There is little doubt that the original display of the Christian flag by the City would violate all three prongs of the Lemon test based on the evidence currently before the Court, and thus would violate the Establishment Clause. Cf. Chambers v. City of Fredrick ("Chambers II"), 373 F. Supp. 2d 567, 571-72 (D. Md. 2005) (assuming without deciding that the government's display of the Ten Commandments was unconstitutional before it sold the land, on which the Ten Commandments stood, to a private organization). However, as stated above, the issue is whether the current display of the Christian flag, through the Flag Policy, violates the Establishment Clause.

flying of the Christian flag, pursuant to the Flag Policy, is government speech or private speech. As Justice O'Connor stated in <u>Board of Education of Westside Community Schools v. Mergens</u> has stated, "there is a crucial difference between *government* speech endorsing religion, which the Establishment Clause forbids, and *private* speech endorsing religion, which the Free Speech and Free Exercise Clauses protect." 496 U.S. 226, 250, 110 S. Ct. 2356, 110 L. Ed. 2d 191 (1990) (emphasis in the original). The Fourth Circuit has adopted a four-factor test to determine when speech at issue can be attributed to the government or a private party. Thus, to determine whether the Christian flag display is private or government speech, the Court must consider:

> (1) the central "purpose" of the program in which the speech in question occurs; (2) the degree of "editorial control" exercised by the government or private entities over the content of the speech; (3) the identity of the "literal speaker"; and (4) whether the government or the private entity bears the "ultimate responsibility" for the content of the speech.

<u>Sons of Confederate Veterans, Inc. v. Comm'r of Dep't of Motor Vehicles</u>, 288 F.3d 610, 618 (4th Cir. 2002) ("<u>SCV</u>"); <u>see</u> <u>ACLU of N.C. v. Tata</u>, 742 F.3d 563, 569 (4th Cir. 2014) (affirming the validity of the four-prong test). After consideration of the evidence and arguments provided by Plaintiff and Defendant City of King and applying these factors, the Court concludes that the Christian flag at issue has elements of government speech but is best categorized as private speech.

In regards to the first factor, the City first argues that the purpose of the program in which the question occurs is private because it allows "private individuals to commemorate veterans." (Def.'s Br. in Supp. of Mot. for Summ. J. [Doc. #69], at 12.) Additionally, the

City asserts that the policy allows private citizens to display different flags, while it explicitly prohibits the City of King to utilize the forum. While Plaintiff does not respond to the City's argument addressing the speech inquiry, Plaintiff generally argues that the Flag Policy was created to "address overwhelming public opposition to removal of the Christian flag" and that the Veterans Memorial, which includes the flag display, serves as "one of [the City's] proudest attractions." (Pl.'s Br. in Opp'n to Def.'s Mot. for Summ. J. [Doc. #80], at 30, 32 (quoting City of King Website [Doc. #81], at 1).) Although the City appears to use the Veterans Memorial as an attraction feature, the record does not show that the City's purpose in implementing the Flag Policy was to attract outside visitors. Cf. SCV, 288 F.3d at 619 (finding that the specialty license plate program could support a finding of government speech because of its revenue raising purpose). Thus, to the extent that the policy allows individuals to fly different flags in honor of veterans of their choosing, this factor favors a finding of private speech.

As to the second factor, the City argues that private parties exercise editorial control in the forum because individuals are allowed to "choose which flag to erect on the eleventh flagpole and which veteran to commemorate on the temporary sign nearby." (Def.'s Br. in Supp. of Mot. for Summ. J. [Doc. #69], at 15.) However, the Court notes that the City exercises some degree of control, as it provides the original pool of faith emblems that individuals may choose from for the purposes of flying a particular flag. The City addresses such an issue by citing to Planned Parenthood of South Carolina Inc. v. Rose, in which the Fourth Circuit stated, based on the facts in that case, that an "array of choices makes the

license plate forum appear increasingly like a forum for private speech." 361 F.3d 786, 799 (4th Cir. 2004). In this case, the City has provided participants with a choice of at least 47 emblems to choose from in considering which flag they would fly in the forum. However, the Court notes that in SCV, the Fourth Circuit also considered the fact that the specialty license plate design criteria contains instruction related to size and space restrictions but did not contain "guidelines regarding the substantive content of the plates or any indication of reasons, other than failure to comply with size and space restrictions, that a special plate design might be rejected." SCV, 288 F.3d at 621; but see Robb v. Hungerbeeler, 370 F.3d 735, 745 (8th Cir. 2004) (finding that some state speech, including limiting signs to using adopter's name, "does not eviscerate the expressive element of the adopters' election to participate in the program" but that the "underlying purpose of the program is unrelated to the dissemination of the governmental messages"). The City also argues that private parties exercise primary editorial control because, per the Flag Policy and the City cannot reject an individual's choice of flag so long as it complies with the policy. The Court agrees that the City's inability, per the Flag Policy, to exercise its discretion to reject an individual's choice of flag that the individual has chosen pursuant to the flag policy favors private speech. However, the Court also finds that the City's ability to strictly control the initial substantive content of the flags also has some qualities of government speech. Although a close call, the Court finds that because a private individual ultimately chooses from a "wide array" of emblems in choosing which flag to display, that the second factor weighs in favor of a finding of private speech.

Third, the City argues that the literal speaker is completely private because the speaker is the flag, which is selected, paid for, erected, and removed by a private person. However, the Court notes that per the Flag Policy, the City may designate a group or individual to "provide reasonable accommodation to the requester for access to the Memorial for the purpose of requester raising and lowering the flag that has been selected by such requester." (Flag Policy [Doc. #1-2], at ¶ 10.f.) Thus, per the Flag Policy, a private party could seek help from a city employee or city designee to assist in gaining access to the Memorial to erect or remove their flag from the eleventh flagpole. However, the Court notes that such an issue is not dispositive on this factor because the City's ability to help a person erect or remove the flag does not change the fact that a private individual is speaking, conveying a message through the forum. Thus, the Court finds that the literal speaker in this case is indeed a private party.

Fourth, the City argues that a private party bears ultimate responsibility over the speech because private parties ultimately select which commemorative flag to erect on the eleventh flag pole. However, the Court notes that "this litigation is itself an indication that the City bears the ultimate responsibility for the content of the display." Wells v. City & Cnty. of Denver, 257 F.3d 1132, 1142 (10th Cir. 2001); see also Sons of Confederate Veterans, Va. Div. v. City of Lexington, Va., 894 F. Supp. 2d 768, 776 (W.D. Va. 2012), aff'd, 722 F.3d 224 (4th Cir. 2013) ("[P]rivate expression might eventually so dominate city flag poles as to swallow whole the flag poles' actual, official purposes.") Also, as Plaintiff points out, this is not the case where a message is "mounted on vehicles owned by private persons",

SCV, 288 F.3d at 621, which could be readily attributed to a private party.  In this case, as Plaintiff argues, the flag is mounted in a public park and the flag, on government property, and the disclaimer attributing the flag to a private party may not, necessarily, be readily noticeable by those initially viewing the Memorial.  Additionally, as stated in Lexington, "allowing a city-owned flag pole to serve as a public forum could suggest the government has placed its imprimatur on private expression."  Lexington, 894 F. Supp. 2d at 776.  Thus, the Court finds that this factor weighs in favor of a finding that the City bears ultimate responsibility for the speech in the flag forum.  However, a finding that one factor of the four-factor test favors a finding of government speech is not dispositive on the issue of what type of speech is involved.  Tata, 742 F.3d at 574 (finding three out of the four factors indicated that private speech was involved and affirming the district court's conclusion that " 'sufficient private speech interests [we]re implicated by the specialty license plates to preclude a finding of purely government speech.' " (quoting ACLU of N.C. v. Conti, 912 F. Supp. 2d 363, 375)).

Finally, the City also requests that the Court consider the fact that the flag is flown on the eleventh flagpole by different private individuals as an acknowledgment that the Flag Policy creates a temporary display.  In advancing such an argument, the City cites to Pleasant Grove City, Utah v. Summum, 555 U.S. 460, 129 S. Ct. 1125, 172 L. Ed. 2d 853 (2009).  In Summum, the Supreme Court was presented with the question of whether a permanent monument placed on public property, but donated by private parties, constituted government or private speech.  Id.  The Summum plurality determined that permanent

monuments erected on public property are generally government speech.  Id. at 470, 129 S.

Ct. 1125.  However, the plurality also opined that the forum analysis, which is applied to

private speech, may be applicable to a permanent monument if "a town created a monument

on which all of its residents (or all those meeting other criterion) could place the name of a

person to be honored or some other private message."  Summum, 555 U.S. at 480, 129 S. Ct.

at 1138.  Although such an example was acknowledged in dicta, the Fourth Circuit has noted

that "dicta of the U.S. Supreme Court, although non-binding, should have 'considerable

persuasive value in the inferior courts.' "  In re Bateman, 515 F.3d 272, 282 (4th Cir. 2008)

(quoting Myers, 418 F.3d at 406; cf. Lambeth II, 407 F.3d at 271 ("Such observations by the

Court, interpreting the First Amendment and clarifying the application of its Establishment

Clause jurisprudence, constitute the sort of dicta that has considerable persuasive value in the

inferior courts.").  Plaintiff argues that the Christian flag "bears all of the physical markers of

a government presentation."  (Pl.'s Br. in Opp'n to Def.'s Mot. for Summ. J. [Doc. #80], at

32.)  Specifically, Plaintiff argues that the Christian flag is part of the Veterans Memorial,

which is owned and operated by the City, and the Veterans Memorial is advertised as "the

heart of the City of King."  (Id. (citing City Website [Doc. #81], at 1).)  Additionally Plaintiff

argues that because the Christian flag was initially flown on the flagpole by the City and it still

flies there on a flagpole indistinguishable from the other ten flagpoles in the Memorial, which

are flown by the City, that the flag display is essentially government speech.  However, the

Court finds the determination in Lexington to be persuasive.  In that case, the district court

determined that the City of Lexington, had created a public forum[21] for private expression when it opened its flagpoles up to private speakers to access the flagpoles. Lexington, 894 F. Supp. at 775. Additionally, the Court finds the dicta in Summum, discussed above, very persuasive on the question of whether the flags flown on the flagpole at issue in this case are private or government speech. Thus, based on the foregoing, this Court does not find the fact that the flags, which were attached to the eleventh flagpole, constitute government speech simply because they were attached to the City flagpole. Although the flagpole bears certain elements of government speech, the Court finds that it is best categorized as private speech.

However, Plaintiff argues that "[e]ven if the Flag Policy were to create a genuine public forum, 'at some point . . . a private religious group may so dominate a public forum that a formal policy of equal access is transformed into a demonstration of approval.' " (Pl.'s Br. in Opp'n to Def.'s Mot. for Summ. J. [Doc. #80], at 34-35 (quoting Pinette, 515 U.S. at 777, 115 S. Ct. 2440 (O'Connor, J., concurring in part and concurring in judgment)).) In advancing this argument, Plaintiff asserts that "the Christian flag has flown 47 of 52 weeks in

_____

[21] The Court notes that the forum created in Lexington, were determined to be designated public forums. The Court described a designated public forum as " 'government property that has not traditionally been regarded as a public forum is intentionally opened up for that purpose.' " Lexington, 894 F. Supp. 2d at 774 n.2 (quoting Christian Legal Soc'y Chapter of the Univ. of Cal., Hastings Coll. of the Law v. Martinez, 561 U.S. 661, 130 S. Ct. 2971, 2984 n.11, 177 L. Ed. 2d 838 (2010)). However, the district court also acknowledged that limited public fora is a subset of designated public fora, as limited public fora "are established when a governmental entity opens property but limits it to use by certain groups or dedicates it solely to the discussion of certain subjects." Id. Although not dispositive on the Establishment Clause arguments advanced in this case, and as Plaintiff makes no argument to the contrary, the Court agrees with the City that the Flag Policy in this case limits users to discussing certain subjects and that the Flag Policy would be properly characterized as creating a limited public forum.

each of the last three years", (id.), and the Court notes that in 2014, the Christian flag will fly for 46 weeks out of the year, (2014 Limited Public Forum Schedule [Docs. #83-12]). The Court finds that Plaintiff's argument has some merit. In Pinette, Justice O'Connor stated:

> Where the government's operation of a public forum has the effect of endorsing religion, even if the governmental actor neither intends nor actively encourages that result . . . the Establishment Clause is violated. This is . . . because the State's own actions (operating the forum in a particular manner and permitting the religious expression to take place therein), and their relationship to the private speech at issue, *actually convey* a message of endorsement. At some point, for example, a private religious group may so dominate a public forum that a formal policy of equal access is transformed into a demonstration of approval.

Pinette, 515 U.S. at 777, 115 S. Ct. 2440 (O'Connor, J., concurring in part and concurring in judgment) (emphasis in the original) (internal citation omitted).[22] In this case, Plaintiff has

---

[22] Although this discussion of forum domination took place within the context of Justice O'Connor's concurrence in Pinette, other courts have used this language in analyzing the issue of forum domination. In Freedom of Religion Foundation, Inc. v. City of Marshfield, the Seventh Circuit noted that a majority of the Justices in Pinette rejected the per se rule espoused by the plurality, because they felt "a *per se* test would prove too inflexible for the many fact patterns potentially implicating an endorsement of religion." 203 F.3d 487, 494 (7th Cir. 2000) (emphasis in the original). Thus, the Court in Marshfield, applied both the per se rule, discussed by the plurality in Pinette, and the endorsement test, discussed in Justice O'Connor's concurrence in Pinette, to the statue at issue in Marshfield. 203 F.3d at 495-96. In this case, the Court does not necessarily find that the *per* se rule of Pinette would apply, as the Court has determined that, while the flag pole is private speech, it contains elements of government speech. See Rose, 361 F.3d at 794 (finding that speech may "be neither purely government nor purely private speech"). In Pinette, the per se rule was to apply to speech that is "purely private." Pinette, 515 U.S. at 770, 115 S. Ct. 2440. Additionally, in Peck v. Upshur County Board of Education, 155 F.3d 274, 278 (4th Cir. 1998), the Fourth Circuit considered the issue of forum domination, but rejected it in that case because (1) it doubted that the "passive distribution of Bibles on a single day during the year, when other material is distributed freely and actively throughout the year, could ever constitute impermissible domination of the forum" and (2) that the appellant's forum domination argument lacked "factual support in the record and [was] both premature and speculative." Id. at 285.

presented evidence that the Flag Policy has had the effect of allowing the Christian flag to fly for 47 weeks out of the year, each year since the Flag Policy was first put into effect. In the Court's view, this evidence would withstand the requirement in <u>Fairfax Covenant Church v. Fairfax County School Board</u>, 17 F.3d 703, 707 (4th Cir. 1994) and <u>Peck</u>, 155 F.3d at 285, that Plaintiff has shown empirical evidence[23] "that religious groups will dominate [the] [ ] forum", <u>id.</u> at 286, or in this case, one religious groups ability to dominate the forum. Defendant City of King responds by arguing that more recent cases have displaced the forum domination doctrine and will uphold equal access programs regardless of whether the programs are predominantly accessed by religious groups. <u>See</u> <u>Zelman v. Simmons-Harris</u>, 536 U.S. 639, 658, 122 S. Ct. 2460, 153 L. Ed. 2d 604 (2002) (finding it irrelevant that "vast majority of program benefits went to religious schools" so long as the program was religiously neutral); <u>Good News Club v. Milford Cent. Sch.</u>, 533 U.S. 98, 119 n.9, 121 S. Ct. 2093, 150 L. Ed. 2d 151 (2001) ("When limited public forum is available for use by groups presenting any viewpoint, however, we would not find an Establishment Clause violation simply because only groups presenting a religious viewpoint have opted to take advantage of the forum at a particular time."). However, the City has not attempted to explain how a

---

[23] The City argues that Plaintiff cannot show forum domination because the Christian flag display "may accurately reflect or even under-reflect the religious demographics in the King area." (Def.'s Br. in Opp'n to Pl.'s Mot. for Summ. J. [Doc. #83], at 22.) However, the ultimate determination in making a forum domination inquiry is whether the government's actions in operating the forum convey a message of governmental endorsement. <u>See</u> <u>Pinette</u>, 515 U.S. at 777, 115 S. Ct. 2440. Thus, the Court finds that even if the Christian flag adequately represented the demographics of the City of King, it is not conclusive on the issue of whether the display has an effect of government endorsement of Christianity.

forum policy, in which the primary subject matter is the use of religious emblems to honor veterans,[24] could truly be an equal access policy that "is neutral in all respects toward religion." Zelman, 536 U.S. at 653, 122 S. Ct. 2460; cf. Widmar v. Vincent, 454 U.S. 263, 273, 102 S. Ct. 269, 70 L. Ed. 2d 440 (1981) (noting that the question before the Court was "not whether the creation of a religious forum would violate the Establishment Clause."). Indeed, the cases cited by the City involve programs that are available to recipients "on neutral terms, with no reference to religion." Zelman, 536 U.S. at 653, 122 S. Ct. 2460; see Milford, 533 U.S. at 114, 121 S. Ct. 2093 (acknowledging that the Court has held that " 'a significant factor in upholding governmental programs in the face of Establishment Clause attack is their *neutrality* towards religion.' " (emphasis added in Milford) (quoting Rosenberger v. Rector & Visitors of Univ. of Va., 515 U.S. 819, 839, 115 S. Ct. 2510, 132 L. Ed. 2d 700 (1995)).  However, as Plaintiff does not argue that the City's use of religious emblems as a basis for the forum itself is unconstitutional, the Court will not address such an argument. Nevertheless, the Court does not find the facts of Zelman and Milford analogous to the facts of this case, as those cases did not involve an equal access policy whose subject matter was religion specifically.

The Court notes that the question of whether the government has endorsed religion

---

[24] However, the Court accepts Plaintiff's argument that the faith emblems designated on the graves in the Arlington National Cemetery would not implicate the same concerns.  In the case of the faith emblems in Arlington National Cemetery, the faith emblems (speech) would be readily attributable to the individual graves and not necessarily the Government. Cf. Demmon v. Loudon Cnty. Pub. Schs., 342 F. Supp. 2d 474, 493 (E.D. Va. 2004) (noting that the Latin crosses on some bricks in a school walkway would not  have the effect of an "unmistakable endorsement" of Christian faith because each brick "bore the name of a student or faculty member").

is seen through the eyes of the reasonable observer. See Marshfield, 203 F.3d at 493. In this case, the reasonable observer would be aware of the history of the City of King and its community, the circumstances surrounding the enactment of the Flag Policy, the location of the flag forum in relation to the other objects in the Veterans Memorial, that the Christian flag permanently occupied the eleventh flagpole for approximately six years prior to its removal. The reasonable observer would also be aware of the community and the City Council's response to the original removal of the Christian flag—including the fact that many members of the community sought to return the Christian flag to the Memorial—and the fact that City officials admitted to numerous statements that intertwine City officials with a desire to promote Christian values amongst the King community. Particularly the facts reveal that Mayor Warren has stated that "in [his] opinion, King is a Christian community" (Def.'s Resp. to Pl.'s First Requests for Admissions [Doc. #74-10], at ¶ 15) and the facts reveal that many members of the community subsequently praised Mayor Warren for making such a statement shortly after it was made. Mayor Warren has also stated that the decision to initially remove the Christian flag from the Memorial was "heartwrenching for our Council" and in the council member's "hearts they wanted to leave the flag up and fight it." (News Recording, available at http://tinyurl.com/ExhibitO2.) Additionally, after the City first removed the flag but prior to creating the Flag Policy, Mayor Warren stated, in reference to the original removal of the Christian flag, "Is the battle over? I won't say that." (Id.) Also, as Plaintiff has pointed out, the City has appeared to endorse the Christian flag primarily, as

there is a picture of the former Christian flag display,[25] the display that was present prior to the creation of the Flag Policy, which still hangs in the King City Hall building. (Hatley Dep. [Doc. #73-3], 426-28.) Furthermore, although the City argues that the media attention in this case has likely caused many applicants to fly the Christian flag as opposed to other flags, the Court notes that City officials and members of the King community have stated that they were aware of the effect that the Flag Policy would have, specifically, that the Christian Flag would likely dominate the forum, when it created the Flag Policy and other officials have also made statements acknowledging that the City of King is primarily a Christian community. (Cater Dep. [Doc. #73-4], at 151 ("[G]iven the large number of people, citizens who were objecting to the flag coming down, my personal belief was that if those people, those same people chose to honor a veteran by submitting their request for the lottery, that it was very possible that the Christian flag would fly predominantly"); Warren Dep. [Doc. #73-5], at 171 (acknowledging that at the time the City originally removed the Christian flag from the Memorial, no one expressed a desire to fly anything but the Christian flag); American Legion Post 290 Resps. to Pl.'s Second Set of Interrogs. [Doc. #74-5], at 2 (acknowledging the statement of a Veterans Memorial Commission member that the initial decision to fly the Christian flag at the Veterans Memorial was appropriate because it "represented the morals and beliefs of their community"); (Def.'s Resp. to Pl.'s First Requests for Admissions [Doc. #74-10], at ¶ 15) (admitting that Mayor made the public statement that "in [his] opinion

---

[25] The Court notes that Plaintiff does not request any relief as it relates to the City's display of this picture in City Hall. As such, the Court will not address the constitutionality of such a display.

King is a Christian community").)  Additionally, the reasonable observer would be aware that the Flag Policy was created in the midst of public outcry, in which a rally was held and late night vigils were hosted at the Veterans Memorial, all in efforts to get the Christian flag back to the Memorial.  " '[R]easonable observers have reasonable memories' and are aware of 'the context in which the policy arose.' "  Green v. Haskell Cnty. Bd. of Comm'rs, 568 F.3d 784, 800 (10th Cir. 2009) (quoting McCreary Cnty., 545 U.S. at 866, 125 S. Ct. 2722 (alteration and internal quotation marks omitted)); see also Fairfax, 17 F.3d at 708 (stating, when analyzing a forum domination allegation, that "no one has even hinted that the current policy of providing religious groups access to public school facilities after hours shows a School Board preference for religion or for a particular sect of religion").  Additionally, "actions which have the effect of communicating governmental endorsement or disapproval, 'whether intentionally or unintentionally, . . . make religion relevant, in reality or public perception, to status in the political community.' "  Green, 568 F.3d at 799 (quoting Lynch, 465 U.S. at 692, 104 S. Ct. 1355 (O'Connor, J., concurring)).

However, taking the City's perspective into account, it does appear that although the City enacted the Flag Policy as a way to alleviate public opposition to the removal of the Christian flag and that, arguably, there may have been religious motivation in implementing the Flag Policy, it also appears that the City enacted the policy in an effort to comply with the law.  The Court also notes that the Flag Policy does appear to have the effect of honoring veterans, to the extent it allows members of the community to fly a flag attributed to an individual veteran.  This position is reflected in the November 2010 meeting minutes when

the City Council members announced that the Flag Policy would allow individuals in the community to honor veterans.  (See November 1, 2010 City Council Minutes [Doc. #96-5], at 2.)  This is something a reasonable observer would also take into account.  (see, e.g., Hunsucker Dep. [Doc. #73-6], at 60 (stating that she understood the Flag Policy to allow private citizens to submit the names of loved ones and honor them with the flag of their choice).)  Nevertheless, in reviewing the record, which addresses the history of the King Community, the divisive history regarding the original Christian flag display, and the decision to implement the Flag Policy, which unsurprisingly created a forum in which the Christian flag is flown 46 to 47 weeks out of the year, the Court finds that a reasonable observer could find that the flag forum has the effect of the endorsing the Christian flag and Christianity.  Nevertheless, the Court notes that perceived government endorsement of religion also relies on the size of the flag display and its relation to the disclaimer that attributes the flag display to private parties.  See Pinette, 515 U.S. at 776 (O'Connor, J., concurring in part and concurring in judgment) (stating that a disclaimer could have the effect of "disclaiming government sponsorship or endorsement" of a religious display on government property); Peck, 155 F.3d at 278 (noting that disclaimer could "negate any appearance of endorsement"); cf. Demmon, 342 F. Supp. 2d at 493 (noting that the Latin crosses on some bricks in a public school walkway would not have the effect of an "unmistakable endorsement" of Christian faith because each brick that "bore the name of a student or faculty member").  But see Smith v. Cnty. of Ablemarle, 895 F.2d 953, 958 (4th Cir. 1990) (finding that disclaimer could not "eliminate the patent aura of government endorsement of

religion"). In this case, Plaintiff argues that the disclaimer attached to the flag forum, which purports to attribute the forum to private parties, is "printed on a small piece of paper that must be read up close." (Pl.'s Br. in Opp'n to Def.'s Mot. for Summ. J. [Doc. #80], at 33 (citing Picture of Flag [Doc. #81-3]). Plaintiff has also argued that the Christian flag is visible from the road "when driving into the City", (Compl. at ¶ 9), however, Defendant City of King disputes such a fact and argues that the Veterans Memorial is located in a "wooded area and that the flags on display at the memorial cannot be seen from virtually all the roads and highways in the area", (Def.'s Answer at ¶ 9.) Thus, the vantage point of the flagpole at issue in this case is disputed. The Court finds such a dispute to be material because it is not clear whether the display of the flag forum must be viewed from afar or up close. In turn, the flagpole's visibility is important because it is not clear, based on the evidence currently before the Court, whether a person viewing the flagpole, in close view or from far away, would readily associate it with the disclaimer, attributing the flagpole to private parties. Thus, the Court will defer to the trial court the determination of whether the flag forum, which displays the Christian flag for 46 to 47 weeks out of the year, currently has the effect of government endorsement based on the size and vantage point of the Christian flag in relation to the disclaimer that associates it with private parties. Indeed, if the Christian flag, which is displayed on the flagpole for most of the year, is visible from the roads without a party viewing the private disclaimer, the trial court may properly find that it has the effect of the City's endorsement of Christianity. Alternatively, if the trial court determines that the Christian flag is readily associated with the disclaimer when it is viewed by the reasonable

observer, then the flag forum may not have the impermissible effect of government endorsement of Christianity. The Court finds such an issue to be significant because when granting injunctive relief as to an asserted religious display, particularly when the Court is addressing whether private speech is attributable to the government, the Court notes that the only "redressable harm that the City must correct is the perception that it has endorsed the speech", and the Court need not always resort to "removal" of the display to remove any "perceived [government] endorsement of religion." Marshfield, 203 F.3d at 497. Thus, for these reasons set forth herein, the Court will decline to grant Defendant City of King's Motion for Summary Judgment as it relates to the flag forum and will allow the trial court to determine whether the flag forum, as currently displayed, has the perceived effect of the government's endorsement of Christianity.

iii.     Memorial Events[26]

Plaintiff's final challenge is to the City of King's memorial events. Plaintiff contends that Defendant City of King "unlawfully promotes religion and Christianity at its annual memorial ceremonies held at Central Park" in violation of the Establishment Clause. (Pl.'s Br. in Opp'n to City of King's Mot. for Summ. J. [Doc. #80], at 38.) Specifically, Plaintiff objects to the prayers delivered by the chaplains and other Christian content at the annual ceremonies, which Plaintiff argues are "overtly Christian . . . [and] have expressly proselytized Christianity." (Id. at 32.)

---

[26] Although the City no longer hosts the September 11 ceremony, to the extent that event could be resumed and conducted in the same manner as the Veterans Day and Memorial Day ceremonies, the Court's determination also applies to that event.

a.      Whether the <u>Marsh</u>/<u>Galloway</u> Standard or <u>Lemon</u> Standard applies

As a preliminary matter, Defendant City of King argues that the Supreme Court's very recent ruling on legislative prayer in <u>Galloway</u>, 134 S. Ct. 1811, governs the issue before the Court. (Def.'s Br. in Supp. of Mot. for Summ. J. [Doc. #69], at 34 ("Defendant moves that this Court refrain from ruling on the invocations and content of the now abolished King commemorative ceremonies until the ruling in the <u>Galloway</u> case is issued.").) However, the Court agrees with Plaintiff that such a ruling would not be dispositive on the prayer practices and the other allegedly Christian practices at issue in the instant case. The question before the Supreme Court in <u>Galloway</u> was "whether the town of Greece, New York, impose[d] an impermissible establishment of religion by opening its monthly board meetings with a prayer." <u>Galloway</u>, 134 S. Ct. at 1815. In that case, the Supreme Court held that such prayer, even when it has Christian content, is compatible with the Establishment Clause, and that a "challenge based solely on the content of a prayer will not likely establish a constitutional violation" so long as the prayers do not "over time denigrate, proselytize, or betray an impermissible government purpose." <u>Id.</u> at 1824. Thus, at first blush, it would appear that the rationale in <u>Galloway</u> would extend to the prayers at the commemorative events at issue in this case. However, the Court notes that the decision in <u>Galloway</u> specifically addressed legislative prayer practices. In assessing the legislative prayer practices in <u>Galloway</u>, the Court discussed the long time practice of solemnizing legislative meetings with prayer, dating back to a practice "by Congress since the framing of the Constitution." <u>Id.</u> at 1818; <u>see also</u> <u>id.</u> ("The prayer was intended to place the town board members in a solemn and deliberative

frame of mind, invoke divine guidance in town affairs, and follow a tradition practiced by Congress and dozen of state legislatures."). In framing the issue before the Court in Galloway, the Supreme Court referenced its landmark decision in Marsh v. Chambers, 463 U.S. 783, 103 S. Ct. 3330, 77 L. Ed. 2d 1019 (1983), in which the Court first determined that the practice of legislative prayer was not inconsistent with the dictate of the Establishment Clause. However, the Supreme Court has not yet extended the rule of Marsh and Galloway to nonlegislative prayer practices. Instructively, as discussed within concurring and dissenting opinions in Galloway, Justices Alito and Kagan noted that hypothetical prayer practices[27] involving other civic proceedings would not or should not come within the reach of the Court's holding in Galloway. Galloway, 134 S. Ct. at 1834, 1842-43. Additionally, in his concurring opinion, Justice Alito noted that "[a]ll that the Court does today is to allow a town to follow a practice that we have previously held is permissible for Congress and state legislatures." Id. at 1834. Thus, based on this record, specifically, where Defendant City of King has not pointed to any evidence that the invocations at issue in this case involve the

---

[27] The hypothetical prayer practices discussed in Galloway are as follows: (1) a presiding judge asking litigants in the courtroom to rise for a Christian prayer, (2) an official at a polling place conveying a sign of the cross and requesting that all present bow their heads in prayer before a constituent casts his or her ballot, and (3) a request that an immigrant seeking naturalization bow her head to recite a Christian prayer. Galloway, 134 S. Ct. at 1834 (Alito, J., concurring); Id. at 1842 (Kagan, J., dissenting).

same unique history and long-lived tradition as legislative prayer,[28] the Court will not extend

the holdings of <u>Marsh</u> and <u>Galloway</u> to the facts of this case.[29]

Furthermore, the Court notes that many courts, including the Fourth Circuit, have

considered and generally refused to extend the rule of <u>Marsh</u>, which like <u>Galloway</u> upheld

legislative prayer practices, beyond its specific context. <u>Wynne v. Town of Great Falls</u>, 376

---

[28] The City does cite to <u>Freedom From Religion Foundation, Inc. v. Obama</u>, 641 F.3d 803, 805, 807 (7th Cir. 2011), for the proposition that government officials have historically participated in public ceremonial events that include religious practices. Specifically, the City appears to assert that "every President since George Washington, except Thomas Jefferson, issued a Proclamation in honor of the National Day of Prayer." (Def.'s Reply in Supp. of Summ. J. [Doc. #86], at 14 (citing <u>Obama</u>, 641 F.3d at 805, 807).) However, the Court notes that as it relates to the National Day of Prayer, United States Presidents have issued *written* proclamations that include an invitation to pray, which this Court does not necessarily find akin to the public and in person prayer practices at issue in this case.

[29] Defendant City of King, in its Reply in Support of Motion for Supplemental Briefing [Doc. #118], has cited to the recent Supreme Court opinion, <u>Elmbrook School District v. Doe</u>, 134 S. Ct. 2283 (2014), which was an opinion dissenting from a denial of certiorari. Defendant City of King cites the case for the proposition that the endorsement test no longer applies in assessing the constitutionality of religious practices under the Establishment Clause. (Reply Brief [Doc. #118], at 3.) Defendant is right in asserting that the dissenting opinion in <u>Elmbrook</u> stated that the decision in <u>Galloway</u> abandoned the endorsement test. <u>See Elmbrook,</u> 134 S. Ct. at 2284. However, the Court notes that the purported displacement of the endorsement test does not appear to have commanded a majority from the Supreme Court, at least as it relates to non-legislative prayer practices or religious practices that do not have a similar history to the legislative prayer practices at issue in <u>Galloway</u>. <u>Cf.</u> <u>Galloway</u>, 134 S. Ct. at 1821 (discussing the abandonment of the endorsement test as it relates to a "host of traditional practices that recognize the role religion plays in our society, among them legislative prayer and the 'forthrightly religious' Thanksgiving proclamations issued by nearly every President since Washington." (quoting <u>Allegheny</u>, 492 U.S. at 670-71, 109 S. Ct. 3086)).) Thus, in the absence of any strict or clear direction from the Supreme Court on how to address the prayer and religious practices at issue in this case, the Court will apply the <u>Lemon</u> test, which includes an analysis of the endorsement test, as discussed below.

F.3d 292, 302 (4th Cir. 2004)[30]; see Mellen, 327 F.3d at 369-70 (declining to extend Marsh to supper prayer at issue in that case because it did not share the "unique history" of legislative prayer."); Coles v. Cleveland Bd. of Educ., 171 F.3d 369, 381 (6th Cir. 1999) (refusing to extend Marsh to prayers opening school board meetings, which it found more akin to the school prayers that were prohibited by Weisman, 505 U.S. 577, 112 S. Ct. 2649 than the legislative prayers allowed in Marsh); N.C. Civil Liberties Union Legal Found. v. Constangy, 947 F.2d 1145, 1149 (4th Cir. 1991) (refusing to extend the rationale in Marsh to a state court judge's practice of opening court with a prayer, and instead, applying the Lemon test); Jager v. Douglas Cnty. Sch. Dist., 862 F.2d 824, 828-29 (11th Cir. 1989) (noting that Marsh "was based on more than 200 years of the 'unique history' of legislative invocations" and that "it has no application to the case at bar" in a case that involved a challenge to the practice of having invocations before high school football games and applying the Lemon test); Newman v. City of East Point, 181 F. Supp. 2d 1374, 1378-80 (N.D. Ga. 2002) (concluding that Marsh did not apply in considering the plaintiff's request to enjoin the "Mayor's Community Prayer Breakfast" and applying the Lemon test).

The Court first finds, as Plaintiff asserts, that there is no question that prayer is a religious practice.  See Santa Fe Indep. Sch. Dist. v. Doe, 530 U.S. 290, 313, 120 S. Ct. 2266,

---

[30] The Court notes that the Fourth Circuit in Wynne expressly declined to extend Marsh to legislative prayers that "explicitly invoke one religion in preference to others." Wynne, 376 F.3d at 302.  However, based on the recent holding in Galloway, the facts in Wynne may now fall within the parameters of permissible legislative prayer.  The Court's consideration that the prayer practices in Wynne, which specifically involved legislative prayer, may now be constitutionally permissible in light of Galloway does not affect the Court's determination that Galloway does not extend to the non-legislative prayer practices at issue in this case.

2281, 147 L. Ed. 2d 295 (2000) ("But the religious liberty protected by the Constitution is abridged when the State affirmatively sponsors the particular religious practice of prayer."); Constangy, 947 F.2d at 1150 ("[C]ontrolling caselaw suggests that an act so intrinsically religious as prayer cannot meet, or at least would have difficulty meeting the secular purpose prong of the Lemon test."). But see Galloway, 134 S. Ct. at 1818 ("[L]egislative prayer, while religious in nature, has long been understood as compatible with the Establishment Clause.") The Court also notes that the prayers involved in this case, specifically prayers that have discussed "the selfless sacrifice of Your Son, Jesus Christ", and statements that have requested that the people in the audience should "teach your children to respect God, older folks, and the military" and regular invocations of Jesus Christ would have the effect of showing that the speaker endorses Christianity as a particular belief and proselytizing the Christian faith. [31]   However, the question in this case is whether those statements can be

_____

[31] Plaintiff mentions in his response brief, the fact that there are religious songs such as "Jesus Loves Me" that are sung at the 2013 Veterans Day ceremony. (Pl.'s Br. in Opp'n Def.'s Mot. for Summ. J. [Doc. #80], at 22 (citing to Video Recording, available at http://tinyurl.com/ExhibitPP4 (1:16 – 3:11).) However, neither party has briefed the issue of whether the song discussed by Plaintiff has the effect of advancing or proselytizing Christianity by the City in this case. Additionally, Plaintiff has not pointed to evidence showing the City's involvement in organizing the musical aspect of the 2013 Veterans Day ceremony. Finally, the video recording Plaintiff points to in stating that the West Stokes High School band opened the 2013 Veterans Day ceremony with the song is not reflected in the portions of the recording cited by Plaintiff. Fed. R. Civ. P. 56 ("The court need consider only the cited materials [at summary judgment] . . . ."). As such, the Court will not make a determination as to such a song in this Opinion. Furthermore, to the extent Plaintiff has referenced alleged religious songs that he asserts were performed at a past September 11 ceremony by citing to a newspaper article [Doc. #74-15], the Court will not consider such evidence. Specifically, the Court accepts Defendant City of King's argument (Defendant's Brief Supporting Motion for Summary Judgment [Doc. #83], at 17) that the Court cannot consider statements reflected in newspaper articles because

attributed to the City of King, particularly, City officials, which, as previously stated, is the crux of an Establishment Clause claim. Thus, the Court will assess whether the City's purported involvement in the annual commemorative events violates the Establishment Clause.

> b. Whether the Religious Content and Government Involvement at the Annual Commemorative Events Violate the <u>Lemon</u> Test

As previously noted, the purpose of the Establishment Clause is " 'to prevent, as far as possible, the intrusion of either [the church or the state] into the precincts of the other.' " <u>Lynch</u>, 465 U.S. at 672, 104 S. Ct. 1355 (quoting <u>Lemon</u>, 403 U.S. at 614, 91 S. Ct. 2105). In cases addressing similar challenges to religious activities that do not fall within the realm of legislative prayer practices, courts have generally applied the <u>Lemon</u> test in assessing challenges to such practices. <u>Constancy</u>, 947 F.2d at 1149; <u>Harris v. City of Chicago</u>, 218 F. Supp. 2d 990, 993 (N.D. Ill. 2002); <u>Newman</u>, 181 F. Supp. 2d at 1378-80. The Court again notes that the <u>Lemon</u> test consists of three prongs: (1) purpose; (2) primary effect/endorsement; and (3) excessive government entanglement. Plaintiff argues that the City's actions violate the Establishment Clause because (1) the City use to sponsor the annual commemorative events at issue in this case, which include religious content and (2) even

they are inadmissible hearsay when offered for the truth of the matter asserted. <u>See</u> <u>Gantt v. Whitaker</u>, 57 F. App'x 141, 150 (4th Cir. 2003) (citing <u>RGI, Inc. v. Unified Indus., Inc.</u>, 963 F.2d 658, 662 (4th Cir. 1992) and quoting <u>Md. Highways Contractors Ass'n v. Maryland</u>, 933 F.2d 1246, 1251 (4th Cir. 1991) ("[H]earsay evidence, which is inadmissible at trial, cannot be considered on a motion for summary judgment.")). As Plaintiff has not pointed to any evidence to substantiate the statements in the newspaper article, to the extent it discusses the alleged religious songs, nor has Plaintiff offered an exception to the hearsay rule, the Court will not consider such evidence.

after the City purported to transfer the events to third parties, the City is still significantly involved in those events, that it still appear that the City sponsors those events. The City primarily argues that because it has ended its sponsorship of those events, that it can longer be held responsible for the religious activity that takes place at those events. Although neither party applies the <u>Lemon</u> test prongs in arguing that the Court should or should not find that the annual ceremonies violated the Establishment Clause, the Court will assess the prongs in light of those arguments that the parties did make.

### 1. Purpose

Under the first prong of the <u>Lemon</u> test, Plaintiff must show that the City engaged in the annual ceremonial events for a religious purpose. Plaintiff has failed to do so. Plaintiff, in responding to the City's Motion, has not pointed to evidence to show that the City's primary purpose in planning the Veterans Day and Memorial Day ceremonies, whether in the past or present, was to advance religion. <u>Harris</u>, 218 F. Supp. 2d at 994 (finding that the September 11th ceremony, which included a planned prayer, had a "plainly secular purpose" and noting that the ceremonies "allow people to show their patriotism and national pride"). Based on the record before the Court, it is clear that these annual events have a secular purpose, and that is to honor veterans.

### 2. Endorsement/Excessive Entanglement

Plaintiff asserts that the City "unlawfully promotes religion and Christianity at its annual memorial ceremonies held at Central Park." (Pl.'s Br. in Opp'n Def.'s Mot. for Summ. J. [Doc. #80], at 38.) Plaintiff also contends that even if the City transferred the

events to third parties, "[c]ourts have prohibited government entities from sponsoring, organizing, or participating in religious ceremonies", (id. at 38-39), and Plaintiff cites to two cases for this proposition.[32]  However, the first case Plaintiff cites is easily distinguishable from the facts in this case.  In <u>Doe v. Village of Crestwood</u>, 917 F.2d 1476, 1479 (7th Cir. 1990), the Seventh Circuit found that where a village sponsored a Catholic mass in a public park, such sponsorship violated the Establishment Clause.  Specifically, the court found that "[a] religious service under governmental auspices necessarily conveys a message of approval or endorsement."  <u>Id.</u> at 1478.  <u>Village of Crestwood</u> is factually distinguishable from the facts of this case because in <u>Village of Crestwood</u>, the court prohibited state sponsorship of an inherently religious event: a Catholic mass.  However, as noted above, the primary purpose of the events at issue in this case is to honor veterans.  The second case Plaintiff cites, <u>Newman</u>, 181 F. Supp. 2d 1374, though distinguishable, is more factually analogous to the facts of this case.  In <u>Newman</u>, the Court granted in part a temporary restraining order, enjoining government sponsorship of the Mayor's annual Prayer Breakfast.  <u>Id.</u>  After determining that prayer was an inherently religious practice and that government involvement in such practices would have the effect of endorsing religion, the district court ultimately enjoined the city "from using City resources or employees on City time for organizing, advertising, promoting or endorsing" the Prayer Breakfast.  <u>Id.</u> at 1382.

---

[32] To the extent Plaintiff has cited <u>Mergens</u>, 496 U.S. at 250, 110 S. Ct. 2356, for the proposition that the City sponsors events when it "promote[s], lead[s], or participate[s] in any [event]", the Court notes that such a definition was discussed as part of the language contained in the Equal Access Act.  <u>Id.</u>  <u>Mergens</u> discussed the constitutionality of a congressional policy regulating public, secondary educational schools and Plaintiff has not attempted to argue how such a definition of sponsorship would control in light of the facts of this case.

Although somewhat factually similar to this case, <u>Newman</u> is still factually distinct in one key way. In that case, the district court determined that the Prayer Breakfast in that case was a "religious activity." <u>Id.</u> at 1378. In contrast to this case, as previously explained, the ceremonies at issue in this case are not inherently religious events, but instead are primarily ceremonies that honor veterans. Thus, Plaintiff overlooks "all secular aspects of the ceremony, and focuses primarily on the [religious aspects]" of the ceremonies, specifically the prayers. <u>See</u> <u>Harris</u>, 218 F. Supp. 2d at 994. Similar to <u>Harris</u>, which involved a city commemoration of September 11, the Court finds, based on the record currently before the Court, that the annual commemorative events at issue in this case are primarily secular events.

However, " 'a religious service under government auspices . . . would run afoul of the Establishment Clause even if it occurred in conjunction with secular activities.' " <u>Harris</u>, 218 F. Supp. 2d at 995 (quoting <u>Village of Crestwood</u>, 917 F.2d at 1478). In determining whether the City's practices have the effect of endorsing Christianity in violation of the Establishment Clause, the Court must specifically determine whether a reasonable observer would find that the City has actually endorsed the religious aspects of the ceremonies at issue in this matter. <u>See</u> <u>id.</u> at 994 (noting that the "context of governmental involvement in religious messages is important" in determining whether the ceremony amounts to an endorsement of religion). In this case, Plaintiff has pointed to aspects of the annual ceremonies that have overt religious overtones–particularly, many references to God or Jesus Christ, requesting that the audience bow their heads for prayer, other messages discussing "the selfless sacrifice of Your

Son, Jesus Christ", stating that the fallen soldiers have "followed in the footstep of your Son", and the fallen soldiers are an "image, reflection, and extension of [God's] love and grace", (Video Recording MM2, available at http://tinyurl.com/ExhibitMM2), and other statements asking that the audience "to teach your children to respect God, older folks, and the military", (Video Recording, available at http://tinyurl.com/ExhibitPP4 (18:10 – 18:54)), and stating that "there are two that died for you: the U.S. soldier [and] the Son of God, Jesus Christ", (Video Recording, available at http://tinyurl.com/ExhibitPP4 (00:59 – 1:07).) Such prayers and statements may have the effect of proselytizing the Christian faith and a reasonable observer may find that they have the effect of religious endorsement. Additionally, the Court notes that city officials, specifically Mayor Warren, are still involved in these events, as they have been in the past. Furthermore, Plaintiff points to Mayor Warren's deposition testimony where the Mayor stated that he attended the May 2013 Memorial Day ceremony as Mayor and he accepted the invitation to attend because it was "part of [his] duties as the mayor to be represented there." (Warren Dep. [Doc. #73-5], at 78-79.) Also, the video recording of the 2013 Memorial Day event shows a speaker thanking the Mayor for asking him to provide the benediction. (Video Recording, available at http://tinyurl.com/ExhibitOO2.) Additionally, Plaintiff has pointed to evidence showing that the Mayor himself has advanced Christianity at a prior September 11 event when he told the audience, in a closing prayer, "May your passenger be the Lord Jesus Christ." (Newspaper Article [Doc. #74-15], at 2; Def.'s Resp. to Pl.'s First Reqs. for Admissions [Doc. #74-10], at ¶ 11 (admitting statement).) Finally, Plaintiff has pointed to evidence in

which the City has previously arranged for the speakers and chaplains, who gave Christian prayers, to attend the commemorative events. (Compl. at ¶ 49; Def.'s Answer at ¶ 49; Def.'s Answers to Pl.'s First Interrogs. [Doc. #74-7], at ¶¶ 3, 4- 5 (stating that the Mayor, among others, was responsible for selecting and inviting speakers to the City ceremonies from 2004 to 2012 and acknowledging that the City's police and fire department chaplain is Paul Norman and his assistant chaplains are Carl Childs and Paul Norman); Event Programs [Doc. #78-7] (listing city chaplains Paul Norman, Daniel Solomon, and Carl Childs as persons giving invocations and benedictions at annual ceremonies from 2005 to 2011; July 2012 Email [Doc. #79-5] (email noting Hatley's arrangement of potential speaker for the 2013 Memorial Day Event).)

Additionally, Plaintiff argues that certain actions by the City in this case convey a message of government sponsorship of the religious activities at issue in this case. As previously stated, "the government cannot sponsor religious ceremonies." Harris, 218 F. Supp. 2d at 995. The Court does take note of the City's advertisement of the 2013 Veterans Day ceremony. In particular, the City placed an advertisement on its website stating "[c]ome join *us* as we honor and pay our respect to the brave men and women of our armed forces and dedicate the new tiles for the Veterans Memorial." (King Website Advertisement [Doc. #79-8] (emphasis added).) In Village of Crestwood, the Court noted that the use of the word "our" that was used to advertise the village festival and the Catholic mass "implie[d] that the mass and Festival alike are under the Village's sponsorship." Village of Crestwood, 917 F.2d at 1479. Thus, the Court finds that the use of the word "us" as it relates to the

City's advertisement of the 2013 Veterans Day ceremony has the effect of conveying sponsorship of the ceremonies, and to a further extent, the religious aspects of the ceremonies.

Plaintiff also appears to challenge Mayor Warren's participation in the commemorative events at issue in this case. Plaintiff points to evidence that even after the City purported to transfer its sponsorship of the events to private parties, Mayor Warren still participates in the ceremonies by "welcom[ing] the crowd, thank[ing] the event sponsors, ask[ing] God to bless America[33] and the citizens, introduc[ing] speakers, [and] help[ing] to lay the ceremonial wreath." (Pl.'s Br. in Opp'n to Def.'s Mot. for Summ. J. [Doc. #80], at 21 (citing Warren Dep. [Doc. #73-5], at 78-79, 80; Video Recording OO3, available at http://tinyurl.com/ExhibitOO3 (5:20 – 6:50).) Additionally, Plaintiff has pointed to evidence showing that the Mayor himself has advanced Christianity, as part of the prayer practices at issue in this case, at a prior September 11 event when he told the audience, in a closing prayer, "May your passenger be the Lord Jesus Christ." (Newspaper Article [Doc. #74-15, at 2; Def.'s Resp. to Pl.'s First Reqs. for Admissions [Doc. #74-10], at ¶ 11 (admitting statement).)[34] The Court agrees that, pursuant to the Establishment Clause, the

---

[33] The Court makes no determination as to the religious nature of the term "God Bless America" because the parties have not briefed this issue.

[34] The Court references the Mayor's statement in the cited newspaper article and accepts it for the truth of the matter asserted, although the Court previously stated that statements made in a newspaper article are generally inadmissible hearsay when offered for the truth of the matter asserted, see supra note 31. This Court, however, accepts this statement as true because the City has admitted that the Mayor made this particular statement in the City's Response to Plaintiff's First Requests for Admissions [Doc. #74-10], at ¶ 11. See also Fed. R. Civ. P. 36 ("In form and substance a Rule 36 admission is comparable to an admission in pleadings or a stipulation

City should not "engage in any conduct that approves or disapproves of the religious beliefs of anyone." Doe v. Small, 964 F.2d 611, 621 (7th Cir. 1992). In this case, Plaintiff has pointed to overt religious messages conveyed by private parties at events in which the Mayor was not only in attendance, but also a participant, and where the Mayor has also expressed religious messages that have the affect of advancing his Christian beliefs. Additionally, Plaintiff points to Mayor Warren's deposition testimony where the Mayor stated that he attended the May 2013 Memorial Day ceremony as Mayor and he accepted the invitation to attend because it was "part of [his] duties as the mayor to be represented there." (Warren Dep. [Doc. #73-5], at 78-79.) Thus, the City, through the acts of its Mayor, could have been understood as placing its "imprimatur" on the religious messages, Donnelly, 465 U.S. at 693, 104 S. Ct. 1355, conveyed at the commemorative ceremonies. Thus, the Court finds that to the extent the City, through the acts of the Mayor or any other city official acting in their official capacity as a representative of the City, has participated in conveying religious messages as part of the prayer practices that take place at the annual commemorative events, and such prayer practices have primarily advanced or proselytized Christianity, that such a practice has the effect of the City's endorsement of Christianity, and alternatively, excessive entanglement in the religious activities that are part of the annual ceremonies and violate the Establishment Clause.

_____

drafted by counsel for use at trial, rather than an evidentiary admission of a party."). As such, the Court will accept this statement as true for the purposes of considering the evidentiary submissions as part of the Court's review of the present Motions for Summary Judgment.

The Court finds that such activities (i.e. the City's organization and arrangement of the religious speakers; the City's advertisement of the annual commemorative events by using words such as "us"; the City conveying disclosing religious messages, through its City officials, as part of the prayer practices at the annual commemorative events) convey a message of endorsement of the religious activities involved in these events and alternatively, excessively entangle the City with the religious messages conveyed at the events.[35]

Thus, based on the above evidence cited by Plaintiff, the Court finds that the following activities by the City violate the Establishment Clause: (1) the City's past involvement, through its city officials acting in their official capacity as city employees, in arranging for speakers or chaplains to speak at the annual commemorative events and those speakers or chaplains have advanced overtly Christian messages at the events; (2) the City's promotion of the commemorative events, that involve religious aspects, but only to the extent the City uses inclusive words such as "us" that reflect the City's involvement in the annual events, and to a further extent, the religious aspects of those events; (3) the City's actions, through the acts of the Mayor or any other city official acting in their official capacity as a representative of the City and only to the extent the officials are required to participate in the ceremonies as part of their official duties, of conveying religious messages as part of

---

[35] However, the Court notes that it appears that the City or the American Legion, Post 290 may have attempted to remedy such entanglement by inviting American Legion chaplains to give invocations and benedictions at the annual ceremonies hosted since 2012. (See Event Programs [Doc. #78-7].) However, as it appears that neither party addresses this, the Court will make no determination as to whether such a practice remedies part of the Establishment Clause violation found by the Court as discussed above.

the prayer practices that take place at the annual commemorative events, and such prayer practices have primarily advanced or proselytized Christianity.[36] As to these activities, the Court will decline the City's Motion for Summary Judgment, as the City is not entitled to judgment as a matter of law, and the Court will enter summary judgment for Plaintiff, as the Court has determined that such activities violate the Establishment Clause.

However, the Court finds unpersuasive, Plaintiffs other arguments that certain activities show impermissible sponsorship or participation by the City in the annual commemorative events that would constitute the City's endorsement or entanglement with the religious aspects of the annual ceremonies. Plaintiff argues that the presence of the city fire truck, without a previous request from the American Legion or the Arts Council, and the City's perpetual allowance of permits to the third parties hosting the annual ceremonies, sends a message of the City's impermissible sponsorship, and as an extension, endorsement, of the religious practices held at the Veterans Memorial ceremonies. However, the Court finds Plaintiff's implication to be unpersuasive. To the extent Plaintiff argues that the City favored the religious aspects of the annual ceremonies by providing a perpetual permit, by waiving the formal permit request submission or fee application, or by allowing the fire truck to be present (which hoisted an American flag), without charge or a prior request, to the Arts Council and American Legion, the Court does not find such actions to be an impermissible sponsorship of the religious aspects of the events. This is because Plaintiff has not shown

---

[36] The Court's findings, however, do not extend to any City officials' abilities to participate in and organize such events in their individual capacities, as such a finding could essentially violate such individuals' Free Speech and Free Exercise rights.

how such actions have any perceived endorsement, or any excessive government entanglement with the religious aspects of the annual ceremonies. Indeed, as the Court has previously noted, it appears, based on the evidence currently before the Court, that the annual ceremonies are primarily secular and hosted for the purpose of commemorating veterans and loved ones.

Furthermore, Plaintiff appears to argue that because the brick pavers installed in the Veterans Memorial are dedicated to veterans at these ceremonies, that it implies some sort of government endorsement of these events, and as an extension, government endorsement of religion. However, the Court notes that the evidence Plaintiff points to in making such an argument shows that the pavers are actually paid for by individuals and installed into the grounds of the Veterans Memorial, by the City but prior to the dedication ceremony. (Hatley Dep. [Doc. #73-3], at 287-88.) Thus, based on the evidence presented by Plaintiff, such a practice does not even show sponsorship by the City of the pavers, as private individuals pay for them, nor does it show any sponsorship or participation by the City in the actual ceremonial events or the religious aspects of such events.

The Court also finds that to the extent City Clerk Hatley has transferred various files and folders relating to past ceremonies to the Arts Council or the American Legion or the fact that Hatley has reviewed the flyers for the 2013 Memorial Day ceremony, such an activity does not convey a message of sponsorship of the annual ceremonies, let alone the religious aspects of those ceremonies. Specifically, Plaintiff has not argued or pointed to any evidence showing that Hatley, in her capacity as City Clerk, has contributed to or organized

any of the religious aspects of the annual ceremonies in transferring such files, lists, and folders to the Arts Council and the American Legion. At most, the evidence shows that Hatley was transferring the files to members of the Arts Council to effectuate the City's promise to discontinue its sponsorship of the annual ceremonies. As such, the Court does not find such a practice to be an impermissible sponsorship of the religious activities at issue in this case and, as such, Hatley's actions do not violate the Establishment Clause.

Finally, to the extent Plaintiff asserts that Mayor Warren, in his official capacity as a representative of the City, should not be able to participate in activities such as introducing speakers, laying the ceremonial wreath, or thanking event speakers, the Court notes that the City has referenced memorial events held at the Arlington National Cemetery where the President of the United States (or his designee) "lays a wreath to mark the national observance of Veterans Day, Memorial Day or some other special occasion." The Official Website of Arlington National Cemetery, http://www.arlingtoncemetery.mil/events/Ceremonies/WreathLayings.aspx. As Plaintiff makes no argument that persuades the Court to the contrary, the Court does not find such activities to be an impermissible religious participation and thus do not violate the Establishment Clause.

Thus, based on the above evidence cited by Plaintiff, the Court finds that the following activities by the City do not constitute the City's endorsement or, alternatively, excessive entanglement in the religious aspects of the annual ceremonies in violation of the Establishment Clause: (1) the presence of the fire truck at the annual commemorative events,

even without a prior request for the presence of the fire truck by the third parties now hosting the annual events; (2) the City's transfer of a perpetual permit to the Arts Council and American Legion to hold the events at the King Central Park; (3) the City's practice of waiving the requirement for the Arts Council to submit a formal application or request a permit to use the King Central Park for the annual commemorative events; (4) the City's installation of the pavers that are dedicated at the annual ceremonies; (5) City Clerk Hatley's transfer of various files and folders relating to past ceremonies to the Arts Council or the American Legion nor City Clerk Hatley's review of flyers for the 2013 Memorial Day ceremony; and (6) the Mayor's actions, specifically when acting in his official capacity as a representative of the City, of participating in the annual ceremonial events by engaging in activities such as introducing speakers, laying the ceremonial wreath, or thanking event speakers.  As to these activities, the Court will grant the City's Motion for Summary Judgment, as the City is entitled to judgment as a matter of law, and the Court will deny summary judgment for Plaintiff, as the Court has determined that such activities do not violate the Establishment Clause.

D.      Coercion Doctrine

Plaintiff also contends that the City's practices of promoting Christianity are unlawfully coercive and in violation of the Establishment Clause.  Under the coercion test of the Establishment Clause, the " 'government may not coerce anyone to support or participate in religion or its exercise.' " Mellen, 327 F.3d at 370 (quoting Weisman, 505 U.S. at 587, 112 S. Ct. 2649.  In this case, Plaintiff asserts that to avoid the City's display of

religious messages, he "must stay away" and "he visits the Memorial less often that he otherwise would as a result of the City's sponsorship of religious displays." (Pl.'s Br. in Opp'n to City of King's Mot. for Summ. J. [Doc. #80], at 42.) In arguing that the City's practices are unduly coercive, Plaintiff cites to two cases, Weisman and Engel v. Vitale, 370 U.S. 421, 82 S. Ct. 1261, 8 L. Ed. 2d 601 (1962). However, the Court notes that both cases involve prayer in the school education context. As noted by the Supreme Court in Van Orden, the Court has " 'been particularly vigilant in monitoring compliance with the Establishment Clause in elementary and secondary schools.' " Van Orden, 545 U.S. at 691 , 125 S. Ct. 2854 (quoting Edwards, 482 U.S. at 583-84, 107 S. Ct. 2573. This is supported by the Supreme Court's analysis of Weisman, where the Court found that although the school district did not require attendance at the middle school graduation, attendance was "in a fair and real sense obligatory" and the Court found that "subtle coercive pressures exist[ed]" in the secondary school environment "where the student had no real alternative which would have allowed her to avoid the fact or appearance of participation." Weisman, 505 U.S. at 586, 588, 112 S. Ct. 2649; see Galloway, 134 S. Ct. at 1827 (noting that the choice to acquiesce to prayer practices or to leave during such practices does not "represent[ ] an unconstitutional imposition to mature adults, who 'presumably' are 'not readily susceptible to religious indoctrination or peer pressure.' " (quoting Marsh, 463 U.S. at 792, 103 S. Ct. 330 (internal quotation marks and citations omitted))); Mellen, 327 F.3d at 371 (finding that the "adversative method of education emphasiz[ing] detailed regulation of conduct and indoctrination of a strict moral code" and intimidating atmosphere supported position that

students in Virginia Military Institute were coerced in participating in religious exercises). Based on the above cited case law, the Court finds that it does not appear the Plaintiff has pointed to any evidence showing that he was particularly susceptible to the "religious indoctrination or peer pressure" of the City's promotion of Christianity in this case. The record shows that Plaintiff has stood up against some of the alleged Christian practices in this case, specifically, when he offered a Buddhist Prayer at the City's National Day of Prayer ceremony, and such prayer promoted multi-religious tolerance by asking the King community to accept other religious and cultural creeds. Thus, the Court will decline to extend the coercion doctrine to the practices and actions Plaintiff points to in this case, as Plaintiff has not pointed to evidence to enable the Court to find that he was susceptible to being pressured to submit to the City's alleged promotion of Christianity.

However, in declining to extend the coercion doctrine to the City's actions in this case, the Court, by no means finds the actions of the City to be appropriate, to the extent City officials have announced that the City of King is a Christian community or engaged in similar conduct, or the members of the King community, in condemning Plaintiff for purporting to ascribe to beliefs other than Christianity. Despite any assertions to the contrary, "[t]he clearest command of the Establishment Clause is that one religious denomination cannot be officially preferred over another." Larson v. Valente, 456 U.S. 228, 244, 102 S. Ct. 1673, 72 L. Ed. 2d 33 (1982). Such an admonition should not be considered lightly.

V.    PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

For the reasons set forth above and herein, the Court will grant in part and deny in part Plaintiff's Motion for Summary Judgment [Doc. #72].

A.    Cross Statute

First, the Court will deny Plaintiff's Motion for Summary Judgment as it relates to his claim requesting injunctive relief as it relates to the Cross Statue.   As the Court has determined that there are genuine disputes of material fact relating to what the Cross Statue purports to depict, and as a result, a dispute remains regarding the history of the Latin cross that is part of the Cross Statue, the Court finds that those issues should proceed to trial.

B.    Flag Forum and Flag Policy

Second, as it relates to the flag forum, the Court will deny Plaintiff's Motion for Summary Judgment as it relates to the flag forum, for the reasons set forth in the Court's analysis of Defendant City of King's Motion for Summary Judgment on the same issue. However, the Court will allow such an issue to proceed to trial to determine whether the flag forum, as currently erected, has the effect of showing the City's endorsement of the Christian flag, which flies 46 to 47 weeks out of the year.   Specifically, the trial court should determine whether the physical aspects of the flag forum (i.e. its size in relation to the disclaimer, which purports to attribute the flag to private parties) has the effect of showing the City's endorsement of Christianity.

However, both parties also argue, in addressing Plaintiff's Motion for Summary Judgment, that the Flag Policy itself is subject to scrutiny under the Lemon test and both parties argue that it can be upheld or invalidated based on a determination of the City's purpose for implementing the Flag Policy. (See Br. in Support of Pl.'s Mot. for Summ. J. [Doc. #73], at 25-31; Def.'s Br. in Resp. to Pl.'s Mot. for Summ. J. [Doc. #83], at 12.) Thus, the Court notes that the City's Flag Policy may be invalidated if it were enacted for the purposes of advancing religion. Widmar, 454 U.S. at 271, 102 S. Ct. 269 ("[A] policy will not offend the Establishment Clause if it can pass [the] three-pronged [Lemon] test"); see Chambers II, 373 F. Supp. 2d at 572 (applying Lemon test to determine whether the city had a sham purpose in selling land on which a Ten Commandments monument sat to a private third); see also McCreary Cnty, 545 U.S. at 864, 125 S. Ct. 2722 (stating that under Lemon secular purpose prong, it is the duty of the courts to distinguish a "sham secular purpose from a sincere one" (citations omitted)).

Based on the statements of Mayor Warren and City Council members before and after the City originally removed the Christian flag from the Veterans Memorial, which were cited and discussed above in the Court's discussion of the flag display in addressing the City's Motion for Summary Judgment, Plaintiff has pointed to evidence that suggests that the City's primary purpose in creating the Flag Policy was to advance Christianity. Furthermore, Plaintiff has pointed to evidence, by way of Declaration of Scott Burdick ("Burdick"), that City Clerk Hatley told Burdick that part of the Flag Policy was designed to keep "aethist groups" from flying "aetheist flags." (Burdick Decl. [Doc. #80-3], at ¶ 5.) The City,

however, disputes that Hatley ever made this statement.  (See Hatley Dep. [Doc. #73-3], at 438-40.)  Nevertheless, the City has also pointed to evidence, by way of statements by Mayor Warren and City Council Members that suggest that the policy was enacted for the purposes of allowing private individuals to honor veterans.  (November 1, 2010 City Council Minutes [Doc. #96-5], at 2; see id. (statement by Mayor Warren stating that he wanted to move forward with the limited public forum approach because it "would give citizens of King access to the Veterans' Memorial for the express and limited purpose of honoring their veterans and the faith traditions that inspired and sustained the service and sacrifice made by their veteran, that they have represented at the Memorial"); id. (statement by Councilmen Fowler and Carter stated that the public forum option would be the best way to "honor our veterans"); id. (statement by Burnette agreeing with the statements of Councilmen Fowler and Carter and stated that "[w]e have to remember to that this memorial is to honor veterans.  Some other issues have gotten in the way and we're going to work through those the best we can").)  Thus, there appears to be conflicting evidence regarding the City's purpose in creating the Flag Policy.

The Court notes that generally, demonstrating a secular purpose for government action presents a "fairly low hurdle" and a secular purpose will be upheld unless the government's action is "entirely motivated by a purpose to advance religion."  Lambeth II, 407 F.3d at 270 (internal quotation marks and citations omitted).  However, the Court also notes that it is the duty of the courts to distinguish between a "sham" secular purpose and a "sincere" purpose.  McCreary Cnty, 545 U.S. at 864, 125 S. Ct. 2722.  Although the City

argues that the Court should not consider the statements by the City officials as evidence of the City's purpose in enacting the Flag Policy, the Court notes, as previously stated, that " '[r]easonable observers have reasonable memories" and are aware of "the context in which the policy arose.' " Green, 568 F.3d at 800 (quoting McCreary, 545 U.S. at 866, 125 S. Ct. 2722 (alteration and internal quotation marks omitted)). Additionally, although the City argues that the enactment of the Flag Policy was a "genuine change[ ]" that may shake the "taint" of any previous conceived advancement of Christianity through the City's original display of the Christian flag, see ACLU of Ky. v. Rowan County, 513 F. Supp. 2d 889, 897, 904, the Court finds that the evidence set forth by Plaintiff calls into question the sincerity of the City's actions in creating the Flag Policy. As the facts surrounding the City's purpose for enacting the Flag Policy is a close call and as some facts regarding the City's purpose in enacting the Flag Policy are materially disputed, the Court will also allow the limited question of whether the Flag Policy was primarily motivated by a religious purpose or a primarily secular purpose to proceed to trial. If the trial court determines that the City's purposes in enacting the policy were for the purpose of advancing Christianity, the Court may find that the policy is invalid under the current Establishment Clause jurisprudence. See generally McCreary Cnty, 545 U.S. 844, 125 S. Ct. 2722 (finding that an impermissible government purpose can invalidate a government action). However, if the trial court finds that the City's purpose was secular, the policy will likely be found to be valid.[37]

---

[37] The Court makes no determination, as part of its current ruling, as to whether the Flag Policy's primary effect is to endorse religion or whether the Flag Policy includes an excessive government entanglement with religion. This is because the parties' effect/endorsement arguments are generally repetitive of the arguments that are addressed in the Court's discussion

C.     Memorial Events

As it relates to the annual commemorative events, the Court will grant in part and deny in part Plaintiff's Motion for Summary Judgment for the reasons stated in the Court's discussion of City's Motion for Summary Judgment on this issue.  Therefore, based on the above evidence in the Court's discussion of the City's Motion for Summary Judgment, the Court finds that the following activities by the City violate the Establishment Clause: (1) the City's past involvement, through its city officials acting in their official capacity as city employees, in arranging for speakers or chaplains to speak at the annual commemorative events and those speakers or chaplains have advanced overtly Christian messages at the events; (2) the City's promotion of the commemorative events, that involve religious aspects, but only to the extent the City uses inclusive words such as "us" that reflect the City's involvement in the annual events, and to a further extent, the religious aspects of those events; (3) the City's actions, through the acts of the Mayor or any other city official acting in their official capacity as a representative of the City and only to the extent the officials are required to participate in the ceremonies as part of their official duties, of conveying religious messages as part of the prayer practices that take place at the annual commemorative events, and such prayer practices have primarily advanced or proselytized Christianity.  As to these activities, the Court will grant Plaintiff's Motion for Summary Judgment because the Court

---

of Defendant City of King's Motion for Summary Judgment.  Furthermore, the parties generally do not address the excessive entanglement prong, as it relates to the Flag Policy, beyond the City's brief statement in its Motion that the Flag Policy does not violate the excessive entanglement prong.  (See Def.'s Br. in Supp. of Mot. for Summ. J. [Doc. #69], at 32.)

finds that Plaintiff is entitled to judgment as a matter of law as the Court has determined that such activities violate the Establishment Clause.

However, based on the Court's discussion of the City's Motion for Summary Judgment, the Court finds that the following activities by the City do not violate the Establishment Clause: (1) the presence of the fire truck at the annual commemorative events, even without a prior request for the presence of the fire truck by the third parties now hosting the annual events; (2) the City's transfer of a perpetual permit to the Arts Council and American Legion to hold the events at the King Central Park; (3) the City's practice of waiving the requirement for the Arts Council to submit of an application or permit to use the King Central Park for the annual commemorative events and instead allowing the Arts Council to call to reserve the events; (4) the City's installation of the pavers that are dedicated at the annual ceremonies; (5) City Clerk Hatley's transfer of various files and folders relating to past ceremonies to the Arts Council or the American Legion nor City Clerk Hatley's review of flyers for the 2013 Memorial Day ceremony; and (6) the Mayor's actions, specifically when acting in his official capacity as a representative of the City, of participating in the annual ceremonial events by engaging in activities such as introducing speakers, laying the ceremonial wreath, or thanking event speakers. As to these activities, the Court will deny Plaintiff's Motion for Summary Judgment because Plaintiff is not entitled to judgment as a matter of law as the Court has determined that such activities do not violate the Establishment Clause.

VI.    NORTH CAROLINA CONSTITUTIONAL CLAIMS

Plaintiff also brings a claim for the above asserted violations under North Carolina constitution Articles I, §§ 13, 19.  Section 13 states, "All persons have a natural and inalienable right to worship Almighty God according to the dictates of their own consciences, and no human authority shall, in any case whatever, control or interfere with the rights of conscience."  N.C. Const. art. I, § 13.  Section 19 states,

> No person shall be taken, imprisoned, or disseized of his freehold, liberties, or privileges, or outlawed, or exiled, or in any manner deprived of his life, liberty, or property, but by the law of the land. No person shall be denied the equal protection of the laws; nor shall any person be subjected to discrimination by the State because of race, color, religion, or national origin.

N.C. Const. art. I, § 19.  However, the Court notes that to the extent Plaintiff alleges that Defendant City of King's conduct violates the North Carolina Constitution, neither party meaningfully cites to North Carolina law as to the constitutionality of the issues raised, with the exception of stating that violation of the religious clauses under the North Carolina Constitution is interpreted in the same manner as a similar violation under the Establishment Clause of the federal Constitution.  The Supreme Court of North Carolina has "previously stated that '[t]aken together, these provisions . . . coalesce into a singular guarantee or freedom of religious profession and worship, "as well as an equally firm established separation of church and state." ' " Appeal of Springmoor, 348 N.C. 1, 5, 498 S.E.2d 177, 180 (1998) (quoting Heritage Vill. Church & Missionary Fellowship, Inc. v. North Carolina, 299 N.C. 399, 406, 263 S.E.2d 726, 730 (1980) (quoting Braswell v. Purser, 282 N.C. 388, 393, 193 S.E.2d 90, 93 (1972)).  Thus, the court has "recognized that while the religious

clause of the state and federal Constitutions are not identical, they secure similar rights and demand the same neutrality on the part of the state" and thus, "[courts] may utilize the Establishment Clause jurisprudence to examine legislation for 'aspects of religious partiality' prohibited by both constitutions." Id. (quoting Heritage Vill., 299 N.C. at 406, 406 n.1, 263 S.E.2d at 730, 730 n.1). Therefore, to the extent the Court has found that the conduct violated the Establishment Clause, the Court will not address the North Carolina Constitutional claims. However, to the extent the Court has allowed any aspect of Plaintiff's Establishment Clause claim to proceed to trial, the Court will also allow Plaintiff's claims under the North Carolina constitution to proceed to trial.

VII.    DEFENDANT CITY OF KING'S MOTION FOR SUPPLEMENTAL BRIEFING

Defendant City of King has filed a Motion to File Supplemental Brief [Doc. #113]. Plaintiff has filed a Response in Opposition to Defendant City of King's Motion for Supplemental Briefing [Doc. #117] and Defendant City of King has filed its Reply Brief [Doc. #118]. In its Motion for Supplemental Briefing [Doc. #113], Defendant City of King has requested that the Court allow the parties to submit supplemental briefing to address any impact that the recent Supreme Court decision in Galloway has had on the facts of this case. However after fully considering the Motions filed by the parties and for the reasons fully discussed by the Court above, in stating that Galloway would not alter the Court's application of the Lemon test to the prayer and religious practices regarding the annual commemorative events at issue in this case, the Court will deny Defendant City of King's

Motion for Supplemental Briefing. Furthermore, to the extent Defendant City of King has requested to submit supplemental briefing on any additional issues argued by the parties in this case, the Court will deny the City's request, as the Court has determined that such briefing is not necessary to the Court's decision making process in resolving the matters currently before the Court.

VIII.   CONCLUSION

IT IS THEREFORE ORDERED that Plaintiff's Motion for Summary Judgment [Doc. #72] is GRANTED IN PART AND DENIED IN PART. Plaintiff's Motion is GRANTED to the extent the Court has found that the City's actions have the effect of endorsing the religious aspects of the annual ceremonies or such actions constitute excessive government entanglement in violation of the Establishment Clause, as declared below. THEREFORE IT IS DECLARED that the following activities violate the Establishment Clause: (1) the City's past involvement, through its city officials acting in their official capacity as city employees, in arranging for speakers or chaplains to speak at the annual commemorative events and those speakers or chaplains have advanced overtly Christian messages at the events; (2) the City's promotion of the commemorative events, that involve religious aspects, but only to the extent the City uses inclusive words such as "us" that reflect the City's involvement in the annual events, and to a further extent, the religious aspects of those events; (3) the City's actions, through the acts of the Mayor or any other city official acting in their official capacity as a representative of the City and only to the extent the officials are required to participate in the ceremonies as part of their official duties, of

conveying religious messages as part of the prayer practices that take place at the annual commemorative events, and such prayer practices have primarily advanced or proselytized Christianity. Thus, the City is hereby ENJOINED from engaging in such practices.

Plaintiff's Motion is DENIED to the extent the Court has found that the City's actions do not have the effect of endorsing the religious aspects of the annual ceremonies or such actions constitute excessive government entanglement and, thus, do not violate the Establishment Clause. The denial of Plaintiff's Motion for Summary Judgment extends to the following activities or actions: (1) the presence of the fire truck at the annual commemorative events, even without a prior request for the presence of the fire truck by the third parties now hosting the annual events; (2) the City's transfer of a perpetual permit to the Arts Council and American Legion to hold the events at the King Central Park; (3) the City's practice of waiving the requirement for the Arts Council to submit of an application or permit to use the King Central Park for the annual commemorative events and instead allowing the Arts Council to call to reserve the events; (4) the City's installation of the pavers that are dedicated at the annual ceremonies; (5) City Clerk Hatley's transfer of various files and folders relating to past ceremonies to the Arts Council or the American Legion nor City Clerk Hatley's review of flyers for the 2013 Memorial Day ceremony; and (6) the Mayor's actions, specifically when acting in his official capacity as a representative of the City, of participating in the annual ceremonial events by engaging in activities such as laying the ceremonial wreath or thanking event speakers.

IT IS FURTHER ORDERED that Plaintiff's Motion for Summary Judgment is DENIED as it relates to the issue of whether the Christian flag impermissibly dominates the flag forum. The Court will allow that limited issue to proceed to trial as set forth herein. IT IS FURTHER ORDERED that Plaintiff's Motion is DENIED as it relates to the limited issue of whether the Flag Policy was enacted for a impermissible or permissible purpose. The Court will allow that limited issue to proceed to trial. IT IS FURTHER ORDERED that Plaintiff's Motion is DENIED as it relates to the issues of whether the City's erection of the Cross Statue violates the primary effect/endorsement and excessive entanglement prongs of the <u>Lemon</u> test or, alternatively, the standard set forth in <u>Van Orden</u>, as discussed herein. The Court will also allow that issue to proceed to trial.

IT IS FURTHER ORDERED that Defendant City of King's Motion for Summary Judgment [Doc. #68] is GRANTED IN PART AND DENIED IN PART as set forth herein. The City's Motion is GRANTED as it relates to the ceremonial events, to the extent the Court has determined that the City's actions regarding the annual ceremonial events do not violate the Establishment Clause, as fully stated in the Court's order language addressing Plaintiff's Motion for Summary Judgment. However, the City's Motion is DENIED as it relates to the ceremonial events, to the extent the Court has determined that the City's actions regarding the annual ceremonial events do violate the Establishment Clause, as fully stated in the Court's order language addressing Plaintiff's Motion for Summary Judgment. IT IS FURTHER ORDERED that the City's Motion is DENIED as it relates to the issue of whether the Christian flag impermissibly dominates the flag forum. The Court will allow that

limited issue to proceed to trial as set forth herein. IT IS FURTHER ORDERED that the City's Motion is also DENIED as it relates to the limited issue of whether the Flag Policy was enacted for a impermissible or permissible purpose. The Court will allow that limited issue to proceed to trial. IT IS FURTHER ORDERED that City's Motion is DENIED as it relates to the issues of whether the City's erection of the Cross Statue violates the primary effect/endorsement and excessive entanglement prongs of the <u>Lemon</u> test or, alternatively, the standard set forth in <u>Van Orden</u>, as discussed herein. The Court will also allow that issue to proceed to trial.

IT IS FURTHER ORDERED that Defendant-Intervenor's Motion for Summary Judgment [Doc. #70] is DENIED, as the Court will allow the issue of the Cross Statue to proceed to trial. Specifically, the issues of whether the City's erection of the Cross Statue violates the primary effect/endorsement and excessive entanglement prongs of the <u>Lemon</u> test or, alternatively, the standard set forth in <u>Van Orden</u>, as discussed herein, will proceed to trial.

IT IS FURTHER ORDERED that Plaintiff's Motion in Limine to Exclude Expert Testimony [Doc. #88] is reserved for review by the trial court.

IT IS FINALLY ORDERED that Defendant City of King's Motion for Leave to File Supplemental Brief [Doc. #113] is DENIED.

This, the 8th day of July, 2014.

_____
United States District Judge